# IN THE UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| **PANDITA CHARM-JOY SEAMAN**, | ) |
| Petitioner, | ) |
| | ) **Civil Action No:** 5:10-CV-462 |
| vs. | ) |
| **JOHN KENNEDY PETERSON**, | ) |
| Respondent. | ) |

## VERIFIED PETITION FOR RETURN OF CHILD TO PETITIONER AND PETITION FOR IMMEDIATE ISSUANCE OF SHOW CAUSE ORDER TO RESPONDENT

**The Convention on the Civil Aspects of International Child Abduction, done at the Hague On October 15, 1980; International Child Abduction Remedies Act, 42 U.S.C. 11601 et seq.**

**COMES NOW** Petitioner, **PANDITA CHARM-JOY SEAMAN,** in the above-styled case, by and through counsel of record, **A. James Rockefeller, Esq.**, Rockefeller Law Center, P.C., and states claims against **Respondent**, **JOHN KENNEDY PETERSON,** as follows:

### I. Preamble

1. This Petition is brought pursuant to The Convention on the Civil Aspects of International Child Abduction, done at the Hague on October 25, 1980[1] (hereinafter the "Hague Convention" or "Convention"), and the International Child Abduction Remedies Act[2] (hereinafter "ICARA"). The Convention came into effect in the United States of America on July 1, 1988 and was also ratified between the United States of America and Mexico on July 1, 1988.

2. The objects of the Convention are as follows: (1) to secure the immediate return

---

[1] T.I.A.S. No. 11,670, at 1, 22514 U.N.T.S. at 98, *reprinted in* 51 Fed. Reg. 10493 (1986), a copy of which is attached and incorporated as **Exhibit 1.**

[2] 42 U.S.C. 11601 et seq. (1995), a copy of which is attached and incorporated as **Exhibit 2.** ICARA was created to deal with the sudden abduction of children and allow a petitioner to assert rights in exigent circumstances. *See **Distler v. Distler,*** 26 F. Supp. 2d 723, 727 (D.N.J. 1998).

of a child wrongfully removed or wrongfully retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States.  Convention, Art. 1.[3]

## II.  Jurisdiction

3.      This Court has jurisdiction pursuant to 42 U.S.C. § 11603 (1995)[4] and because this case involves the removal and retention of a child under the age of sixteen from his or her habitual residence of Mexico to the United States of America.[5]

## III.  Status of Petitioner and Child

4.      The **Petitioner**, **PANDITA CHARM-JOY SEAMAN** ("Mother" or "**Petitioner**") and the **Respondent**, **JOHN KENNEDY PETERSON** ("Father" or "**Respondent**") are the parents of **T.L.P.**, **C.D.P.**, **R.T.P.**, and **S.A.P.** (the "Children").  **Petitioner** and **Respondent** were lawfully married on February 2, 2002, in Macon, Bibb County, Georgia.  *See* "Marriage Certificate" attached and incorporated as **Exhibit 3.**  The parties separated in February of 2010, and since that date have continuously lived in a bona fide state of separation.  Since their marriage, they have maintained a home in common where Mother was carrying out her responsibilities toward their Children.  The family moved to Mexico together in May of 2006 and **Petitioner** and the Children have lived together there until the Children's abduction.  *See* "Mexican Visa" attached and incorporated as **Exhibit 4.**

---

[3] As has been stated by other courts addressing Hague cases, the Convention therefore authorizes a federal district court to determine the merits of the abduction claim, but does not the merits of any underlying custody dispute.  ***Morris v. Morris,*** 55 F. Supp. 2d 1156, 1160 (D. Colo. 1999) (recognizing that "[p]ursuant to Article 19 of the Convention, [this Court has] no power to pass on the merits of custody"); see also ***Currier v. Currier,*** 845 F. Supp. 916 (D. N.H. 1994) *citing* ***Friedrich v. Friedrich,*** 983 F.2d 1396, 1399 (6th Cir. 1993); ***Meredith v. Meredith,*** 759 F. Supp. 1432, 1434 (D. Ariz. 1991).  The court's role is not to make traditional custody decisions but to determine in what jurisdiction the child should be physically located so that the proper jurisdiction can make those custody decisions.  ***Loos v. Manuel,*** 651 A.2d 1077 (N.J. Super. Ct. Ch. Div. 1994).

