**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **PANDITA CHARM-JOY SEAMAN,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:10-CV-462 (MTT)** |
| | ) | |
| **JOHN KENNEDY PETERSON,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

## ORDER

This matter is before the Court on Petitioner Pandita Charm-Joy Seaman's

Petition (Doc. 1) filed pursuant to the Hague Convention on the Civil Aspects of

International Child Abduction ("Hague Convention" or "Convention") and its

implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 42

U.S.C. § 11601-11610.  The Petitioner seeks the return of her four children to Mexico,

alleging that the children were wrongfully removed from Mexico and taken to the United

States by the children's father, Respondent John Kennedy Peterson.[1]

The Hague Convention, to which the United States and Mexico are contracting

parties, was enacted to "secure the prompt return of children wrongfully removed to or

retained in any Contracting State" and to "ensure that rights of custody and of access

---

[1] The Petitioner also requested temporary custody of the children during the pendency of this proceeding. Initially, the Court asked the parties to agree to arrangements that would allow the Petitioner to visit her children.  When the parties were unable to reach an agreement, the Court ordered counsel for the Respondent to make the children available for supervised visitation by the Petitioner.  During a December 21, 2010 evidentiary hearing, counsel for the Respondent requested additional time to secure the testimony of a physician in Mexico.  The Court granted this request.  However, because the evidence at that point established no reason to believe that the children would not be safe while in the Petitioner's custody, the Court, with the parties' consent, established a schedule allowing both parents unsupervised custody.  As discussed below, based on developments occurring December 30, the Court on December 31 ordered the children to remain in the Petitioner's custody.

under the law of one Contracting State are effectively respected in other Contracting States."  Hague Convention, art. 1.  Under ICARA, a person may petition a court in the country where a child is located for the return of the child to his or her habitual residence in another contracting country.  The Convention and ICARA "empower courts in the United States to determine *only* rights under the Convention and not the merits of any underlying child custody claims."  42 U.S.C. § 11601(b)(4) (emphasis added). Thus, this Court's inquiry is limited to the merits of the Petitioner's claim that her children were wrongfully removed from Mexico by the Respondent in violation of her rights of custody.  The Court will not address the merits of any underlying custody dispute.

The Petitioner filed her Petition on November 30, 2010.  Because the Hague Convention required expedited proceedings, the Court convened evidentiary hearings on December 9, 17, and 21, 2010, and January 13, 2011.  For the reasons set forth herein, and as announced in open court on January 13, 2011, the Petition is **GRANTED in part.**

## I.    FACTUAL BACKGROUND

The Petitioner, Pandita Charm-Joy Seaman, a Jamaican citizen, and the Respondent, John Kennedy Peterson, a United States citizen, were lawfully married on February 2, 2002, in Macon, Bibb County, Georgia.  From July 2002 through May 2006, the Petitioner and Respondent had three children together, T.L.P, age eight years; C.D.P., age seven years; and R.T.P., age five years.[2]  During this time, the Petitioner and Respondent maintained a home in Houston County where the Petitioner cared for

---

[2] T.L.P was born in Mexico, in July 2002, and is therefore a Mexican citizen by birth. Mexican law recognizes dual nationality for Mexicans by birth, and children born in Mexico are entitled to Mexican citizenship.

the three children.  The Respondent is, and has been at all times relevant to this action, a 100% permanently-disabled Army veteran due to Post-Traumatic Stress Disorder ("PTSD").

In May 2006, after four years together in the United States, the Petitioner, the Respondent, and their children moved to the state of Jalisco, Mexico.  They briefly lived in Guadalajara and then moved permanently to nearby Chapala.  While the precise motivation behind the family's decision to move to Mexico is disputed, what is clear is that the Petersons settled in Mexico and remained there until the Respondent brought the children back to the United States in October 2010.  According to the Petitioner, the Petersons "were moving down [to Mexico]," and, in preparing to do so, sold their home in Houston County along with all their belongings.  In her testimony in this Court, Wendy Chadwell, an investigator for the Houston County Department of Family and Children Services ("DFCS"), stated that, based on her investigation, it was clear the Petersons intended to stay in Mexico.  While living in Mexico, the Petitioner and Respondent had their fourth child, S.A.P., now four years of age.[3]

While living in Guadalajara, the Petersons lived either with or in close proximity to several members of the Petitioner's extended family.  By all accounts, the Petitioner's family belongs to a religious organization known as The Family International ("TFI").  Although the Petitioner disavowed her allegiance to TFI approximately ten years ago, she does not dispute that she was raised a member of TFI or that her father, mother, and sister, at the very least, are TFI members.  TFI has been the subject of much controversy.  TFI advocates compare the theological underpinnings of TFI with those of

---

[3] S.A.P., like T.L.P., is a Mexican citizen and had never been to the United States until brought here by the Respondent in October 2010.

Fundamentalist Christianity.  According to its advocates, TFI is an organization that provides inspiration, support, and sometimes resources to missionaries throughout the world.  TFI's critics, on the other hand, allege that the organization has several radical beliefs and practices, including sexual contact with minors.  While it is not clear what exactly the beliefs and practices of TFI are, neither its advocates nor its critics deny that rumors and allegations of improper sexual contact between adults and minors have plagued TFI in the past.[4]  Regardless of the general controversy surrounding TFI, there is no evidence here, and the Respondent does not contend, that the Peterson children were ever subjected to any improper contact or influence as a result of living with or in close proximity to those members of the Petitioner's family who are active members of TFI.