[4] A court considering an ICARA petition has jurisdiction to decide the merits only of the wrongful removal claim, not of any underlying custody dispute.  The Hague Convention is intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.  ***Lops v. Lops,*** 140 F.3d 927, 936 (11th Cir. 1998) (citations omitted).

[5] ***Toren v. Toren,*** 191 F. 3d 23 (1st Cir. 1999).

5.      There are four (4) children at issue of the marriage between the parties. The names and age of which are **T.L.P.**, age eight (8) years; **C.D.P.**, age seven (7) years; **R.T.P.**, age five (5) years; and, **S.A.P.**, age four (4) years. A copy of each child's birth certificate is attached as collectively **Exhibit 5.**

6.      The Convention applies to cases where a child under the age of sixteen (16) years has been removed from his or her habitual residence[6] in breach of a petitioner's custody rights, which he or she had been exercising at the time of the wrongful removal[7] or retention[8] of the child.

7.      At the time of the Children's wrongful removal and wrongful retention of the Children (as specifically set forth in Part IV below), **Petitioner** was exercising her custody rights within the meaning of Articles Three and Five of the Convention,[9] in that she is the Mother of the

---

[6]**"Courts in both the United States and foreign jurisdictions have defined habitual residence as the place where [the child] has been physically present for an amount of time sufficient** for acclimatization and which has a degree of settled purpose for the child's perspective." ***Pesin v. Rodriguez,*** 77 F. Supp. 2d 1277, 1284 (S.D. Fl. 1999) (citations omitted), *aff'd,* ***Pesin v. Rodriguez,*** 244 F.3d 1250 (11th Cir. 2001); Morris at 1161 ("the law requires [the Court] to focus on the child in determining habitual residence"); see also In re Robinson, 938 F. Supp. 1339, 1341-42 (D. Colo. 1997). It is a state of being or state of mind. Habitual residence is the permanent physical residence of the child as distinguished from their legal residence or domicile. ***In Re Bates,*** No. CA 122-89, High Court of Justice, Family Div., England, February 23, 1989; ***Brook v. Willis,*** 907 F. Supp. 57, 61 (S.D.N.Y. 1995); ***Loos,*** *supra,* 651 A.2d at 1080 (stating that it is immaterial that the concept of habitual residence lacks precision); see also ***T.B. v. J.B.,*** 2000 WL 1881251, at *1 (Supreme Court of Judicature, England, December 19, 2000) (stating that it is important to remember that the Convention is concerned with the return of child to the country of their habitual residence and not with their return to any particular person).

[7]**"Article 3 of the Hague Convention provides that the removal or retention of a child is wrongful where it violates the custody rights of another person that were actually being exercised at the time of the removal or retention or would have been exercised but for the removal or retention."** *Lops*, *supra* at 935; **"[t]he removal of a child from the country of his or her habitual residence is 'wrongful' under the Hague Convention if a person in that country is, or would otherwise be, exercising custody rights to the child under that country's law at the moment of removal."** ***Friedrich v. Friedrich,*** 78 F.3d 1060, 1064 (6th Cir. 1996); *see* **Prevot v. Prevot,** 59 F.3d 556 (6th Cir. 1995); Convention, Art. 3.

[8]"Wrongful retention" occurs when it is in breach of rights of custody attributed to a person under the law of the country in which the child was habitually resident immediately before the retention; and at the time of retention these rights were actually exercised, or would have been so exercised, but for the wrongful retention. Convention, Art. 3; ***Feder v. Evans-Feder,*** 63 F.3d 217, 225 (3rd Cir. 1995); ***Wanninger v. Wanninger,*** 850 F. Supp. 78, 80-81 (D. Mass. 1994).