While the Respondent adduced no evidence suggesting any improper TFI influence on or contact with the children, he does claim that he downloaded TFI information relating to sexual contact with minors from his father-in-law's computer.  Exhibits R-9A to R-9D.  His father-in-law, Chrispin Seaman, works as a missionary in Mexico and operates Proyecto Refugio.  Proyecto Refugio provides various services to the poor, including medical and dental care.  According to Mr. Seaman, the activities of Proyecto Refugio are closely regulated and monitored by Mexican authorities and his mission work has never been the subject of any investigation.  The Respondent also

---

[4] For a thorough, although somewhat dated, inquiry into the allegations against TFI and the efforts of TFI to combat  these allegations of abuse, see the decision of Lord Justice Ward in the High Court of Justice, Family Division, Case W 42 1992, London, England, October 19, 1995.  Exhibit R-23.  In that case, after three years of investigative work and deliberation, Lord Justice Ward ruled that members of TFI had, in the past, engaged in abusive sexual practices with minors as well as corporal punishment and sequestration of children.  However, Lord Justice Ward was satisfied that TFI leadership had, pursuant to his instructions, abandoned these practices and that TFI was a safe environment for children.  Lord Justice Ward ordered that, with certain conditions, custody remain with the child's mother, a full-time TFI member.

claims that he saw in Mr. Seaman's library a book authored by "Davidito," the son of TFI founder David Berg. The Respondent tendered Exhibit 9E, which consists of excerpts from Davidito's book that he downloaded from a website that purports to be an enemy of TFI. Respondent's Exhibits 9A through 9E describe and depict vile and, in many instances, likely illegal conduct. Mr. Seaman strongly denied these materials came from any computer he ever owned, and he denies ever having possession of Davidito's book.

The Respondent also claims that the Petitioner's niece was molested at his father-in-law's house and that his father-in-law allowed the perpetrator, who was allegedly involved in mission work, to stay in his house. Both the child's mother and Mr. Seaman denied that any molestation took place. However, Mr. Seaman testified that he nevertheless asked the alleged perpetrator to leave his home.

The Petitioner and Respondent's relationship has nearly always been marked by conflict. According to the Petitioner, after the death of the Respondent's stepfather, who also lived in Mexico, in November 2009, the Respondent began drinking heavily and smoking marijuana, causing the Respondent's behavior to become even more volatile. To bolster her claim that she, rather than the Respondent, is the more appropriate custodial parent of the children, the Petitioner cites numerous incidents in which the Respondent exhibited threatening, and even violent, behavior. In particular, the Petitioner cites at least three occurrences in which the Respondent berated the Petitioner and intimidated her physically. On multiple occasions, according to the

Petitioner, the Respondent was physically abusive towards her, and he did not temper his abusive contact when the children were present.[5]

Although these claims of abusive and violent behavior, if true, might lend substantial credibility to the Petitioner's claim that the Respondent is not a suitable custodial parent of the children, that issue is not before the Court. To the extent these allegations can be proven, they are more appropriate considerations for the court that ultimately decides the custody dispute between the Petitioner and the Respondent.

In February 2010, after several months of increasing discord, the Respondent moved out of the family home in Chapala and established a separate residence from his family, leaving the children in the Petitioner's custody. The Petitioner filed for divorce in Mexico in May or June 2010, but she has not served the Respondent with process in that action.

In July 2010, the Respondent left Mexico and returned to the United States. Once back in the United States, the Respondent began planning to take the children from the Petitioner and to bring them to the United States. Ironically, and notwithstanding the domestic violence during the Respondent's first marriage, his first wife, Kristi Peterson, assisted in his planning.[6]

---

[5] The Petitioner also cites unrelated incidents in which the Respondent was arrested for obstruction in Bleckley County, Georgia, and charged with battery in Peach County, Georgia, both of which arise from the Respondent's first marriage to Kristi Peterson. The obstruction arrest (Exhibit P-24) stemmed from a situation in which the Respondent brandished a semi-automatic handgun during a standoff with Bleckley County Police, all while in the presence of his small child. After much pleading, the Respondent put down the weapon, but five members of the Bleckley County Police Department were required to effect the Respondent's arrest. The battery charge (Exhibit P-26) was the result of a domestic dispute with Kristi Peterson in which the Respondent allegedly bit his ex-wife's leg. The Court did not admit evidence of these incidents.

[6] It is also ironic that Respondent's initial plan was to file his own Hague Convention action in Mexico seeking the return of the children to the United States. Exhibit R-18. He abandoned that plan because he was told that relief was not available to him under the Hague Convention, presumably because the

While the Respondent was away, the Petitioner assumed sole caretaker duties of the children, enrolling them at Instituto Terranova, a private Jesuit-run school in the Chapala area, and providing for their day-to-day care.

On September 24, 2010, by his own admission, the Respondent returned to Mexico and broke into the Petitioner's home, apparently looking for the children's passports so that he could "legally" take them back across the border into the United States.  After a physical confrontation, the Respondent eventually left the Petitioner's home.  Fearing for her life and afraid that the Respondent would return and attempt to abduct the children, the Petitioner withdrew the children from school and moved in with her parents in Guadalajara.  Following this altercation, both the Petitioner and Respondent filed reports with local authorities.

On September 27, 2010, the Petitioner and Respondent appeared before Lic. Sergio Gutierrez Tejada, Deputy of the Municipal Judge and Acting Head of Functions of the Municipal Court, in an attempt to reach a resolution concerning custody of the children.  Pursuant to a Written Declaration (the "Declaration") issued by the Municipal Court, the Respondent was permitted to spend Saturday, October 2, 2010, with the children, but was under strict orders to return the children to the Petitioner no later than 10:00 p.m. that night.  However, the Respondent, again by his own admission, had no intention of returning the children to the Petitioner.  Rather, in accordance with his plan, he took the children and fled to the United States.  In a Houston County, Georgia, Juvenile Court hearing held November 17, 2010, when asked whether he "had every intention of disobeying that Judge's order?" and whether he "knew when [he] went in

United States was not the children's habitual residence.  Regardless of why he decided to forgo judicial relief, he resorted to self-help.

7

that [he] wasn't going to listen to this judge?," the Respondent replied, "Absolutely."[7]
Exhibit R-6A, p. 36.  Instead, the Respondent called the Petitioner at approximately 9:00
p.m. that night and informed her that he was not going to return.  *Id.* at 82.