[9]The issue of "custody" must be addressed under Mexican law. ***Pesin,*** *supra,* 77 F.Supp.2d at 1284; *see also* ***Whallon v. Lynn,*** 230 F.3d 450 (1st Cir. 2000); ***Friedrich,*** *supra,* 983 F.2d at 1402; ***Ohlander v. Larson,*** 114 F.3d 1531, 1541 (10th Cir. 1997) (stating that the Convention was meant,

Children, had exercised custody rights over all of her Children since each was born, **Respondent** voluntarily left the Children in **Petitioner**'s custody, and, under Mexican law, **Petitioner** had presumptive custody of the Children. Furthermore, **Petitioner** and the Children were "habitually residents" in Mexico within the meaning of Article 3 of the Convention since May of 2006 until the Children's wrongful removal and wrongful retention from Mexico by **Respondent** in **October of 2010.**

8.  **Petitioner** has requested the return of her Children to Mexico pursuant to her Request for Return, a copy of which is attached and incorporated as **Exhibit 6.**[10] The Request for Return has been filed with the United States Department of State and the National Center for Missing and Exploited Children, the Central Authority of the United States of America under the Convention.

9.  All of the Children at issue are under the age of sixteen (16) years, at the time of filling of this Petition. At the time immediately before the wrongful removal and wrongful retention of each of the Children, each of them, individually and collectively, habitually resided in Mexico within the meaning of Article 3 of the Convention. They each went to school in Mexico[11] and were completely settled and integrated in Mexico's life and culture. At the time of **Petitioner**'s application to the Central Authority of the United States of America, **Petitioner** was located in the Contracting State of Mexico.

### IV. Wrongful Removal and Wrongful Retention of Child by Respondent

10. **Petitioner** has rights of custody under Mexican law pursuant to the Mexican Civil Code, a copy of which the relevant Titles are collectively attached and incorporated as **Exhibit 8.**[12]

---

in part, to lend priority to the custody determination hailing from the child's state of habitual residence. Pursuant to Article 14 of the Convention, this Court "may take notice directly of the law of . . . the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law . . . ." *See also* Fed. R. Civ. P. 44.1.

[10] Given the urgency of this Hague Convention Petition, no authentication of any documents or information included with the Petition is required. 42 U.S.C. § 11605 (1995).

[11] Copies of their school records are attached and incorporated as **Exhibit 7.**

[12] Not all the packet's exhibits are attached to this Exhibit.

*Title Eight, Ch. I*, of the Mexican Civil Code, entrusts both parents with the welfare, care and education of their children. Furthermore, *Title Eight, Article 585* establishes that in the event of the separation of the parents, custody of any child shall be either by agreement of the parties or by *Title Seven, Article 572*. The latter provides that, under Mexican law, custody of a child **"when the parents do not live together, [shall be] with the mother if she wills it so and if it is [e]ffectively possible for her to have custody, so as she doesn't behave in a manner that is harmful to the physical and mental health of the children."** Title Seven, Article 572, *¶II*. In the event a child is involuntarily separated from a parent, the parent from whom a child has been removed has the **"duty and right to visit and spend time with their children so that the affective bond that derives from every parent-child relationship is not broken."** *Title Seven, Article 572, ¶VI.*

11. **Respondent** left Mexico sometime in July of 2010 and traveled to the United States. **Respondent** returned to Mexico from the United States sometime towards the end of September of 2010. When he did so, he broke into **Petitioner**'s house and assaulted her. ***Respondent*** *has essentially admitted to all of these facts by his recent Juvenile Court testimony.* [13]

12. **Respondent** left the family in February of 2010 and established a Mexican residence separate and apart from the family, leaving the Children behind in **Petitioner**'s custody. **Respondent** left Mexico sometime in July of 2010 and traveled to the United States. **Respondent** returned to Mexico sometime towards the end of September of 2010, with the intention of grabbing the Children and removing them to the United States. When he returned on **September 24, 2010,** he broke into **Petitioner**'s house and assaulted her, looking for the Children's passports to carry out his plans to abduct the Children and take them back to the United States with him. **Respondent** slapped **Petitioner** several times, threw her on the couch, and choked her while telling **Petitioner** he was going to her. ***Respondent*** *has essentially admitted to all of these facts by his recent Juvenile Court testimony.*

13. On **October 1, 2010, Petitioner** made a complaint against **Respondent** with the

---

[13] The undersigned has requested that this testimony be transcribed, but there has been insufficient time to do so at this time.

"public prosecutor," a copy of this Preliminary Investigation is attached and incorporated as **Exhibit 9**. **Respondent** is still under investigation, but, given his flight, this investigation is on hold.