Late on the night of October 2, 2010, the Respondent crossed the border back
into the United States.  In his testimony before this Court, the Respondent claims he
crossed into the United States "legally" by producing certain documents to Mexican
authorities.[8]  This testimony is suspect.  First, it conflicts with the Respondent's
testimony in Juvenile Court.  In response to a question from his lawyer about crossing
the border without the children's passports, Peterson acknowledged what he had done:
"Yes ma'am, I was looking about 50 years in prison doing what I did if I was caught on
that side of the border."  *Id.* at 14.  On cross-examination in the Juvenile Court
proceeding, he acknowledged that he had carefully planned the abduction, and, in the
process, disobeyed a Mexican "judge."  *Id.* at 35.  Second, neither the parties nor the
Court have been able to find Mexican law that allows one parent to take children across
international borders without the children's passports or the other parent's consent.
Although it is unclear exactly how the Respondent managed to cross the United States-
Mexican border with his children, what is clear is that he did so without the Petitioner's
permission and without his children's passports.  The Petitioner did not learn of her
children's presence in Georgia until October, 6, 2010.

The Respondent drove the children in a two-door Pontiac Grand Prix from

---

[7] It is not clear to this Court that the "order" was actually entered by a Mexican judge, although the
Respondent, at the time, evidently considered it a judicial order.

[8] The Respondent appears to claim that his impression that his abduction of the children and their
removal to the United States was lawful was based, in part, on the advice and assistance of an attorney
in Guadalajara, Mexico. However, the Petitioner has provided an affidavit from that attorney denying that
he provided any such assistance to the Respondent and promising to institute an action for defamation to
protect his reputation.  Exhibit P-61.  The Court did not admit this affidavit into evidence.

Chapala, Mexico, to Houston County, Georgia, over the course of three grueling days and nights, which included a night spent in the car and a night spent with the Respondents sister in Columbus, Georgia, "to calm the kids down." *Id.* at 8.

As a part of the scheme, the Respondent's former wife, Kristi Peterson, arranged for her doctor, Dr. Thomas Williamson, who is an adult internist, to examine the children late in the evening of October 5, 2010, when they finally arrived in Houston County. The Respondent frankly admitted the reason he took the children to Dr. Williamson: "I knew this would be coming and I knew that I would need that documentation so immediately full check-ups for all the kids." *Id.*  When asked if the children, other than C.D.P., had "any health issues that required you to see them on short notice," Dr. Williamson said no, they "all seemed fairly healthy, other than the weight issue."

To buttress his claim that the children were in very poor health and suffered from "long-term starvation," as the Respondent testified in juvenile court, *Id.* at 59, the Respondent obtained from Dr. Williamson a letter which, on its face, appears to confirm that the children had been neglected and were malnourished in Mexico.  The letter states, "outward signs of neglect were present.  All the children were below average in height and weight for their respective age and sex ...  These measures would be consistent with malnutrition." Exhibit P-13.

 For C.D.P. in particular, the letter expresses Dr. Williamsons "major concern." The Respondent told Dr. Williamson that C.D.P. had a seizure disorder and he was taking Dilantin, an anti-seizure medication.  However, the Respondent told Dr. Williamson that C.D.P. had never had an EEG to determine the cause and nature of his seizure activity.  In the letter, Dr. Williamson states that he "was initially concerned

9

about this particular medication being used for the type of seizure [C.D.P.] was diagnosed with – Petit-Mal.  I have become more concerned since I have found him to [have] markedly elevated liver enzymes and, from what I understand, he never had an EEG to document and confirm seizure activity.  The medication has been discontinued and he has had no reported seizure activity.@ Dr. Williamson also expresses concern about C.D.P.'s abnormal gait for which Ahe has never evaluated or treated ….@ *Id.*

Armed with this letter, the Respondent would paint a dire picture in Juvenile Court.  The children had been neglected, they were malnourished, and, in the case of C.D.P., medical treatment had been denied.  None of this was true.  Indeed, the manipulation of the medical evidence in this matter in the Juvenile Court proceedings greatly concerns the Court.

Other than C.D.P., the medical evidence concerning the children is straightforward and benign.  T.L.P., age eight years, weighed 59 pounds on October 5, 2010, and 61 pounds on November 22, 2010.  The October 5, 2010, office note for T.L.P. reflects no significant health concerns.  As Dr. Williamson testified in this Court, T.D.P. Awas in pretty good shape.@ He did not Adiagnose and determine that she had any particular ailment in need of immediate care,@other than Ajust nutrition.@

R.T.P., age five years, weighed 40 pounds on October 5, 2010, and 42 pounds on November 22, 2010.  When asked whether he had observed anything Aabout his condition which indicated any immediate need for medical,@Dr. Williamson stated, Ano, the child had no complaints, active, alert, appropriate for his age.  Again, he, along with the other children gained a little weight and went up a couple of pounds between the visits."

S.A.P., the youngest child, weighed 33.5 pounds on October 5, 2010.  On November 22, 2010, she weighed 35 pounds, a gain of a pound and a half.  Dr. Williamson's October 5, 2010, office note states Ano complaints@ and reflects a normal physical examination.  Dr. Williamson=s impression was simply Alow height and weight for age.@ In his testimony in this Court, Dr. Williamson said that S.A.P. had no condition that needed immediate attention: Ashe was a fairly healthy appearing young lady, again, a little underweight.@

Thus, with regard to T.L.P., R.T.P., and S.A.P., and notwithstanding the ordeal of their flight from Mexico (which Dr. Williamson admitted had them all Apretty tired out@, Dr. Williamson could testify to no objective or subjective finding indicating any cause for concern other than weight slightly below the 50th percentile for children of their ages. Even for this "finding," however, Dr. Williamson admitted that he had no maternal information and that the stature and weight of a parent can have an impact on a particular child=s normal height and weight.  When Dr. Williamson first saw the Petitioner during his testimony in this Court, he acknowledged that the Petitioner is very petite. Indeed, the Petitioner is no more than five feet two inches tall and weighs approximately ninety pounds.  With regard to the children's weight gain, in a comment that might have been intended to be light-hearted but which nevertheless is instructive, Dr. Williamson acknowledged that the children's weight gain may be due to Aour fast food diet, I'm not sure.@

There is nothing light-hearted about what happened to C.D.P. when he was seen by Dr. Williamson.  First, his statements that C.D.P. had never had an EEG and had never been treated or evaluated for his foot condition were both false, although Dr.