14. On **October 2, 2010, Petitioner** and **Respondent** appeared before a Mexican Magistrate concerning the Children.  Pursuant to the Order issued by this Magistrate, **Petitioner** was ordered to give the Children to **Respondent** to spend the day with him; **Respondent** was ordered to return the Children at 10:00 p.m.; a copy of this Order is attached and incorporated as **Exhibit 10**. **Respondent** was, therefore, given the Children by **Petitioner**; but, **Respondent** had absolutely no intention of obeying this Order to return the children to **Petitioner** and actually sought physical custody of the Children for the premeditated purpose of abducting the Children and taking them back to the United States with him.  **Respondent** called **Petitioner** at 9:00 p.m. that same evening and told **Petitioner** that he was keeping the children and returning them the next day; **Respondent** did not tell **Petitioner** that he was taking the Children to the United States.  ***Respondent** has essentially admitted to all of these facts by his recent Juvenile Court testimony.*

15. **Respondent** left Mexico with the Children sometime on or about **October 2, 2010**; **Respondent** did this against **Petitioner**'s expressed wishes.  **Petitioner** later learned that **Respondent** might have been in Texas with the Children.  And, on or about **October 6, 2010, Petitioner** became aware that **Respondent** had taken the Children back to Houston County, Georgia.

16. **Respondent**, in leaving Mexico with the Children, violated United States and Mexican immigration law, by crossing the United States-Mexican Border without their passports. **Respondent** has admitted as such in his recent Juvenile Court testimony.

17. Nearly two (2) weeks after abducting the Children, on or about **October 13, 2010, Respondent** initiated a frivolous deprivation action[14] in Houston County Juvenile Court concerning the minor children, alleging two (2) basis that the Children were "deprived" of necessities under Georgia law, of which **Petitioner** received approximately twenty-four (24) hours telephone notice of the initial emergency hearing, from her home in Mexico; a copy of this Petition is attached and

---

[14]**Petitioner** was not provided a copy of this Petition, until it was obtained by her attorney.

incorporated as **Exhibit 11.**[15]

18.     The first allegation in this Petition was that because **Petitioner** is allegedly a member of the "Family International," an international quasi-religious organization, this, in and of itself, is harmful to the Children.  At a Juvenile Court hearing held on **November 17, 2010,** where "hearsay" evidence was admitted over objection, **Respondent** presented no verified evidence or direct testimony that any alleged involvement with the Family International, caused any actual harm to any of the Children; all he did was "suggest" that the Children *might* be harmed if they remained in Mexico.

19.     The second allegation was that while in **Petitioner**'s care, the Children were in a state of malnutrition and had not received proper medical care.  At the Juvenile Court hearing, **Respondent** produced an unverified letter, allegedly written by a local doctor, Thomas Williamson, M.D., who had supposedly examined the children and determined that they were malnourished[16] and that Connor had not been treated properly for his medical conditions for seizures[17] and allegedly "club foot"[18]; a copy of this letter is attached and incorporated as **Exhibit 13.**[19]  **Petitioner** produced

---

[15] **Petitioner** has filed her own deprivation action with Houston County Juvenile Court, which is still pending.  A copy of is attached (without exhibits) and incorporated as **Exhibit 12.**

[16] Dr. Williamson wrote in his letter that **"Outward signs of neglect were present.  All of hte children were below average in height and weight for their respective age and sex.  Their body mass was low in each case.  These measures would be consistent with malnutrition."** *See* **Exhibit 13.**  The fact of the matter is that **Petitioner** and everyone in her family is naturally of very low height and weight; **Petitioner** is just a little over five feet tall and may weigh as much as 100 lbs., if that much.  Obviously, the Children take after her.

[17] This letter says that **"from what I understand, he never had an EEG to document and confirm seizure activity."**  *See* **Exhibit 13.**  This is untrue; **Petitioner** produced copy of the report at the Juvenile Court Hearing and, as well, she has the physical EEG in her possession. no EEG report had been run on Connor – this was not true.

[18] Dr. Williams writes that his **"other concern about Connor is his abnormal gait.  It would appear that he had never been evaluated or treated for this problem.  It should have been addressed long before now and it is quite possible that nothing can be done at his age to correct it."** *See* **Exhibit 13.**  This is also untrue.  **Petitioner** had taken Connor to a local podiatrist (Dr. Jokhai), here in Perry, Houston County, Georgia before the family had moved to Mexico.  These medical records have been requested, but they are in storage, and it may be another week or so before they can be produced.