Williamson did not know they were false when he provided the letter the Respondent would use in Juvenile Court.  The Respondent told Dr. Williamson that C.D.P. had never had an EEG even though the Respondent was present when a July 10, 2010, EEG was performed in Mexico.  In this Court, after the truth came to light, the Respondent testified that he had "forgotten that we had got the EEG."  The Respondent told Dr. Williamson that C.D.P. was taking Dilantin even though in his Juvenile Court testimony the Respondent said he did not know what medication C.D.P. was taking.  Exhibit R-6A, p. 8.  It appears, incredibly, that the basis for the Respondent's representation to Dr. Williamson that C.D.P. was taking Dilantin was a conversation the Respondent had with his sister, Kelly Gustafson.  Ms. Gustafson, who is a certified nursing assistant, talked with a fellow employee who told her that Dilantin was the proper medication for petit-mal seizures.  Based on nothing but this second-hand, non-expert opinion, Dr. Williamson wrote a prescription for Dilantin on the evening of October 5, 2010.  In fact, C.D.P.'s Mexican physician had prescribed a different medication, Depekane, which is appropriate for petit-mal or absence seizures.

Whether because of incorrect dosage or incorrect administration, C.D.P. developed Dilantin toxicity.  Fortunately, a school nurse became concerned by C.D.P's behavior and sounded the alarm.  An October 25, 2010, Dilantin screening revealed a value of 37.6 ug/ml.  Dr. Williamson acknowledged that the upper limit of normal is 20 ug/ml.  One consequence of Dilantin toxicity is liver injury and, as Dr. Williamson noted in the letter used in Juvenile Court, the October 25, 2010, laboratory tests also revealed "markedly elevated liver enzymes."  What Dr. Williamson's letter does not make clear is that he was the physician who prescribed the Dilantin that caused the Dilantin toxicity.

Recognizing the significance of the elevated liver enzymes, Dr. Williamson discontinued the Dilantin and, fortunately, C.D.P.'s liver function testing has returned to normal.[9]

With regard to the club foot, Dr. Williamson did not believe that condition posed any immediate problem.  Rather, his point was that it should have been evaluated earlier.  Again, Dr. Williamson had been provided with false information; C.D.P. had been evaluated for this condition, including an evaluation by a Perry, Georgia, pediatrician several years earlier.

In short, Dr. Williamson admitted that none of the children, including C.D.P., had any type of "grave health risks" when he examined them.  Dr. Williamson expressed no opinion in this Court that the children were, within any degree of probability, malnourished or neglected while in Mexico.  Even if he had, it is unlikely that such testimony, even from a qualified expert, would be sufficiently reliable to be admissible, given the false information provided to the doctor, the lack of information regarding family history and conditions in Mexico, and the fact that the children, when he saw them late on October 5, 2010, had been through a grueling three-day odyssey.  On the contrary, his testimony in this Court, if anything, suggests that the children were remarkably fit when he first saw them.

The conclusion that the Respondent manipulated the medical evidence in Juvenile Court is buttressed by the testimony of the Respondent's own physician, Dr.

---

[9]  Of particular concern to the Court is the fact that while C.D.P. was in the Respondent's care he was never seen by a pediatric neurologist.  C.D.P. was off of anti-seizure medication from when he was removed from the improperly-prescribed Dilantin in late October until recently when the Petitioner took C.D.P. to see Dr. Joseph Trasmonte, a pediatric neurologist.  As the Court learned at the final evidentiary hearing, Dr. Trasmonte saw C.D.P. on January 5, 2011.  He prescribed a different anti-seizure medication and performed an EEG, the results of which were learned during a recess at the final hearing.  C.D.P. suffers from absence seizures; in fact, C.D.P. had three seizures while he was having the EEG.

Gilbert Silverman.[10]  Dr. Silverman is a physician who resides in Guadalajara.  He primarily treated the Respondent but claims he has a physician/patient relationship of some sort with the Petitioner.  He also was a family friend and had frequent contact with the children.  Before the Respondent took the children to the United States, Dr. Silverman told the Respondent that the children were not malnourished.

On October 13, 2010, the Respondent initiated a deprivation action in the Juvenile Court of Houston County, alleging (a) that the Petitioner's affiliation with TFI is harmful to the children, and (b) that, while in the Petitioner's care, the children had fallen into a state of malnutrition and had not received proper medical care.  The Juvenile Court verbally pronounced that the Children were to remain in the care of the Respondent until the matter could be fully resolved.  In the meantime, on November 30, 2010, the Petitioner, in accordance with the Convention, filed her Petition in this Court seeking the return of her children.  On Friday, December 10, 2010, the day after the first evidentiary hearing in this Court, the Juvenile Court of Houston County entered "nunc pro tunc November 17, 2010," a handwritten "72 Hour Hearing Order" (Court's Exhibit 1) granting temporary custody to the Respondent and allowing supervised visitation by the Petitioner.[11]

---

[10] As noted, the Court allowed the Respondent additional time to depose Dr. Silverman.  By agreement, the parties convened a telephone deposition on January 11, 2011.  Also by agreement, the audio recording of this deposition was played in court January 13, 2011, even though the transcript of the deposition was not available.  Essentially, Dr. Silverman's testimony provides some ammunition for both parties to use in their eventual custody dispute.  His testimony and office notes, however, confirm the general sequence of events leading up to the abduction.  Also, Dr. Silverman's testimony and office notes buttress the conclusion that Mexico was the family's habitual residence.  For example, according to Dr. Silverman, Mr. Peterson told him he could not get a divorce in Georgia because he had not been a resident of Georgia for the requisite six months.