[19] **Petitioner** only copy of this letter is  "marked up"; **Petitioner** has requested a complete set of any of Dr. Williamson's records and is awaiting compliance.

several medical documents from Mexico, either directly contradicting much of what Dr. Williamson wrote in his letter or casting serious doubts on either his conclusions or what Dr. Williamson had been told about the Children's physical condition; a copy of Connor Peterson's medical records are collectively attached and incorporated as **Exhibit 14.**

20. After the "probable cause" hearing, the parties received verbal notice from the Juvenile Court Judge's office that the children were to remain with **Respondent,** with **Petitioner** having supervised visitation. **Petitioner** recently submitted additional evidence and documentation to the Court and another hearing has been scheduled for **December 8, 2010.** As of the submission of this Petition, no written Order has been issued containing any factual findings or conclusions.

21. Since **Respondent** wrongfully abducted the Children and smuggled them illegal across the United States-Mexican border, **Petitioner** has had no contact with the Children, as controlled by the **Respondent**.

22. This Petition is filed within one (1) year of the Children having been wrongfully removed from **Petitioner**.

23. **Respondent** is 100% disabled due to PTSD from his military service, *by his own admission of his testimony at the Juvenile Court Hearing* and as indicated in the records attached and incorporated as **Exhibit 15. Respondent** has been hospitalized for his mental health condition. *See* "Affidavit of Pandita Joy-Charm Seaman" attached and incorporated as **Exhibit 16. Respondent** has had suicidal thoughts, which he has expressed to third parties. *See* "Affidavit of Matthew Bixler," attached and incorporated as **Exhibit 17. Respondent** has previously been banned from the Veteran's Hospital in Dublin, because of a physical incident there. *See* **Exhibit 16.**

24. **Respondent** is violent, emotionally unpredictable, has caused physical and emotional harm to **Petitioner** on multiple occasions, and, just prior to abducting the Children threatened to "destroy" **Petitioner**. *See* **Exhibit 16. Respondent**'s violent behavior has either been directly witnessed by third parties and/or third parties have witnessed the fruits of his violence, for example, two (2) attempted prior strangulations of **Petitioner**. *See* "Affidavit of Clara Torelles Bixler," attached and incorporated as **Exhibit 18;** "Affidavit of Joan Cecilia Delisser," attached and

incorporated as **Exhibit 19;** "Affidavit of Dolores Christine Bixler," attached and incorporated as **Exhibit 20;** "Affidavit of Chrispin Seaman," attached and incorporated as **Exhibit 21;** and,"Affidavit of Gentle Joy (Sherri) Seaman-Bixler," attached and incorporated as **Exhibit 22. Respondent** has threatened to "destroy" **Petitioner**, which is likely why he abducted the Children; and, he has been very emotionally abusive towards her throughout the marriage. *Id.*

25.  **Respondent** has previously been arrested for Battery in Peach County and for Obstruction in Bleckley County, concerning a prior domestic custody dispute involving **Respondent**'s ex-Wife (Kristi Peterson), as follows:

- ✓ **Centerville Police Department (February 28, 1995) – Respondent** was accused by his eldest daughter's grandparents of ripping his 5-month old child away from them. He told them **"If you ever try to keep my child from me, I will kill you."** He is described as having problems and having multiple guns. He was described also of not properly transporting the baby and having her on the floor of a car right beside a gun. *See* Report attached and incorporated as **Exhibit 23.**

- ✓ **Bleckley County Sheriff's Department (February 28, 1995) – Respondent** was arrested there, for Obstruction, as a consequence of what had just happened in Centerville. The Obstruction arrest was because, **Respondent** nearly got himself shot and was mumbling somewhat incoherently, when he refused to get away from his gun, after being stopped by law enforcement with the baby. *See* Report attached and incorporated as **Exhibit 24.**

- ✓ **Centerville Police Department (May 1, 1996) – Respondent** admitted to pushing Kristi Peterson down, grabbing a dining room chair and breaking it. *See* Report attached and incorporated as **Exhibit 25.**