[11] This Court is not critical of the temporary custody order entered by the Juvenile Court.  It is understandable given the one-sided, and in some instances false, information provided to the Juvenile Court.  Also, the Hague Convention issues were not before the Juvenile Court.  However, a custody order, even a temporary one that has since expired, clearly contravenes established law.  The main

By all independent accounts, and with the exception of C.D.P.'s experience, the children appear to be well-cared for in the custody of either parent and are in good health and spirits.  Shortly after returning to Houston County, the Respondent contacted Houston County DFCS and requested an investigation, something that DFCS investigator Wendy Chadwell found "unusual."  Exhibit R-6A, p. 64.  Nevertheless, she conducted an investigation and found no evidence of neglect or malnourishment.  The children told Ms. Chadwell "they liked [Mexico], that they had been in school there and that they liked it."  *Id.* at 69.  They said they loved their father, but they loved their mother as well, and they missed her.

The Court appointed Roxanne Hinson, an experienced domestic relations attorney, to be the Court's representative tasked with interviewing the children.  See Doc. 15.  Ms. Hinson met with all four children on December 15, 2010.  Ms. Hinson testified that the children all appeared very comfortable meeting with her, and, over the course of the nearly two hour long meeting, the children discussed many aspects of their lives both here in the United States and in Mexico.  The children appear to enjoy their schools in both locations equally, and each child named to Ms. Hinson at least one best friend that he or she has at school in each country.  The children expressed their love for each parent and their grandparents in Mexico.  The children were all very affectionate and loving during their visit with Ms. Hinson.  In short, Ms. Hinson noted no signs of neglect, malnutrition, or physical abuse relating to their home life in Mexico or in the United States since their return.

---

purpose of the Hague Convention, and the motivation behind its implementation, is to "deter parents from crossing borders in search of a more sympathetic forum for child custody proceedings."  *Baran v. Beaty,* 526 F.3d 1340, 1344 (11th Cir. 2008).  Furthermore, Article 17 of the Hague Convention states that the "sole fact that a decision relating to custody has been given in … the requested State shall not be a ground for refusing to return a child under this Convention…."  Thus, the temporary custody order entered by the Juvenile Court has no impact on this Hague Convention proceeding.

There is no basis for concluding that the children were subjected to any inappropriate conduct or influence in Mexico.  On the contrary, the children clearly enjoyed a happy, safe home life in Mexico, except, of course, when their parents fought.  Indeed, C.D.P. was the only child ever placed at risk, and the Respondent and Dr. Williamson are primarily responsible for that incident.

There are two final twists in this unfortunate affair.  First, as noted, the Petitioner tendered evidence of the Respondent's violent acts during his prior marriage to Kristi Peterson.  Ms. Peterson, identifying herself as the Respondent's former wife, contacted one of the Court's law clerks prior to the first evidentiary hearing in this matter to offer information about the Respondent.[12]  When the Court disclosed this contact to the attorneys, the Court commented that it assumed the former wife had contacted the Petitioner's attorney to discuss the problems the couple had during their marriage.  As it turned out, Ms. Peterson had been in contact with the Respondent's attorney and she subsequently testified on the Respondent's behalf.  Indeed, as discussed above, Ms. Peterson, who is a non-practicing attorney, had been intimately involved in this matter for a year and a half.  She assisted the Respondent in gathering information about how to get the children out of Mexico and she arranged for her doctor, Dr. Williamson, to examine the children.  She testified that, although the Respondent had considerable problems in the past, she had been sufficiently in his presence recently to conclude that he no longer was capable of committing violent acts.  Indeed, the Respondent even reconciled with their daughter who had been the subject and victim of much strife during

---

[12] Of course, the law clerk refused to discuss the substance of the caller's information and referred the caller to the parties' attorneys.

their marriage.  During the December 21, 2010, hearing, the Respondent acknowledged that he and Ms. Peterson would "probably be married."

The second development concerns both Ms. Peterson and Dr. Williamson.  On December 30, 2010, Dr. Williamson called the Clerk's Office and informed a deputy clerk that he believed the Respondent had poisoned C.D.P. and, according to the deputy clerk's understanding, had possibly poisoned one of his daughters.  Because of the nature of this allegation, the Court called Dr. Williamson late in the evening of December 30 and, after talking with Dr. Williamson, convened a telephone conference on December 31 to disclose to the parties Dr. Williamson's allegations.  At the Court's request, William Sammons, Houston County DFCS's attorney, and Ms. Chadwell participated in this conference.  Dr. Williamson claimed that he had been reviewing C.D.P.'s laboratory test results and, because the Dilantin level became elevated so quickly, he concluded there was a strong possibility that this had been an intentional overdose.  Dr. Williamson also revealed that he suspected the Respondent had attempted to poison Kristi Peterson.  (Apparently, the deputy clerk mistakenly understood Dr. Williamson to be referring to one of the Respondent's daughters.)  Dr. Williamson claimed that the Respondent had "lied" to him.  Dr. Williamson said that he repeatedly asked the Respondent whether C.D.P. had an EEG or whether he had any "work up" for seizures and, according to Dr. Williamson, the Respondent repeatedly said C.D.P. had not had an EEG or any work up.  Dr. Williamson said that he felt he had been "suckered" into helping the Respondent.  In sum, Dr. Williamson claimed to have significant concerns about the children's safety while in Respondent's custody.  Based on this information, Ms. Chadwell felt it necessary to initiate an investigation.  Also, the

Court ordered that the children, until further notice, would remain in the Petitioner's custody.[13]  Subsequently, the Court granted the Respondent's request for supervised visitation.  Neither party requested that Dr. Williamson's allegations be included in the evidentiary record and the Court has not considered these allegations in reaching its conclusions with regard to the Petitioner's requested relief, except with regard to custody of the children during the pendency of this proceeding.