- ✓ **Peach County (May 30, 1996) –** Defendant was accused of Battery of his ex-Wife, for having beaten Kristi Peterson, which was eventually placed on a Dead Docket from Peach County Superior Court (97-CR-279). *See* Report attached and incorporated as **Exhibit 26.**

26.     **Respondent** also previously been accused of grabbing his ex-wife, Kristi Peterson, throwing her across the kitchen, causing her to hit some cabinets, kicking her in the stomach, and stepping on her leg. *See* Report attached and incorporated as **Exhibit 27.** After doing so, he allegedly attempted to intercepted her attempts to call for help. *Id.* Pictures were taken of Kristi Peterson's injuries were apparently logged into evidence (there is also a medical record attached to this report). *Id.* It is not believed that this incident ever resulted in an arrest.

27.     **Respondent** and his ex-Wife, Kristi Peterson, also went through a series of contentious custody court cases. In the last one, **Respondent** lost all rights concerning his eldest daughter due to his unbalanced mental state. Attached to this Petition in support of this allegation, from Bibb County Superior Court, Civil Action No.: 01-CV-11906, are:

- ✓ **Judgment under the Family Violence Act (February 12, 2001)**. *See* **Exhibit 28.**
- ✓ **Report of Guardian Ad Litem (April 23, 2002)**. *See* **Exhibit 29.**
- ✓ **Order for Psychological Evaluation (December 16, 2002)**. *See* **Exhibit 30.**
- ✓ **Final Order Incorporating Agreement (March 13, 2003)**.[20] *See* **Exhibit 31.**

28.     **Respondent** has assaulted **Petitioner** on more than one (1) occasion and an *ex parte* Family Violence Protective Order has been issued by the Honorable Katherine Lumsden, Superior Court Judge, Houston County, Civil Action No. 2010-V-102063-K – the Petition (without exhibits) is attached and incorporated as **Exhibit 32;** the Order is attached and incorporated as **Exhibit 33.**[21]

29.     **Petitioner** has never acquiesced or consented to the removal or retention of the Children from Mexico or for their retention outside of Mexico. Indeed, **Petitioner** commenced proceedings in Mexico for custody of her children on **June 4, 2010** – approximately four (4) months *before* **Respondent** absconded with the Children and *more than four (4) months* before **Respondent**

---

[20]As is evidenced by the Final Order, **Respondent** never submitted to the court ordered psychological examination.

[21] **Petitioner** requested that the children be included within the ambit of this Order, but Judge Katherine Lumsden was reluctant to do so on an *ex parte* basis given the false allegations **Respondent** had made against **Petitioner** in Juvenile Court. A final hearing concerning these family violence allegations is scheduled for **December 3, 2010.**

filed his deprivation petition in Houston County Juvenile Court, a copy of which is attached and incorporated as **Exhibit 34.** There has also *already* been a Temporary Order entered granting her request for temporary sole custody of the Children, under the custody laws of Mexico, a copy of which (original and translation) is attached and incorporated as **Exhibit 35.**

   30. The removal of the Children is therefore in violation of the Mexican Civil Code and is a wrongful removal and wrongful retention within the meaning of Articles 3 and 5 of the Convention. **Respondent** either voluntarily left the Children in the custody of **Petitioner**, as defined by the Mexican Civil Code, when he either left them in February of 2010, or that very least when he left Mexico for the United States in July of 2010, as defined by *Title Eight, Article 585.* If **Respondent** did not "voluntarily" leave the Children with **Petitioner**, as defined by the Mexican Civil Code, under Mexican law presumes custody remained with **Petitioner**, pursuant to *Title Eight, Article 585* and *Title Seven, Article 572, ¶II.* Furthermore, by abducting the Children from **Petitioner**'s custody, and smuggling them illegally across the United States-Mexican border, and depriving **Petitioner** of her right to maintain her relationship with her children, **Respondent** violated a fundamental principle of Mexican family law. *See Title Seven, Article 572, ¶VI.* Consequently. since removing the Children, **Respondent** has wrongfully retained the Children in the United States of America.

   31. In light of the aforementioned Mexican Civil Code and the Convention, the Children are currently being illegally held in custody, confinement and/or restraint by **Respondent**. Unless this Court takes immediate action to bring **Respondent** and the Children before the Court, irreparable harm will occur to the well-being of the Children in that they are being denied all proper access to their mother and their home, school, friends and culture, and are being wrongfully detained in Georgia. Unless a show cause order is issued, **Petitioner** will continue to have no proper contact whatsoever with her Children.