## II.    DISCUSSION

As mentioned, an action under the Convention is not an action to determine custody.  *Whallon v. Lynn*, 230 F.3d 450, 455 (1st Cir. 2000).  The sole issue is whether a child has been wrongfully removed from his or her habitual residence.  *Id.*  The goal of the Convention is to ensure that the custody of a child should be determined in accordance with the laws in, and should be decided by the appropriate authority in, the nation in which the child habitually resides.  The Convention's purpose, therefore, is "to prevent parents from abducting children in order to avoid the jurisdiction of courts with whose rulings they do not (or believe they will not) agree."  *Shealy v. Shealy*, 295 F.3d 1117, 1121 (10th Cir. 2002).  "The treaty and legislation seek to 'preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court."  *Id.* (*quoting Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993)).

> From the Convention's standpoint, the removal of a child by one of the joint holders, without the consent of the other, is . . . wrongful, and this wrongfulness derives in this particular case, not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. The Convention's true nature is revealed most clearly in these situations: it is not

---

[13]  This ruling does not mean the Court found Dr. Williamson's allegations credible, only that their gravity required appropriate precautions.

concerned with establishing the person to whom custody of the child will belong at some point in the future, nor with the situations in which it may prove necessary to modify a decision awarding joint custody on the basis of facts which have subsequently changed.  It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.

*Whallon*, 230 F.3d at 455-56 (*quoting* Explanatory Report, ¶ 71, at 447-48).

According to the Convention, the removal of a child from one country to another is "wrongful" if:

> (a)     it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> (b)     at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3.  If the Court determines that the removal was wrongful, and that no exception applies,[14] then the Court "shall order the return of the child forthwith." *Id.*, art. 12.

To make out a prima facie case of wrongful removal, the Petitioner must show, by a preponderance of the evidence, that "(1) the child was habitually resident in a given state at the time of the removal or retention; (2) the removal or retention was in breach of petitioner's custody rights under the laws of that state; (3) petitioner was exercising those rights at the time of removal or retention."  *Shealy*, 295 F.3d at 1122.  If the Petitioner can make this showing, then the children "are to be promptly returned unless one of the narrow exceptions set forth in the convention applies."  42 U.S.C. § 11601(a)(4).

**A.     Whether the Children Were Habitually Resident in Mexico.**

---

[14]  The defenses are discussed below.

The Petitioner first must show that the children were habitually resident in Mexico at the time of their removal.  Previously, this element was difficult for courts to apply because neither the Convention nor ICARA define "habitual residency" and there was little agreement among the courts (both in the United States and in the other Convention countries) as to what that term meant.  The issue has been resolved in this Circuit because the Eleventh Circuit, following the lead of the Ninth Circuit, has established a two-step process for determining habitual residence.

First, the Court must determine "[w]hether there [was] a settled intention to abandon a prior habitual residence . . . ."  *Ruiz v. Tenorio*, 392 F.3d 1247, 1252-53 (11th Cir. 2004).  "It is not necessary to have this settled intention at the time of departure, as it could develop during the course of a stay originally intended to be temporary."  *Id.* at 1252.  Additionally, in a case such as this one, where both parents are "entitled to fix the place of the child[ren]'s residence," the Court must consider the intention of both of the parents.  *Id.* at 1253.

The Court is satisfied that the parties intended to abandon their Houston County residence.  They either traveled to Mexico intending to stay for a brief period and, within a few months at the most, decided to abandon their Houston County residence, or they traveled to Mexico already intending to abandon their Houston County residence.   The fact that the parties sold their house in Houston County and took up residence in Mexico in their own dwelling (rather than living with the Petitioner's parents or in a hotel) suggests that, even initially, they intended to abandon their Houston County residence.  Whether or not this is the case, it is clear to the Court that at the very least they abandoned their Houston County residence once in Mexico.  They seldom, if ever,

returned to the United States.  They enrolled their children in school when they reached

the appropriate age.  They established legal, temporary residency in Mexico and

intended to become Mexican citizens.  Their fourth child was born and raised in Mexico

and had never been to the United States prior to her recent removal from Mexico.

Moreover, Wendy Chadwell, the investigator for the Houston County Department of

Family and Children Services, stated that, based on her investigation, it was clear that

the Petersons intended to stay in Mexico.

       The only evidence the Respondent cites to dispute that the habitual residence of

the children was in Mexico is the fact that the Petitioner maintains a mailing address in

Georgia.  The Petitioner testified, though, that prior to this action she has only been

back to the United States once since leaving in 2006, and that she maintained that

mailing address for correspondence because she lacked complete confidence in the

Mexican postal service.  It is common, according to the Plaintiff, for "expats" to maintain

a United States address.  There is no evidence that the Petitioner ever resided at the

United States address for any appreciable period of time, or that the Petitioner

maintained that mailing address because she intended to retain her prior habitual

residence.  The evidence is clear, therefore, that the Petersons intended to abandon

their previous habitual residence in the United States.

       Having determined that the Petersons intended to abandon their previous

habitual residence in the United States, the Court next must determine if there was "an

actual change in geography and the passage of a sufficient length of time for the

child[ren] to have become acclimatized."  *Id.* at 1253.  This question is easily answered.

The Peterson family had lived in Mexico for four years and seldom traveled back to the

United States.  As noted, the youngest child was born in Mexico and only traveled to the United States when brought here in October by her father.  The children attended school in Mexico, are fluent in Spanish, and are generally acclimatized to Mexico.  Indeed, the children had no appreciable connection to their previous residence in Houston County prior to their removal from Mexico in October.