   32. Given **Respondent**'s history of violence, against **Petitioner** and third parties, his mental health history, his access to weapons, his discussions of suicide, and the smuggling and abduction of the Children from Mexico, there is a potential risk of violence and danger concerning

the Children, such that this Court should issue an Emergency Ex Parte Order, authorizing the U.S. Marshall's Office to retrieve the Children and turn custody over to **Petitioner**, while also issuing a protective order against **Respondent**.

### V.  Provisional Remedies[22]

33. **Petitioner** requests that the Court issue a show cause order and direct that the order be served immediately by United States Marshals on **Respondent** and that he be brought before this Court with the Children forthwith.[23]  Section 5(b) (Provisional Remedies) of ICARA provides, inter alia, that, in a proceeding under Section 4(b) for the return of a child, **"No court exercising jurisdiction . . . may . . . order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied."**  42 U.S.C. §11604.  In this case, the State law referred to in Section 5(b) is that of Georgia.  In Georgia, the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") is the source for statutory law governing, inter alia, the resolution of both domestic and international child custody disputes.  O.C.G.A. §19-9-40, *et seq.*.  Georgia law addresses the appearance of the parties and the child in such cases in O.C.G.A. §19-9-70.  That section authorizes this Court to order the appearance of the child and custodian or custodians together.  *Id.*  This Court therefore has the authority to order the immediate appearance of **Respondent** and the Children together.

34. **Petitioner** requests, for the well being of the Children, that she be given emergency and immediate access to and custody of them, pending further hearing in this Court.

35. **Petitioner** requests, for the well being of the Children, that a protective order be immediately issued against **Respondent**.

36. **Petitioner** also requests that this Court issue an immediate order prohibiting the

---

[22]This Court **"[i]n furtherance of the objectives of . . . the Convention . . . may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the further removal or concealment before the final disposition of the petition"**  42 U.S.C. 11604 (1995).

[23]Such an approach is consistent with the approach of other district courts faced with equivalent concerns regarding the flight of a respondent following service of a petition for return under the Convention.  See ***Fawcett v. McRoberts,*** 168 F. Supp. 2d 595, 597 (W.D. Va. 2001).

removal of the Children from the jurisdiction of this Court, until further Order of this Court, taking into safe-keeping all of the children's travel documents and setting an expedited hearing on this "Petition for Return of Child to Petitioner."[24]

## VI.  Relief Requested

37. WHEREFORE, **Petitioner** respectfully requests the following relief:

a. An Order directing that the name of the Children be entered into the national police computer system (N.C.I.C.) missing person section;

b. An Order directing a prompt return of the Children to their habitual residence of Mexico;

c. The issuance of an emergency "Warrant in Lieu of Writ of Habeas Corpus" directing that the Children be returned to the custody of **Petitioner**, and the Children together with **Respondent**, be brought into this Court by any United States Marshal, federal officer or police officer;

d. The issuance of an immediate Order prohibiting the removal of the child from the jurisdiction of this Court;

e. An Order commanding **Respondent** to appear in this Court with the Children to show cause why the Children have been kept from their mother in contravention of Mexican law;

f. An Order directing **Respondent** to pay **Petitioner**'s legal costs and fees; and,

g. Any such further relief as justice and its cause may require.

## VII.  Notice of Hearing

38. Pursuant to 42 U.S.C. § 11603(c), **Respondent** will be given notice of any

---

[24]Such a Petition may also be treated as an application for a Writ of Habeas Corpus itself. ***Zajaczkowski v. Zajaczkowska,*** 932 F. Supp. 128, 132 (D.Md. 1996) (**"[T]he Court will treat the [Convention] petition as an application for a writ of habeas corpus . . . pursuant to 28 U.S.C.A. § 2243"**); *see also* ***In re McCullough,*** 4 F. Supp. 2d 411 (W.D.Penn. 1998).

hearing in accordance with C.G.S.A. §46b-115g and §46b-115o of the UCCJEA.[25]

## VIII. Attorneys' Fees and Costs Including Transportation Expenses Pursuant to Convention Article 26 and U.S.C. 11607

39.     **Petitioner** has incurred substantial expenses as a result of the wrongful removal and wrongful retention of the Children by **Respondent**. The undersigned will submit a copy of all expenditures as soon as practicable and possible and will amend these costs, from time to time, according to proof and in light of further expenditure required because of this wrongful removal and retention.