Because both the Petitioner and the Respondent intended to abandon their previous habitual residence in the United States, and because there was an actual geographical change and the passage of sufficient time for the children to have become acclimatized, the habitual residence of the Peterson children is in the state of Jalisco, Mexico.

**B.     Whether the Petitioner Had Rights of Custody.**

The Petitioner next must prove that the Respondent's removal of the children to the United States was in breach of her custody rights under the laws of Mexico.  The Convention distinguishes rights of custody from rights of access.  A return order can only issue if the removal violated the Petitioner's rights of custody.[15]

According to the Convention, rights of custody "shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  Hague Convention, art. 5(a).  Rights of access, on the other hand, include "the right to take a child for a limited period of time to a place other than the child's habitual residence."  *Id.*, art. 5(b).  Because rights of custody are rather loosely

---

[15]   Remedies for violations of rights of access include "ordering that the custodial parent who removed the child from the child's habitual residence reimburse the other parent for expenses incurred in exercising his or her rights of access."  *Whallon*, 230 F.3d at 455 n.3.

defined, courts generally look at the background report of the Convention for guidance.

*Whallon*, 230 F.3d at 455.

> That report states that "the law of the child's habitual residence is invoked in the widest possible sense," and that the sources from which custody rights derive are "all those upon which a claim can be based within the context of the legal system concerned."  The Report also states that the Convention favors "a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration."

*Whallon*, 230 F.3d at 455 (internal citations omitted).

The applicable law here is the Civil Code for the State of Jalisco, Mexico (the "Civil Code").[16]  In Mexico generally, and in Jalisco particularly, the doctrine of *patria potestas* (parental authority/responsibility) governs the relationship between parents and their children.  "Parental authority/responsibility (*patria potestas*) can be understood as the series of reciprocal rights and obligations that exist between the father and the mother. . . .  *Its purpose is the custody of the minors themselves as well as their assets and it is intended to protect them*."  Article 578.  *Patria Potestas* "is exerted by both parents," (Article 581), and lasts until it ceases under Article 597, is terminated under Article 598, or is suspended under Article 601.[17]  The rights and duties of *patria potestas* are as follows:

> I.      It is, above all, a duty and an obligation to be exerted personally and it cannot be waived under any circumstance.  Only in the exceptions

---

[16] Article 14 of the Convention allows a court, "[i]n ascertaining whether there has been a wrongful removal . . . within the meaning of Article 3, . . . [to] take notice directly of the law of . . . the State of the habitual residence of the child, without recourse to the specific procedures for proof of that law . . . which would otherwise be applicable."  Additionally, under ICARA, "no authentication of . . . [documents or information included with a petition under the Convention] shall be required in order for the . . . document[] or information . . . to be admissible in court."  42 U.S.C. § 11605.  To that end, the Court takes judicial notice of the translated excerpts of the Civil Code for the State of Jalisco, Mexico, attached as Exhibit P-8.  Another translated copy of the Civil Code was provided to this court by the U.S. Department of State.

[17] There has been no allegation or evidence suggesting that the Petitioner's *patria potestas* rights have ceased, or have been terminated or suspended.

permitted by law, may those exerting parental authority/responsibility (*patria potestas*) entrust custody of those subject to it to a third party;

II.    It is not transferrable, except in cases of adoption;

III.   It represents a positive duty of constant care that requires effective and constant performance to achieve its purpose; and

IV.   It confers the right and duty to discipline in a prudent and moderate manner with the purpose of harmonic and positive education.

Article 580.

The issue, therefore, is whether the rights conferred on the Petitioner by the doctrine of *patria potestas* are rights of custody or rights of access. The Eleventh Circuit has yet to address this specific issue, but the First Circuit has in *Whallon v. Lynn*, 230 F.3d 450 (1st Cir. 2000). In discussing the doctrine of *patria potestas* in general, and as applied by the Baja California Sur Civil Code in particular, the First Circuit concluded that rights conferred on a parent by *patria potestas* are rights of custody rather than mere rights of access. *Whallon*, 230 F.3d at 458. As in *Whallon*, here, *patria potestas* rights are rights of custody. The purpose of the doctrine "is the custody of the minors themselves as well as their assets and it is intended to protect them." Article 578. Moreover, the Petitioner's *patria potestas* rights have not ceased, nor have they been terminated or suspended. Thus, when the Respondent removed the children without the Petitioner's consent, he violated the Petitioner's rights of custody.[18]

## C.    Whether the Petitioner Exercised her Custody Rights

The Petitioner next must show an actual exercise of her rights of custody. However, this element has been considerably weakened by the courts that have

---

[18] The Written Declaration of Lic. Sergio Gutierrez Tejada, Deputy of the Municipal Judge and Acting Head of Functions of the Municipal Court, is indicative, although not determinative, of the Petitioner's custody rights. In that Declaration, the Respondent was allowed visitation rights with his children, but he was to return the children to the Petitioner, who "has custody of the their children [sic]." Doc. 1, Exhibit 10. The Respondent was not allowed to "take his children out of the municipality of Chapala, Jalisco, the State and even less out of the country." *Id.* In other words, this Declaration indicated that the Petitioner had custody of the children and it limited the rights of the Respondent with respect to his children.

considered it.  Motivated by myriad concerns, the courts "liberally find exercise

whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of

regular contact with his or her child."  *Bader v. Kramer*, 484 F.3d 666, 671 (4th Cir.

2007) (internal quotations omitted).

> Under this approach, "a person [who] has valid custody rights to a child under the law of the country of the child's habitual residence . . . cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child."

*Id.* (*quoting Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996)).  "Further, '[o]nce

it determines the parent exercised custody rights in any manner, the court should stop—

completely avoiding the question whether the parent exercised the custody rights well or

badly.'"  *Id* (*quoting Friedrich*, 78 F.3d at 1066).

There is no evidence that the Petitioner abandoned her children.  On the

contrary, the children lived with the Petitioner prior to and after the parties separated.