40.     **Petitioner** respectfully requests that this Court award all legal costs and fees incurred to date as required by 42 U.S.C. 11607, reserving jurisdiction over further expenses.

## IX. Declaration Pursuant to Uniform Child Custody Jurisdiction and Enforcement Act

41.     The details regarding the Children that are required to be provided under the UCCJEA are as follows:

- The present forced location of the Children are in Houston County, Georgia, at 75 Randolph Street, Warner Robins, GA.

- In more than the last four (4) years, the Children have continuously lived in Mexico. From May of 2006 to February of 2010, the Children lived with both **Petitioner** and **Respondent** first at the family's home at Privada Lopez Cotilla #10, Chapala, Jalisco ,Mexico and then at Calz Club Atlas de Golf #500A, Guadalajara, Jalisco. Mexico.

---

[25] The Convention itself does not specify any specific notice requirements. ICARA provides that notice be given in accordance with the applicable law governing notice in interstate child custody proceedings. 42 U.S.C. § 11603(c). In the United States, the Parental Kidnapping Prevention Act ("PKPA") and the Uniform Child Custody Jurisdiction and Enforcement Act ("UCCJEA") govern notice in interstate child custody proceedings. ***Klam v. Klam,*** 797 F. Supp. 202, 205 (E.D.N.Y. 1992). The UCCJEA and Part (e) of the PKPA provide that reasonable notice and opportunity to be heard must be given to all parties before a custody determination is made. The UCCJEA further provides that notice shall be given in a manner reasonably calculated to give actual notice. In Georgia, the relevant statute is found in this State's UCCJEA in O.C.G.A. §19-9-40, *et seq*. The Notice section provides, in pertinent part, that notice and an opportunity to be heard shall be given in a manner reasonably calculated to give actual notice. O.C.G.A. §19-9-65. Furthermore, in cases where flight of a respondent is at issue, federal courts have allowed substituted service in any manner reasonably effective to give the respondent notice of the suit. ***Ingram v. Ingram,*** 463 So.2d 932, 936 (La.App. 1985).

Since February of 2010, the Children continuously lived with **Petitioner** at Calz Club Atlas de Golf #500A, Guadalajara, Jalisco. Mexico.

▸ **Petitioner** is participating as a party in proceedings in Mexico for legal separation and custody of the Children referenced in paragraph 29 above.

▸ Other than the Mexican litigation set forth above, the aforementioned Juvenile Court Deprivation Action initiated by **Respondent**, a Juvenile Court Deprivation initiated by **Petitioner** in Houston County Juvenile Court, a Legal Separation and Family Violence action initiated by **Petitioner** in Houston County Superior Court, **Petitioner** does not have information of any custody proceeding concerning the Children pending in any other court of this or any other state other than these proceedings referenced above.

▸ **Petitioner** does not know of any person or institution not a party to the proceedings who has physical custody of the child or claims to have rights of parental responsibilities or legal custody or physical custody of, or visitation or parenting time with, the Children.

**Respectfully submitted,** this *30th day of November, 2010*

> *s/ A. James Rockefeller, Esq.*
> A. James Rockefeller, Esq.
> Attorney for **Petitioner**
> State Bar Number: 611214

Rockefeller Law Center, P.C.
P.O. Box 7385
Warner Robins, Georgia 31095-7385
(478) 953-6955
Fax (478) 953-7364
jim@rockefellerlawcenter.com

**STATE OF GEORGIA**

**COUNTY OF HOUSTON**

## VERIFICATION

    I hereby swear and affirm that the information included in the within and foregoing "Verified Petition for Return of Child to Petitioner and Petition for Immediate Issuance of Show Cause Order to Respondent" is true and correct to the best of my knowledge, information and belief.

    This \_\_\_\_ day of November, 2010.

 

_____
Signature of Affiant

_____
Print Name

Sworn To And Subscribed

This \_\_\_\_ day of November, 2010.

_____
NOTARY PUBLIC