The children remained with the Petitioner when the Respondent returned to the United

States.  The Petitioner provided nourishment and medical attention for her children.  All

of the evidence establishes beyond dispute that the Petitioner clearly exercised her

rights of custody; and certainly there is no evidence that she unequivocally abandoned

her children.

**D.    Whether Any Defenses Apply**

Having determined that the Petitioner has made out a prima facie case of

wrongful removal, the Court must next determine whether any of the exceptions apply.

Of the exceptions provided by the Convention, only the exception in Article 13(b) could

possibly apply under these facts.  Article 13(b) states that the Court "is not bound to

order the return of the child[ren] if . . . there is a grave risk that [their] return would

expose the child[ren] to physical or psychological harm or otherwise place the child[ren] in an intolerable situation."

This "narrow" exception is a difficult one to prove.  *Whallon v. Lynn*, 230 F.3d 450, 459 (1st Cir. 2000).  As an initial matter, the Respondent must prove the exception by clear and convincing evidence, rather than the preponderance of the evidence burden placed on the Petitioner.  42 U.S.C. § 11603(e)(2)(A).  This reflects the Convention's strong preference that custody issues be resolved in the country of habitual residence.  Moreover:

> To meet [his] burden under the article 13(b) exception, the respondent must establish that the alleged physical or psychological harm is "a great deal more than minimal."  Indeed, the harm must be "something greater than would normally be expected on taking a child away from one parent and passing him [or her] to another."

*Whallon*, 230 F.3d at 459 (internal citations omitted).  Most importantly, perhaps, "[c]ourts are not to engage in a custody determination or to address such questions as who would be the better parent in the long run."  *Id.*

The Respondent's arguments with regard to this exception are: (1) that the children were malnourished while in the Petitioner's care, and that the Petitioner did not provide adequate medical care for the children; and (2) that the sexual practices of TFI, and the Petitioner's and her family's involvement in TFI, put the children at risk of improper contact or influence.  The Court will address each argument in turn.

First, however, it is appropriate to note the observations of the DFCS investigator and the Court's appointed representative, Roxanne Hinson.  Both are independent and both have considerable relevant experience, Ms. Chadwell in matters of alleged child abuse, and Ms. Hinson in both allegations of child abuse and child custody disputes.

26

Based on their observations and discussions with the children, there is no basis to conclude that the children were neglected or mistreated in Mexico.  Neither is there any independent evidence that the children are afraid to return to Mexico.  On the contrary, they appear to look forward to seeing their family in Mexico, and, for example, jumping into their grandfather's pool.  Of course, there is nothing to suggest the children are not happy with their father.  The point, however, is that nothing in the children's experience in Mexico suggests even the slightest hint of risk.

Nevertheless, the Respondent contends, or at least contended before Dr. Williamson's change of heart, that medical evidence establishes that all of the children were in a state of malnutrition and that one of the children, C.D.P., was not receiving proper treatment for his various medical conditions.  Given the detailed discussion of the medical evidence above, extended comment here is not necessary.  Despite the Respondent's efforts to marshal the medical evidence to his liking, there is no credible evidence that the children were at grave risk in Mexico and no evidence, credible or otherwise, that medically they would be at grave risk if they returned.

Next, the Respondent claims that, if the Court were to order the children's return to Mexico, they would be put at grave risk of physical or psychological harm as a result of the Petitioner's and her family's close affiliation with TFI.  As noted above, rumors and allegations of several radical beliefs and practices have plagued TFI since its inception.  However, for the purposes of this action, there is simply no credible evidence that the Peterson children were or would ever be subjected to any threats of improper contact or influence as a result of living with or in close proximity to those members of the Petitioner's family that are active members of TFI.  That is not to say that the

general and somewhat dated information about TFI adduced in this Court merits no attention.  However, those concerns should be raised in the court that decides the custody dispute between the Petitioner and Respondent.

In short, the Respondent has failed to show by any standard, let alone a clear and convincing standard, that there is a grave risk that the children's return to Mexico would expose them to physical or psychological harm or otherwise place the children in an intolerable situation.  Accordingly, the Respondent's affirmative defense must fail.

### III.    CONCLUSION

For the foregoing reasons, the Court rules that the Respondent's removal of the children from the care of their mother in Mexico was wrongful under the Convention, Article 3.  Therefore, the Convention requires that this Court order the return of the children forthwith, (Article 12), and ICARA requires this Court "[to] order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate."  42 U.S.C. § 11607.

Accordingly, it is hereby **ORDERED** that the children be returned to their habitual residence in Mexico.  The Court further **ORDERS** that the Respondent pay the actual, reasonable costs and expenses of the children's transportation to Mexico.  The Court defers ruling on the Petitioner's request that the Respondent pay her remaining fees and expenses.  The Petitioner is instructed to file, within 14 days, an itemization of all fees she seeks to recover (including costs of returning the children), along with a brief explaining why she is entitled to costs, fees and expenses in addition to the costs of

returning the children to Mexico. The Respondent shall have 14 days from the date of service of the Petitioner's brief to show that such an award would be inappropriate.  The Petitioner shall then have seven days to respond.

This Order is stayed until Monday, January 24, 2011, for two reasons.  First, if the Respondent elects to appeal this Order, he should be allowed time to obtain a stay from the Eleventh Circuit Court of Appeals.  Second, and although the Respondent has failed to demonstrate that the children will be subject to grave risk if they return to Mexico, the Court has established, through the respective Central Authorities of Mexico and the United States, contact with the Hague Convention "network judge" in Mexico, Judge Dionisio Núñez Verdín, who happens to be a family law judge in Guadalajara. This Order may be supplemented to ensure that the appropriate Mexican authority becomes involved in this matter.  The Respondent's alleged concerns regarding TFI will be addressed in the appropriate forum and by the proper authorities.

**SO ORDERED**, this the 14th day of January, 2011.


S/  Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT