method of handling them! In fact it might be time to have a big revolution in all of our homes and schools."

In April 1991, Peter Amsterdam wrote the new "Back to the Basic Home Requirements". So far as education was concerned, "Scholastics" in The Family terminology, the compulsory requirement for Jetts and teens was a minimum of 12 hours of scholastics each week though only 6 hours would be required for teens who were up to par scholastically for their age. He added "teens 16 years of age or older, who are doing fairly well scholastically, are no longer required to have scholastics, but could possibly use the 6 hours weekly for ministry training."

1992 saw the beginning of what The Family regarded as "unprecedented persecution". It caused them publicly to state their position and policy on education. Their belief was that:-

"Education is primarily the process of learning to apply God's work to help us more fully understand the purposes of God in life and appreciate Him and the wonders of His creation." The Bible is central to the children's education and it forms the cornerstone of their curriculum. Their educational objective is:-

"To foster total dedication to God and Christian discipleship in all of our children while helping them to acquire the knowledge, skills and abilities needed to lead happy and productive fulfilling lives in His service. ... We would view any attempt to impose totally secular values and secular perspectives on our children as a serious disregard for our spiritual belief and an infringement of our religious rights, aimed at destroying our religion, as well as placing our children in serious moral danger." They believe that true education should not be confused with simply acquiring knowledge:

"The Bible warns us that worldly wisdom and knowledge are not only considered foolishness to God, but are not able to deliver or transform the human spirit; in fact, they do not even bring happiness to a man at all.... The most essential, meaningful and rewarding education one can receive in life is obtained through a prayerful study of God's word and by letting Jesus and the Holy Spirit dwell in him and instruct him and lead him into all truth, knowledge and understanding. ... We translate this (a Godly education) into practical terms by providing our children with a multi-faceted education: Christian and ministerial training, practical vocational training, scholastics, physical and social developments. Our Christian ministry and cooperative life style help provide an ideal home-based learning environment in which to accomplish these educational objective."

The changes suggested by the DTR did not wholly achieve that. By January 1993, it had come to Maria's attention that a number of the teens and young adults still had legitimate concerns about The Family, especially regarding the role they had to play in it. The "Personal Encouragement Revolution" (the PER) was published in June. The Summit 93 proposed changes to the DTR scholastical requirements. It defined scholastics as mainly referring to formal assigned study time in three R's and the three G's. This was reduced from 12 to 8 hours a week. The junior teens were to have a minimum of 4 hours of scholastic study plus 4 hours of vocational/ministry study, down from 12 hours a week, but junior teens (ages 14 and 15) who were up to par scholastically and senior teens (ages 16 and 17) were required to have a minimum of 4 hours study time a week (vocational/ministry study and/or scholastic, as chosen by the teen).

In his letter to me, Peter Amsterdam expanded upon The Family's educational philosophy. He told me that in January 1994, Maria convened a meeting of a number of WS and CRO educational representatives who made a number of recommendations to enhance the educational content in the children's lives and to "facilitate participation in local national secondary education examinations", to "research the possibility of taking outside training in subjects they need help in" and generally, to "make greater use of local educational opportunities," and to "be as supportive and accommodating as posible of our children's individual desires for special training." He said:-

"This is a massive undertaking and it will take time and a great deal of financing to fulfil these goals, but senior leadership is committed to implementing the above measures."

## THE ORAL TESTIMONY ON MATTERS OF EDUCATION:

All are agreed and there is no issue about the fact that the very young children receive a wholly satisfactory education. In my judgment, The Family are entitled to greater credit than just that. I find that the young develop their reading, writing and arithmetic skills at an earlier age than their contemporaries outside the communities. Moreover, I am satisfied by the evidence of MM, that there is a very wide variety of games, activities, arts and crafts gathered together in the "activity books", which would stimulate as well as entertain the young.

It follows that I have no qualms about the education S has probably already begun to receive and the education he is likely to receive over the next several years of his life.

The education of the children at a secondary school level is quite different. The case against The Family is summarised by one of its recent defectors, JG who expressed his concern in these terms:-

"Children suffer - you grow up in a one way street with no other thought of anything else to do except to be a missionary."

I must bear that evidence in mind when looking at the isolation of the children within The Family. I must also bear in mind the evidence of another defector, SC, that though life is geared to being a missionary, the Family "seem to be working on it (education) a lot more."

The crucial question for my decision is whether they are working on it hard enough. Their own expert witness Doctor Millikan is "not without some reservations concerning the education of the children above the primary school level." He accepted findings of Doctor Watson-Munro in Victoria, Australia who formed the opinion that the children were well adjusted and well educated but:

"His only reservation (which was not a serious one) was similar to my own, that the educational environment was less than full. For the teens, the educational materials available are limited to a narrow band of publications emerging from fundamentalist, creationist framework although it must be said that there is a concerted attempt within The Family to address this situation. They are at an early stage in developing educational materials for this age range. They are in a sense growing up as a movement with their children and what I observe is a change to greater diversity in the education."

I am satisfied that the strident strictures in the early "You are what you read" and "Book Burning" letters are not rigorously enforced and nor rigorously observed by the young. Perhaps they never have been. Berg may have sounded off in "The Advantages of Having Children" (May 1978) that:

"Much of that expensive Montessori junk is not even worth putting in your house". ... Stick to the New Testament and the Mo Letters and teach the children at home. Take the children litnessing take the children provisioning in every single home. Then the kids will be getting the best school possible every day".

MM endeavoured to teach by Montessori methods. SC used to go to the library when he was at the teen school at Wantage. The bookshelves at the Ward's home have books from the local library upon them. I am, however, equally satisfied that the children are not wholly free to pursue their intellectual interests as they wish. The education now seems based around "Program Studies" being prepared by the Christian Vocational College. The most cursory glance at it will reveal the heavy reliance placed on The Family literature for teaching over the whole range of the syllabus, from history and geography to current affairs and physical education. This is less than satisfactory. There is a dearth of good literature available. EM a childcare expert in the family, told me that there was a wide range of books that were available in the homes but when pressed, and pressed again, she could not recall a single title. Some material is absolutely prohibited. I can understand that Darwin's "Origin of the Species" might be proscribed material but I confess to being less able to understand what untold harm Greek mythology might do. In such a narrow environment an enquiring mind suffers:-

      (a)      because the material to broaden it is not readily available and in some aspects is not available at all.

      (b)      because generally speaking, enquiries are frowned upon on the basis that curiosity is the product of a doubting mind and doubt allows the Devil to take it over.

I am satisfied, however, that there is an awareness, which I find to be a growing awareness, that studying for public examination is permissible, indeed advantageous, but at the moment any such public participation takes place within a very narrow compass, if it takes place at all. The movement towards it may be strongest in America but there is evidence of it beginning to happen in this country. LA and VB and JL, spoke of this development with varying degree of enthusiasm,which I have to treat with caution in the light of the heavy emphasis The Family place upon the deficiencies they perceive elsewhere in state education. For example, MM was insistent on exhibiting to her affidavit an inordinate number of press cuttings reporting one school disaster after another or one educational failing after another in "system" schools. JL's antipathy seemed to stem from a murder at the school attended by her sister's children. They use these examples as to condemn secular education. It is not the most rational approach. I am far from accepting that "system" education is perfect - it never can be - but the leadership should not allow their judgment of what is best for their children's rounded education to be clouded by the exaggerations of the Traumatic Testimonies.

I have to accept that parents within The Family are entitled to educate their children at home. It is neccesary, therefore, to see how well they are doing it. I have the benefit of a report of the Local Authority who conducted an investigation at my direction pursuant to Section 37 of the Children Act 1989. As part of that investigation officers of the Local Education Authority visited The Family for one school day. They reportd as follows:-

"The educational activities are planned with reference to a defined, carefully structured and sequential programme of work that is used in all Family homes. Content is detailed for each identified level of ability and strongly reflects the religious and moral beliefs of The Family. Extensive guidance is provided for the adults who use the programme. Assessment and recording are built into the programme based on the six week marking period. Accomplishment sheets are maintained for each child for each period with accumulative record sheets also being maintained. Regular reports are made to parents of the children.

The records were conscientiously maintained although the YC (young child) group had less in the way of documented records due to the recent changes in adults assigned to them. The teaching staff employed laid emphasis on children working under the close directional instruction of the adult. However, the small teaching groups enabled a great deal of discussion, questioning and flexibility so children had the opportunity to follow particular interests within the parameters set by the adults. Work with the teens laid more emphasis on independent enquiry although the sources and reference material provided are carefully defined in order to reflect the values and beliefs of The Family. Opportunities were being taken to make use of learning opportunities provided in the community and one of the teens had recently attended at a local education authority maintained community college on food hygiene. In discussion the adults responsible for the teaching all expressed interest in the children taking up the new opportunities that are being developed for external certification/qualification. The Family are interested in extending their knowledge of general national, vocational qualifications as a means of adding 'substance' to their own internal qualifications....There is an extensive collection of books and videos to support teaching and learning that are located in the various parts of the house used as teaching bases. There are many sets of encyclopedias and BEKA books available. These tend to promote views and values that are consistent with those of The Family. The variety of other books is similarly controlled and early reading materials were concentrated on one rather dated scheme. The children are given the opportunity to use several public libraries and are guided in their choice of reading material. The rooms and furniture used for teaching purposes were all suitable for the range of activities that were being undertaken. Information technology resources are extensive and suitable software is available for all the children with data bases for the retrieval of factual information, word processing facilities and drill work/games for basic numeracy and literacy all being used during the time of the review. Resources for imaginative play were less in evidence in the teaching areas and there were few facilities for practical science enquiry or to support investigative work in mathematics and technology for the younger pupils. The extensive opportunities afforded by the large grounds for physical and recreational activities have been recognised.....The standards of work and achievement that the review observed were in line with norms expected for the age and ability of the children. In particular the children demonstrated good standards in oracy, numeracy and literacy, and their attitudes, behaviour and relationships both with the adults that taught them and with each other were excellent. The older children were able to work without close supervision, whilst the OC/JETT group gave an excellent example of co-operative and collaborative work which also demonstrated the ability to evaluate, modify and polish their own work and progress. The children were encouraged to question, to think and to find out for themselves, although this operated clearly within the values, beliefs and principles aspired by The Family. Adults took their tasks seriously and were concerned to discharge their responsibilities effectively. The use of praise was particularly evident in all the groups observed."
Their conclusion was that:

"From the review undertaken, the review team are of the opinion that the education provided:-

      ¤      is undertaken within the strong and explicit framework of values and principles aspired by The Family;

      ¤      is based on a strong relationship between adults and learners in a controlled safe and secure environment;

□ next, whilst there may be concerns about the .ffect on the children in the long term of being isolated to some degree from a wider community, nevertheless on a day to day basis the education provided offers activities that are broadly suited to the age, ability and aptitude of the children and which enabled the children to achieve standards that are satisfactory or better."

That report was prepared in November 1993. It seems that a year later further visits were made. This further report stated the following:-

"The curriculum followed is one that is prescribed for all Family homes, is American in origin and extensively documented. It lays heavy emphasis on the basic skills of numeracy and literacy through set and structured programmes of work in reading, language, arts and mathematics. There are other programmes in modern foreign languages, science, art, music, Bible reading, social studies, geography, history, health and physical education. The curriculum is also influenced by the national curriculum. The adults have consulted the recent draft proposals made following the Dearing Review into the National Curriculum and expressed interest in any support and advice the local education authority might be able to offer.....The range of the curriculum is broad and balanced in most respects. The teaching of art is confined mostly to colouring and drawing. To a certain extent science lacks coherence and the adults recognise the need to include more practical and investigative work....All the adults take their responsibility seriously and appear to be keen to do their best for the children".

The Inspector observed the secondary age pupils and reported ·his:-

"During the morning of the visit, the four children worked under the supervision of LA who had planned a number of different activities. The pupils participated well in a discussion on violence on television (stimulated by newspaper articles) and produced a short written summary of their opinions. The children went on to discuss the dramatisation of a story and, despite the age differences, all children participated and were involved in the task. The children talked about other activities and projects and performed an impromptu song followed by a dance. From the evidence in portfolios of work, science is more investigative than practical, but information technology skills were well developed. The children were following a course book for GCSE mathematics and extend their work by using a bank of activity stored on computer software."

Of the primary age pupils, the report observed that:-

"All the pupils were achieving at least standards that would be expected nationally of pupils their age and beyond. The pupils were keen and eager to participate and clearly enjoyed the activities. They were attentive throughout the session, responded well to challenge of the tasks and related well to each other and to the teacher. The session had good pace, AG clearly enjoying her role and had planned and prepared the material well and took into account the differing ability of the children. She was clear and precise in her instructions, developed the learning points well, praised and encouraged the children as they responded and was firm when necessary."

There was a second group of younger children working under LA:-

"The session began with handwriting practice. Standard of control and letter formation was at the level expected nationally and all the children could write in a fluent classic style....The two boys in particular were very contributive; they showed a wide range of general knowledge and drew on other learning to add to the discussion."

Of the resources the report said:-

"The range of resources to support teaching and learning is adequate. There is an extensive range of video material that links to the curriculum programme together with recorded wild life programmes. There is an adequate range of books and reference material, most of which reflect closely the religious views and values of The Family. A range of musical instruments is available, although equipment for science was less in evidence. A wide range of appropriate books relating to the national curriculum had been purchased from booksellers for use with younger children. A more than adequate number of computers and software is available.

Contacts and links with the local and wider community: Although children from the village visit the home, most friendships are within The Family. However contact outside the home is achieved through a variety of activity. Some of the older children give musical entertainment in other towns and some have performed in the recent Diwali celebrations in Leicester. The older girls have been to the local primary school to watch the teachers as a 'pre-vocational' part of their education. Some work has begun on looking at formal creditation for the education provided and one of the adult helpers has recently completed a 'clait' course in IT. The police have also been approached to run a cycling proficiency course and the local vicar is a regular visitor to the home.

## CONCLUSION

The standard of work and achievement seen during the course of the visits is in line with the national expectations for the ages and abilities of the children. Standards in the key skills of literacy and numeracy meet those expected nationally with some children achieving beyond. The curriculum is close structured, clearly organised and the adults work in close co-operation with each other. In many ways the arrangement is that of a small private school with a particular religious emphasis. Most of the children seen were open, they relate well to each other and to the adults who teach them and are only too happy to talk about themselves and their work. The adults welcome the visits. They were at ease and open in all the discussions; they were happy to articulate their philosophy and appeared eager to seek ways to extend the quality of what they were doing. From the range of evidence available the educational needs of the children are being met."

I accept those findings.

So far as tertiary education is concerned, I do not recall evidence of any child who has gone on to further education. Peter Amsterdam wrote to me:-

"It is likely that the pursuit of extended post-secondary educational qualifications will entail temporarily stepping out of D.O. status. It would be very difficult for a home to provide the necessary resources to facilitate such courses of education. The development of the TS programme should make this option far more readily available and acceptable to those who wish to pursue it".

Those who did would labour under a disadvantage because they do not have the necessary grades at GCSE or at A level. From the observation of those who have left The Family but wished to pursue further education, I was left in little doubt that they have the ability but struggle to catch up with the formal requirements for entry to University. Many of the adults have had the benefits of that further education themselves but the very fact they are not able nor willing to permit this privilige to their children is an indication still of their conviction that the essential training is for the End-time and that the end is nigh. It is a

'imitation on the full development of the child. I shall turn to the implications of this for S when I reach the concluding part of my judgment.

## IMPAIRMENT OF EMOTIONAL, SOCIAL OR BEHAVIOURAL DEVELOPMENT

This is an important topic. I must deal with a number of areas of concern, covering such matters as the emotional pressure to conform and to remain faithful; the loss of identity, self esteem and self respect and loss of freedom; isolation from the community and from the natural family and so forth. These are all matters particularly affecting the JETTS and teens. The JETTS are the 11-13 year old group, the junior teens are 14 and 15, the senior teen 16 and 17 and the Experimental Adults are the 18-20 year olds.

Although some of the early members of the group would have brought their children with them, it was not until about 1985 that World Services appeared to have become concerned about the problem confronting the teenage children who had been born into the movement and grown up within the movement. I must therefore consider the last decade or so of The Family's life. I shall endeavour to set out the developments chronologically and to correlate what was happening generally with what was happening to the children in this country over the past 5 years. To set that scene, I remind myself of the background against which these events were taking place. In particular:-

1    Early members were drawn from the hippy community. They were the drop-outs from a society whose religious, moral, social and political values they scorned and rejected. The message David Berg preached gave their life meaning and gave them hope. It was a 'revolutionary' message with the plain intent of overthrowing a secular order imposed by a system in the hands of Satan. Contact with the system was, therefore, contact with the Enemy. Fraternising with the enemy was punishable by God. As an example of what befell those who ceased to be members, the letter 'IRFers Beware: If you fail to tithe, God will take a collection!" written in February 1988 told the story of a former member who was raped and murdered because she had lapsed. The message of the letter was:-

"So it looks to me more like she may have reaped what she sowed and got what she deserved rather than died as a martyr..I just don't believe God would let something like that happen to one of his absolutely dedicated wholehearted 100% full time servants or handmaidens if they were serving the Lord full time sincerely or doing the best they can to support God's works".

2.    The metaphor of an army was frequently and powerfully deployed. It served to reinforce the messages of the paramount need for obedience and loyalty and also the draconian penalties, always imposed for mutiny and desertion.

3.    Since the early days in the 1970's when influential parents of a young convert brought the Children of God to the attention of Governor Ronald Reagan and to the media, the movement has lived under the sword of persecution. Persecution drove David Berg into hiding; persecution drove them from Tenerife; persecution led to their retreat to the Philippines. To counter persecution, the movement  resorted to secrecy. They used the word "Selah" for all things that were secret. In 1976, 'Gotcher Flee Bag' gave advice on how important it was to carry the few vital possessions one needed to make a quick escape. The Family literature was kept in a trunk and systems were imposed to ensure that its precious secret (which is a euphemisam for incriminating) contents could be removed

before the authorities could lay hands on them. I heard evidence of raids by the police in India and I am not in doubt about the intense security precautions that perforce were considered to be essential.

4.    What bound the movement together was a religious fervour. They believed - so far as I know they still believe - that the End-time is at hand (even if some deadlines have passed!) The message that was preached and received was that one chose the prospect of eternal salvation or faced the certainty of eternal damnation. It is a message of all or nothing. An inevitable consequence in logic and on Biblical authority was to 'forsake all'. This call has been made from the earliest days of the movement. In 1972 in the 'One Wife' letter, Berg wrote about God being:-

"In the business of breaking up little selfish private wordly families to make of their yielded broken pieces a larger unit of one Family....don't forget this means your children also. If you love your flesh and blood children more than you love God's children of God's Family, then you really haven't come to the realisation of what God's Family is all about."

As recently as March 1993 Maria wrote to a leader who was having 'some trials over the fact that she and her children often had to be apart because of her work'. Maria said:-

"It makes your heart ache because it is so difficult for them to understand why they can't be with you or you with them. We feel terrible when our children have difficulties and we can't do anything to prevent it, we can only pray for them. But often it seems to me that this is part of our (and their) forsaking all for Him and His Work - forsaking mothers and fathers and children so we can put His Work first - and our children having forsaken their mothers and fathers for the very high privilege of being a member of his family."

So much for the ethos of The Family. In dealing with its more recent history as World Services presented it to me, I note how after RNR in 1978 The Family was driven underground by the 'anti-cult hysteria' following the Jonestown tragedy "with the media fuelling the public's outrage and fears, extreme prejudice and animosity towards new religious movements were the order of the day." Berg's response was to scatter The Family into smaller communities because:-

"Sometimes one of the smartest things you can do is to make your enemy think he has won! Make him think he has accomplished his purpose. When their target disappears they've got nothing to shoot at! The game is over and the enemy feels like, 'well, we accomplished our purpose!' (from Furlougher Backslider- or Supporter? July 1979)."

The Family were urged to begin their mobile ministry and became fragmented. They did not die. Indeed they spectacularly exploited the media through their broadcasting of their message through tapes and videos created by Music with Meaning. The circulation of the videos brought The Family together again. By 1983 many had returned to co-operative living especially as The Family continued its migration south and east. World services and Berg himself established a headquarters in the Philippines. It was there that MB joined them at the end of 1983. In 1984 The Family had to endure the unfavourable publicity of Deborah Davis, Berg's daughter, publishing her revelations about the inside story of life within The Family. In 1985 MB would have been 13 years old and Davidito 10. As I have already set out, The Family were already beginning to cope with the difficulties of adolescence about which Berg had written his 'Early Teens' letter. 1986 saw the gathering of the teens mostly aged 12 to 14 at the Mexican TTC. The Family says it then learnt of some of the sexual exploitation of these children.

This had been revealed by the confessions made by the children through some early form of Open Heart Report (OHR). As larger teen homes operating virtually as 'high schools' began to develop through 1987, The Family became aware of the diverse activities, practices and disciplinary standards that were applied throughout the movement. Berg and his household were becoming aware of the difficulties which MB was undergoing. This section on emotional and psychological abuse must, once again, start with MB.

Her father had died when she was a toddler. Whether his death was suicide or an accident, is by no means clear: there are some strong indications that he took his own life. Her mother, Shula, was 'mated' with Andy Irwin. They had a child Adonis. MB had no contact with other half brothers and sisters. At an early age she was removed from her mother and was in the care of her grandmother, Mother Eve, Berg's wife. Her first knowledge of sex and her first sexual encounter came during that time with her grandmother. After some years it was a shock to her to see her mother and Adonis again and there was an unfortunate encounter as mother and grandmother struggled almost literally for her possession. The mother won. A few years later aged 9 she joined Music with Meaning in Greece. As I have already set out, it was there that she was filmed and abused. Berg must have known it for he would have seen the videos. In the history before 1980 it is acknowledged that 'these unique circumstances (in MWM) fostered a unique liberal sexual climate as well.' Berg must have known about that as well. In the last state Sara records:-

"At only 9 and 10 years old she freely watched adult videos, plus she was showered with attention by many of the men there which caused her to have an extremely high opinion of herself and this became of major importance to her."

Then, at the age of about 11 1/2 she was sent to her Grandfather's compound in the Philippines. She met him in December 1983. She was completely overwhelmed by him. He looked like the prophet of God for the End-Time which she truly believed him to be. She told me in evidence that she had 'utter respect, fear and terror, love and adoration for him and because he was my grandfather, I also had more sentimental feelings for him.' That state of veneration did not last. As the months and years went by, his feet of clay were revealed. He drank too much, as is acknowledged in 'The Last State'. His language was coarse. He publicly fondled women in his household. He called upon them for sexual comforts. He made prophecies which did not come true. He was contradictory. He began to request MB to 'share' with men, for example her step-father Angel a Leader in the public relations section. Eventually he abused her and he manually ruptured her hymen.      She became filled with doubt. That was hardly surprising. The confession of these doubts to Sara was at first sympathetically dealt with although Sara was driven to warn MB that doubting let the Devil in. She believed it. She believed in Satan. She feared him. But they were always encouraged to confess whatever was bothering them and MB was under a compulsion to make admissions even if, in the beginning at least, only partial admissions. When she was about 14, she again started recording her thoughts. She was again at first treated sympathetically by Sara, Maria and Peter Amsterdam. I accept that evidence. Milk of human kindness does flow through their veins and I must not forget it. By now MB was beginning to doubt. It seems common ground that she believed she was seeing devils and she complained that they were attacking her sexually. She expressed violent anger towards her grandfather. JC spoke of reports that she was trying to stick scissors up her vagina. On many an occasion I have had

psychiatrists tell me that sexualised behaviour is often displayed by those who have been sexually abused. That thought did not cross The Family's mind or if it did they ignored it. They made the diagnosis of spiritual problems and treated her accordingly. I have dealt with the errors in diagnosis and treatment already. I will not have conveyed fully the tremendous pressure they put this young child under. There was not then and nor is there now any appreciation at all by The Family of the torment inflicted on this child. They urged confession upon her. She was obedient by nature. She confessed. She wanted to confess her doubts because doubts let the Devil in and she was afraid of Satan. She wanted to be right with God. The Family was all she knew. The Family was all she had. She wanted their approval. Sara recounts:-

"A year and a half after the teen training programme and when the searchers and other ambassador leadership were here, MB finally, after much probing, further shared some of the devil and witchcraft she had been deeply involved in and by that time she had almost stopped believing in the word and was doubting her salvation. The leadership here talked and prayed and exorcised her several times..After 2 months and five major exorcisms over her, MB began to improve on a slow day to day basis. She was totally immersed in the word full time with top leadership reading aloud along with her to keep her mind and mouth and eyes and ears occupied and for a constant infilling of the Holy Spirit. Eventually she was nearly completely healed even of this constant mental and spiritual warfare of the Enemy and even these horrible pictures, which were now gradually fading away. Jesus never failed, as every time we prayed over her, even 50 times day, the Lord's mighty power would overcome and put a stop to this evil."

I have also set out how MB was beaten by her grandfather, slapped or 'swatted' by Peter Amsterdam and by others. MB told me. "It was humiliating because these people were important to me."

In my judgment what MB went through was a form of torture. To describe her ordeal, as it is portrayed to The Family in the 'False Accusers in the Last Days' letter published in January 1993, as being no more than a 'stiff stern talk with a little spank and a shaking' is, I find a travesty of the truth which is elsewhere recorded in their own documents. My findings will no doubt be rejected by The Family because, as they write in the same document, 'Spiritual truths (are) incomprehensible to flatlanders'. As a System judge, I am an archetypal flatlander.

MB's punishment was to be sent to Macau in mid 1987. Macau was a Teens Detention Camp. The Family prefer to call it a camp for Determined Teens, determined, that is to make change. I have no doubt it was more a case of The Family determined to change the Teens. It is difficult to be certain of the chronology of developing ideas for controlling the young, sometimes bored, disaffected, disobedient adolescents. It seems likely that ideas grew from Sara's experience with her group including MB, Davidito and Techi to a bigger grouping in the Philippines called the Jumbo.

### THE PHILIPPINES JUMBO

It seems likely that a teen school was established here in about 1986 or 1987 but the precise time may not much matter. Another large "combo" had been established by Faithy in Japan some time in about 1984. I suspect there was a considerable cross fertilisation of ideas between the two. The 'Jumbo Story' has been written but only parts 4 and 5 have been produced and they do not deal with the way the children were treated. Although I raise an eyebrow at this omission, it does not appear

'o me to be sinister in the context of the whole case. Some features of life as practised in the Jumbo, even if not started in the Jumbo have been widely followed. One of them is the Demerit system of which both JG and SD spoke. I have some literature about it. There is a Family Special News by Sara Davidito on 'The Demerit System - finding the balance' written in July 1987. She had been reading the childcare reports from a new combo and the reference to Marianne suggests it must be the Phillipines combo. Sara wrote that the demerit system was actually instituted in her home for teen training programmes for ages 10-14 and the matter was apparently discussed in a series on teen training which draw on material which had been used in the various teen training camps around the world. The children were grouped by age, the 4-6 year olds and 7-12 year olds. A list of offences earning a demerit were specified ranging from no talking during quiet times to a double demerit for murmuring, complaining or criticising. 7 demerits resulted in disciplinary action (a spanking or being deprived of parent time). Sara refered to sharing the children's daily reports and the teens' open heart reactions. She started scheme to encourage teens to dictate a personal reaction tape every 2 weeks, or when needed, confessing any trials or questions about their working relationships with overseerers and peers. This was what had been required of MB. Sara made the concession that:-

"Many of the teens and older kids had not been dealt with properly through the years due to many mistakes and the fact that they were our 'experimental generation'.

Sara also acknowledged that there was an element of 'public humiliation for getting so many demerits'. There was indeed! It placed a heavy burden upon the children.

Maria wrote in commendably sentitive terms:-

"The danger is, we can turn out perfectly behaved children who are really quite screwed up because of the way they have been treated and raised. Our ultimate goal is not to have perfect children, but well adjusted children and by well adjusted we mean loving, caring, feeling confident of the Lord's love and of our love, mature in the spirit and loving the Lord and his Word and having faith in the Lord. But so much depends on how they are treated and raised, especially from a young age. Having too strict and too many rules may result in submission, but not out of the right motivation."

That valuable advice may not have been fully practiced. JG who felt that he was sent to the Jumbo as a punishment for wishing to play his guitar, considered that his time at the Jumbo was a time "trying to put me in a mould - they looked at it as training to be leaders for the End Time."

It would seem that Open Heart Reports were being used daily. In the "Jumbo Story No.5," it was written - not specifically with children in mind - that OHR's were "a very good way for the leadership to stay intimately involved with the different situations and personnel in the camp". Some of the teens soon learned how to play the system. JG realised that to reveal doubts in the OHR's to the shepherds was permissible activity which was treated with prayers whereas revealing the same doubts to his peers was murmuring and was punished with long talks, written reactions, silence restriction or corporal punishment.

Another feature of the Jumbo was the use of silence restrictions. SPM said that this was begun in the teen home in the Philippines in about 1987/1988 and some of the people who had run that home were involved in the teen home in Wantage and used the procedure there. He said:

"It was not used throughout the whole of the family. It appears to have been a local initiative. When I raised it with World Sservices as a result of this case, I was advised they didn't really know anything about it. It was not Family policy." That evidence was neither full nor frank. As I shall explain, there was a great deal more to it than that and either SPM was telling me half the truth or World Services were telling him only a part of the story.

The corporal punishment meted out for obtaining too many demerits was by means of a "paddling", being beaten with a flat "paddle" which, as variously described to me was about 2 to 3 feet long with the paddle being about 6 to 8 inches long, 4 inches wide and an inch thick. Sometimes it had holes drilled through it.

The majority of the children at the combo were there without their parents. Among the adults at the combo were JD and ED and Mary Malaysia. They feature in the case later.

## THE TTC IN JAPAN

I have little direct knowledge of this school. SD believed, rightly or wrongly, that the silence restrictions imposed upon him at the Jumbo were modelled on the Japanese experience. Given the high degree of reporting to World Services and the distribution of the information throughout the group, I am in little doubt that there was a cross-fertilisation of many ideas. A number of them would have been initiated by Sara Davidito and Maria in their teen training programmes conducted in their own compound as they grappled with the difficulties presented by MB, and Techi and others. Maria has described the teen schools as undertaking a "revolutionary boot camp training programme", the task of which was:-

"To teach and train and CLOSELY SHEPHERD these poor, needy teens and prepare them for the field. This is probably these teens last chance to really make it for the Lord. ... We're supposed to be single mindedly, whole heartedly and with great concentration fighting the devil as a huge warfare for the lives and training of leadership, children and teens." (The emphasis is Maria's)

The close shepherding clearly involved concentrated attention upon the need to reveal doubts and difficulties in the Open Heart Reports, and then to deal with them, I have no doubt, lovingly and sympathetically, but with a heavy emphasis on reading the Word, which would include the Mo Letters, where necessary writing reactions and, if the difficulties persisted, having desperate prayer sessions to overcome the perceived problem.

I also have no doubt that the teen schools in operation in Japan and elsewhere operated in accordance with the "Basic Training Handbook" published in February 1987. Its introduction offered the children the opportunity:

"To personally experience teen training so that you can take up the challenge to become a teen soldier and disciple of Jesus Christ! This power packed handbook is specially written and designed for the feeding, teaching, inspiration and guidance of you family teens, our hope for the future! In order to fully benefit from the wonderful counsel in this your own basic training handbook, before you even read your first article, you'll need to promise to be open and receptive to life changing lessons to come, and be ready, yielded and willing to forsake any of your old ideas which are not truly revolutionary so that you can become a new creature and a true soldier of Christ. Teen training involves a serious personal commitment to dedicated discipleship. Please desperately pray before reading each article in this book that you will be able to personally apply each lesson to your own needs and spiritual life. Please try to read these articles out loud and unitedly along with another teen or an adult or teacher so that you can fully concentrate and capture the spirit

and message herein."

I have not had sight of the whole of the manual. The goals at the TTC included:-

"1.To give our all to Jesus, no matter what tries to stop us.

2. To become revolutionaries for God's entire army.

21. To get training which is chastisement for the End time.

22.To learn yieldedness which is the opposite of rebelliousness and stubbornness.

25.To change and be willing to change

39.To learn how to take correction

54.To learn to be security minded

55.To learn how not to space out or day dream"

I have sight of the "prayer requests of the teens, first Sunday fellowship Japan TTC:"

"We had desperate prayer and laying on of hands for deliverance and prayed individually for each of these specific requests:

For immediate obedience

Against system influence through books

To receive correction

To be able to forsake those in our family who aren't following Jesus

Against compromise with the system" (and even)

"Against fear of gaining weight."

Having looked at the pictures of the children in Japan, having seen the video of the Mexican TTC and having read some of the comment, I am in no doubt that these training camps were highly emotionally charged and pressurized environments for children. They existed for the purpose of changing the children and shaping their lives in order to mould them to The Family's image. The cost to the children was to rob them of their personal identity. It was an invasion of personal freedom. I can well understand that this process sends shivers of apprehension down the spine of this grandmother and of many, many who think like her, all of whom have good cause for alarm. The regime does not win the support of Doctor Cameron who considers it an undue pressure on an impressionable young mind. Nevertheless, sympathetic as I am to those opinions, I cannot find that the essentially religious experience of renewal which was undergone, and in many cases even enjoyed, by these teenagers was so extreme that I can properly find on a balanced view that it was significantly harmful to the emotional and psychological well being of those children.

## MACAU

I am far from tolerant about what took place here. This disgraceful experiment in childcare lasted from at least 1987 to 1990.

In a Teen Special published in November 1992, The Family describe the Special Teen programme in Macau in these terms:-

"This voluntary programme was established to help a small handful of teens who needed more individualised guidance and encouragement to overcome long standing serious personal problems. While in this programme, the teens received exceptionally close shepherding in a small personal family atmosphere, with lots of love and prayer, individualised personal training, hours and hours of personal counselling, specialised Word classes that were often spoon-fed to the teens, and a consistent daily schedule of typical boarding school-style discipline, administered with patience, prayer, reasoning and understanding. They worked on a farm in rural surroundings,

learning to channel their energies into a product of pursuits. The teens of this programme dubbed themselves "the determined teens" - determined to make the changes that they realised they needed in their habits or attitudes. They aspired to successfully graduate so they could join other family teens, and be trusted to be given valuable training, or to carry positions of responsibility."

That was the propaganda which was fed to the teenagers in 1992, and having heard from and seen a number of the teenagers who were at Macau, I am in no doubt at all that it was a travesty of the truth thus to describe that programme. The truth is that the children were subjected to a regime of physical and psychological brutality. Paddlings were a regular feature of life in the camp. The children were systematically beaten in it. I had that evidence not only from MB and JG but from one of The Family's own witnesses DR. She recalls being beaten five times. On one occasion she recalls being given ten "swats". She was bruised. She gave evidence that she was beaten because she was "super proud, cocky. There was nothing in the paddling that was wrong. I agreed to it. It made me realise there was something wrong with me."

DR sought to challenge evidence MB had given me about a girl T1 whom MB described as running around the room to avoid being beaten by Michael Gambrill, who was in charge of that camp. MB had described that Michael was "trying to exorcize rebellion out of her." This is DR's description of what happened:

"She was rebellious. She was going to get four swats. Got one, and freaked out. Michael tried to calm her down. She didn't. She put her hands on her bottom. Finally he got her to move her hands. She got two more swats. She was pretty shook up. Freaking out. Putting her hands there and saying "please no more," and crying. So he stopped."

I believe JG was describing the same event when he spoke of:

"One girl collapsed half way through her paddling. They held her up to hit her a few more times and finally dragged her half conscious to her room."

MB spoke of another girl who was slapped and became so upset that she could not talk properly but was stuttering incoherently. The reaction of the shepherds was to say that she was possessed of deaf and dumb spirits and so they held an exorcism, talking in tongues over her.

DR's description of MB's being paddled was that MB had been talking uncontrollably all night keeping everyone awake and it was thought that a few swats would wake her up. She was given a few swats and she just kept "right on talking". She got about five. They took her out but brought her back and tried to stop her talking. When she started to smash things up and throwing things, they tied her to her bed with cloth-like ties. She was by then incoherent. A couple of days later they took her to the mental institution. This was barbarous treatment of a girl who was in fact in need of psychiatric help.

DR herself felt that she was going insane. She said she was an avid day-dreamer who did not know how to control her mind and was on a path leading to the spirit world where the spirits would devour her if she continued. She was tortured by these thoughts pretty much all of her waking hours, she said. Her thoughts became violent when she thought of killing people and hurting people "which are attacks of the Devil."

It was JG's impression that:

"Most of the children there were shipped in from other countries because they had deep psychological problems as a result of being in The Family, in my opinion. I would call them "mental." Three of them were completely irrational and were

'hallucinating. Some of them thought that they were seeing demons, some others fancied their idea of eating "horse shit" and most of the time walked around dazed. I and a few others were the only ones who were not "mental". One of them, Ben, later committed suicide. Throughout the time I knew him, he desperately wanted to leave the group but was always prevented and failed in his attempts to run away. Other teenagers at the camp mentioned that they wanted to kill themselves but they were usually severely beaten for saying so. The youngest child I met at the camp was 11. He had tried to jump off the roof of his commune in India, and so had been sent to the detention centre in the hope of solving his problems."

Ben did eventually leave the family. His Traumatic Testimony was described the Teen Special to which I have referred. It was made required reading for teens aged 14 and over as "a sobering warning about the sins of bitterness, unyieldedness and rebellion." Michael wrote in that letter:

"We really loved Ben and tried everything we know to help him as did many others. He had many very loving and dedicated shepherds who spent hours, days, and weeks counselling him. It's so sad he chose to throw it all away." To take that view of what was happening in Macau deeply disturbs me. The truth is that these children were there to have their spirits broken by whatever means it took, and loving kindness was not the primary means deployed. These children were the "bad apples" who were removed from the bosom of the family for fear of contaminating those who were more amenable to the regime. They were dispatched to a punishment camp for punisment. I have no doubt that within their own definition, the shepherds there did act "in love" when handing out their punishments. Their failure to appreciate that their actions were nonetheless abusive to the children in their care is frightening. DR herself told me that it was "her considered view" that there was "nothing oppressive about anyone's treatment in Macau." She said that with conviction she equally told me that "I guess they should have learnt by the Summer of 1990 that (silence restriction) doesn't work and there was no reason for it". She told me that "In Macau there were no guidelines and they did not really know what they were doing." She told me, "Things were taken to the extreme before they were stopped." She knew perfectly well from bitter personal experience that the regime in Macau was brutally oppressive but she could make no unequivocal condemnation because to do so would be to fall into the trap of murmuring, rebelling, being proud, manifesting, in other words, all the deadly sins intolerable to The Family's way of life. Freedom of thought was the crime for which she was banished to Macau. Freedom of thought was beaten out of her in Macau. Though DR lives on, the spirit of a young girl died in Macau. It is time The Family faced that truth.

## SILENCE RESTRICTION

DR told me that the policy "to stop us chatting" was in force most of the time she was in Macau. She wished to make the point, which was a good point, that this should not be blown out of proportion. I agree and I do not find these children were on permanent silence every minute of the day or every day of the week or anything like that. DR describes it herself in this way: "Chatter was normal, but we weren't normal because I had problems, serious problems especially when I had thoughts of going insane. Michael and Crystal wouldn't let us carrying on talking about bombs, stealing, naughty things we had done in the past." She also said, "After one and a half years of my time in Macau, they realised silence didn't work so they lifted it."

I am totally satisfied that putting the children on silence was used as a means of punishment, and even after making all due allowances, I am still satisfied that they were kept on periods of silence which were both prolonged and abusive.

## ISOLATION

This was another technique used to dominate the children and to punish them. MB was put in isolation and was locked in her room. At the beginning of his stay in Macau, JG was locked up alone in the attic, given a bucket to use as a toilet and left without food for 3 or 4 days in order to fast. They needed to fast in order that their mind and spirit might be made receptive to the heavy dose of the Word which was to be their spiritual food. It was administered excessively.

## HARD LABOUR

I am totally satisfied that children in the camp at Macau were put to hard labour. Sometimes this took the totally punitive form of digging trenches, filling them in again and digging them out once more. At other times the labour would have been more purposeful and would have improved the amenities of the camp. The children knew that they were being punished by being put to work and the punishment was excessive.

## CONCLUSIONS

The Macau experience is a shameful example of putting into practice the belief that the end justifies the means. The end was, as the Teen Special letter describes it, to bring about changes in the habits and attitudes of the teens who had reacted against The Family way of life. The means was a form of physical and mental atrocity mercilessly dished out to young, often already emotionally damaged children. There seems little acknowledgement from the leadership of the abusive nature of that regime. In my judgment, the leadership must stand condemned. That this went on and they did not know it is a conclusion which I cannot accept. Jose and Faithy were in charge. Faithy was Berg's daughter. MB was his granddaughter. I simply cannot accept that he and World Service did not know what was being done. The fact is that knowing that the treatment meted out to those difficult, damaged teenagers would never stand the test of any reasonable scrutiny, The Family now try to rewrite the truth not just to the outside world but more importantly to their own members to whom in the Teen Special letter Macau is now presented as a rural idyll. What nonsense!

## THE VICTOR PROGRAMMES

This was how World Services described the Victor programme in answer to the Official Solicitor's interrogatories:

"As is the case in nearly any large group of teenagers, some of ours are naturally more positively motivated than others. School and teen homes, in particular, found negative peer pressure to be very disruptive and detrimental to the other teens' training. In efforts to nip any "teen terror" situations in the bud, some schools deemed this problem serious enough to warrant a separate programme for particularly problematic students."

EM was an architect of the Victor programme and she explained its inception in this way:

"By 1988 there was so much concern about the difficulties in various field homes being experienced with the Jett age (11 to 13 years), that a council of people was called. It had become apparent that some of the teenagers who did not have the same commitment to the way of life of The Family as their parents (it wasn't so much that they didn't have the same beliefs as their parents, they probably did, but they didn't share the same enthusiasm and commitment and many of them bored and felt

here was no challenge in their life and nothing to do.) We felt that the solution lay in providing for the teenagers the sense of enthusiasm that we had had when we first joined the Children of God in the early 70's to bring them a sense of excitement and adventure and to enlarge their vision and the goals of what it means to be in the family, and that is basically what we try to do with the Victor programme."

After an initial programme for the Jetts, it was increased to include the teens in the 14 to 17 year age group. The Teen Victor programme ran for about a year and a half during about 1989 through to 1990. Her experiences were written up in January 1991 in the "Case Histories of Jett Victors." Maria said of them:-

"I think these, along with the Techi GNs are going to be an absolute goldmine of material! They really go together! So many of the ways the Lord has shown me to handle Techi, he shown them also. Together they are going to be wonderful!"

In her affidavit EM acknowledged that her methods were copied throughout the family. She sought to exculpate The Family by the assertion that her suggestions were:

"Copied or applied too literally and the spirit or what we were recommending or suggesting appears to have been lost. This is particularly the case with silence restrictions. We had pioneered having periods of silence as a method of enabling each of us to commune with the Lord. It was intended that we would have half an hour of silence in the morning right after getting up, the one hour rest period during the day and then 30 minutes in the evening. It was never intended as a method of punishment." She acknowledged that the children were subject to corporal punishment but asserted it was never harsh nor cruel. She said that she was:

"Familiar with some of the accusations that have been made concerning Victor programmes, that they are chilling examples of doctrination and brainwashing. ... What we have tried to do was give them inspiration and direction, not take over their minds."
To assess that, it is necessary to look at the case histories. That defined the Victor programme in these terms:-

"The Victor programme is an intense shepherding and training programme that is The Family's physical and spiritual counterpart to the system's many rehabilitation programmes. You will note that the Victor shepherds use some of the disciplinary measures such as silence restriction, isolation and occasional swats. It's good to keep in mind that our Victor programmes are extremely mild compared with system delinquent teen rehabilitation programmes. The system programmes are much stricter and more severe, even cruel but they are much less effective".
These are some of the examples of the successes claimed by The Family and the methods of obtaining them.

T an 11 year old boy had been on intensive care status which means that he was with an adult 24 hours a day separated from the other Victors to receive "lots of personal counselling and spoon-fed Word." He was taken off i.c. status but returned to it after 3 days.

This meant he was on silence restriction - he wore headphones with word tapes while he was working and he was not allowed to talk to the other Jetts at all. ... He seemed to have a very hard time making it through the day without getting a spanking. The policy in the beginning was that as soon as they got 16 merits, they would get 6 swats. Some kids might stack up 16 merits in a week, where as T found it quite easy to stack up 6 in a day, so he would get swats almost every day. ... When he'd have to get a spanking, afterwards Ricky would hug him and say,

"Look in my eyes. Let me see you smile. Do you still love me?" Ricky would make sure he was really receiving it before he would let him go on his way again. ... After being in the Victor programme for 4 or 5 months T graduated. During this time he lost about 30 kilos (66 pounds). He was down to about 45 kilos which was is a good weight for his height. He is probably the most changed person I have ever seen since working with Jett teens and Jetts."

R was also 11 years old. He had:
"Got into stealing and covering up. He lacked a real connection with the Lord. He seemed to have a fascination for encyclopedias and any time he could get away with it he would read an encyclopedia. The real problem is that he would then basically use his newly found knowledge and wilfully put others down for their lack of knowledge. He went on i.c. status with T. These two boys spent the first 6 weeks together doing extra labour. R has been on the Jett Victor programme now for over a year. Although he is subdued in a way he has by no means graduated or been able to go on to something else."
Dealing with the case of F, EM acknowledged that:
"When we initially began the programme it was tough! It was boot camp, military style. ... What happened in F's story was that the regimentation and strictness carried through into the second session of the programme and because F was at a real discouraged point in his life when he came back into the Victor programme, feeling that he had completely failed, this approach didn't bear good fruit. He sunk lower and lower and lower until when Richy and I visited the Jett Victor programme 6 months later, he was on i.c. status and in pretty bad shape..... So we took F off i.c. status and he pretty much sky rocketed back to a positive level again. So now we are a little cautious and much more aware that as you have the kids with you a longer time you have to adapt the situation. There is no set pattern or set rules for the programme. ... The correction and discipline have to be tailored personally for each child. The kids are not in the Victor programme to be punished for their sins. They're in the programme to get training."
D1 is Ricky's son who was brought into the programme to:
"Humble him a little but and help him overcome his problem of having such a high opinion of himself. He is not really committed to the Lord. He was infesting and infecting others with serious bad attitudes - especially along the lines of spiritual lethargy.
H was 11 and had an "emotionless" attitude:
"where it is very difficult for them to give or receive love or show any sign of expression, of joy or sadness or gladness or whatever. We have a lot of emotion in the Victor programme and each class will either make them mad, sad or glad. Also the teachers are usually on fire and stirred up so we zero in on anybody who has this emotionless attitude right away to find out why and usually there are all kinds of reasons. The solutions usually take desperate prayer and digging in the word to find similar situations so we can try to apply the word to their lives and get them to respond. I think that's a key in the Victor programme: we expect response! We expect change and we're not satisfied if we don't get it!"
K was aged 11.
"Her NWO' (needs work on) were being unable to communicate with others (other than her mom), not respecting the Lord in others, not knowing why she was in The Family and not believing in The Family. She basically seemed to lack a connection with the Lord. Those who had shepherded her in her previous home had resorted to giving her quite a lot of discipline for her rebellious stubborn behaviour but were frustrated with the

'ack of fruit from the correction given. K really fell apart when ne realised she wasn't going to be seeing or spending any time with her mom during her stay at the Victors. (She is very close to her mother.) She was a bucket of tears and very emotional for the first few days. In these difficult initial days when she was having such a hard time forsaking her mom, the Lord gave her, for the very first time in her life, some direct word from the Good Thots on forsaking your parents. She was in tears, she was overjoyed. It was very beautiful to see her so overjoyed in knowing she had made a connection with the Lord."

EM's general advice with dealing with typical Jett girl problems of "self righteousness, criticalness, great difficulty getting along with peers and lack of respect for teens and adults", was to make the girls "learn to confess and be open and honest about their mistakes and to learn to connect with Jesus."

"We found that the Jetts eventually saw the benefits of being honest and learnt to openly share their hearts. We feel sure that the Jetts are well aware of the seriousness of what they are saying by the time they pour out their heaviest confession. Honesty and honest confession is a real key to the Jetts gaining victories in the Victor programme and they all know this so they don't take it lightly."

It is likely that Victor programmes were run throughout the world. I know of them in the United Kingdom, Switzerland, Italy, Denmark, Thailand and Mexico.

It is quite apparent that there was considerable cross-fertilisation about childcare. Ideas were communicated to and from World Services. Common patterns had already emerged and become quite well established. They included features such as:-

1.    Paddlings
2.    Isolation - the physical separation of troublesome children from their friends leaving them either alone or cloistered with an adult whose function it was to feed them the Word.
3.    Silence restriction - this was widely practised as a form of punishment, not as an opportunity for contemplation as EM sought unsuccessfully to persuade me.
4.    OHRs - open heart reports - were widely used as a means of forcing confession with the result that the children were made to feel guilty if they did not confess. If they had no NWO (Needs Work On) they were said to be self righteous and proud: if they expressed their doubts and their antipathies, then they were murmuring. Either way they could not win.

In February 1991, Maria wrote "Jett/Teen Discipleship Revolution Needed Now" (the DTR):

"We've got to institute a new kind of intensified Jett training programme not in every major area, but in each individual home throughout The Family. ... They have highlighted the fact that we have a big worldwide emergency with all our Jetts and there is no way one little Victor home in each area is going to be able to cope with that need! We've got to somehow institute a Victor programme in all of our homes if we're going to truly reach and win our Jetts and Teens and turn them into the dedicated disciples the Lord wants them to be. ... We may not necessarily have the constant high excitement level of a TTC where everybody's weeping and crying and praying and rah - rahing and shouting and everything. I'm not saying that they have to maintain that kind of emotional high. ... If our kids are capable of that level of commitment at 11, 12 and 13 years of age at a TTC, why can't they be capable of that kind of commitment when they get home too? What I'm beginning to realise is that too when our own Jetts and Teens to the Lord's cause, to get them really sold on the family and on fire for the Lord, we've got to go overboard. ... We need to somehow reach

our kids and really get through to their heart. ... That's why they've had such success in the Victor's programme: they bring those Jetts and Teens in and they show them what the revolution for Jesus really is. They have on-fire word classes and bible studies, they have moving inspirations where they sing and cry out to the Lord with all their hearts praying in tongues and weeping and prophesying and really being moved and ignited by the spirit of God! The kids really see and experience the moving of the spirit and they go through the same sort of things that our new babes used to go through. ... So this is the challenge before us. Unless we touch them and reach them emotionally and really win their hearts to the Lord and to the family and get them turned on and on fire about it, we're not going to save them."

It is apparent from this excerpt that the children, and especially the doubting Thomases, were placed under intense emotional pressure to conform.

Maria was no stranger to the problems of dealing with unhappy children. Davidito had at the age of about 12 or 13 on several occasions contemplated suicide. He was a disturbed child. Then Techi her daughter began to manifest difficulties symptomatic of some emotional breakdown - she was having nightmares and crying every half an hour. That led to the Techi series on her battles and victories. The letter set out the confessions that were taped.

"She discovered the truth of the scripture, "He that covereth his sins shall not prosper, but whosoever confesseth and forsaketh them shall have mercy" - Pro. 28, 13."

I emphasise these words in hope that Maria and the leadership will remember those words when they come to read this judgment and will then practice what they preached. The series recorded Techi's problems of lying, unyieldedness, being fascinated with evil, having bad thoughts, being resentful and daydreaming. Coping with these problems seemed to have caused such difficulty that Amy who was in charge seemed as close to a nervous breakdown as Sara had been dealing with MB. Maria commented on the comparison between her sweet and loving talks she held with Techi and the stern dealings that Dad had with her. She said:-    "When a child is having serious problems and is fighting heavy spiritual battles, the key question is not so much which method to use but when to use which method."

It is quite clear that enormous pressure was put on Techi, however lovingly it was imposed.

Fear, not love, was another powerful weapon in the armoury of control. The first issue of the new "Teen Special" for teens aged 12 and over was the story of MB as a warning to those who might feel they could dabble with the Enemy. Then Singing Sam made his confessions and so did Crystal of lives filled with sex, alcohol, drugs and trouble. Later in November 1992, the "sad story of a delinquent teen," namely Ben, the boy from Macau who committed suicide, was told to the teens. All of these "traumatic testimonies" were accompanied by questions for the teens to "pow-wow". It was all pressure to conform, to obey, to remain faithful to The Family, indeed, and in truth, to remain in The Family.

It was not uncommon for individuals to be singled out and publicly humiliated in the Letters. Such a one was Tony Zack Attack. This series began in August 1991. He was apparently quite "famous" when he was a teen, having appeared in many Family circuit videos as a gifted musician and song-writer. He was then aged 24, married to Claire with a 2 year child. They were shepherds but had problems with criticism, doubt, murmuring and unyieldedness and they were eventually placed on a Victor programme. Tony felt dissatisfied and upset

with the way things were going for him in The Family and had been tempted with thoughts of going to the system. EM was his Victor shepherdess. Tony and Claire were separated "in order to concentrate on the lessons they were learning." For this same reason their 2 year old son went to live at the school nearby, rather than living in the Victor house. Tony was put in intensive care. His OHR was published. He had there confessed:

"Being under constant supervision and authority is one of my main battles. I feel I have very little freedom and I can't do anything without permission - unless it's on the schedule. I can't even ride a skateboard or a horse or go ice-skating or roller-skating or even climb a tree."

Maria wrote to him and giving him his "last chance:"

"You also have to be able to take the humiliation of public exposure or public correction for your mistakes because if you're not corrected, just as with any leader, their mistakes and wrong attitudes and NWOs easily filter down to and affect others."

Eventually Berg delivered his letter "Grumblers Get Out" in August 1991. The message was "Repent or perish in the system":

"He needs to get up and confess with strong crying and tears and real show of repentance and confession and humbling. He oughta grovel on the floor with strong crying and tears and ask everybody to forgive him and saying he's never going to do it again, and show it, or out he goes right now."

The Teens had to pow-wow Grandpa's instruction to Tony's shepherds to take away his responsibility and make him "a flunky - mopping the floors and cleaning toilets."

"When people see Tony mopping floors or cleaning toilets instead of being a Jett shepherd or playing the guitar in inspiration or leading teen witnessing excursions etc., it will serve as a reminder to all that he is being punished and humiliated because of his wrong-doing."

The letter ended "Murmurers beware! Are you?"

Faced with this flurry of letters it is hardly a surprise that Tony made his confession. He wrote:-

"I realised that I was more broken about my son than about offending the Lord. I've been making a god out of my son. The sin of putting my son before the Lord in my heart has been a weak chink in my armour that the enemy has been able to use. So now I feel I have to forsake him and really prove to the Lord that I am willing to put God first and bring forth fruits needed for repentance."

The recording of his confession to his home is punctuated by his tears. His letter to Grandpa and Maria begs them to let him stay as "a hired servant because if I go to the system I fear it will be "going after her straight away as an ox goeth to the slaughter."

Three matters in particular trouble me about this series:-

1.  The public humiliation to which this young man was exposed and with which he was threatened.

2.  The starkness of the choice offered which virtually amounted to a denial of choice - grovel on the floor in confession and slop out the lavatories or get out back to the system where, according to Faithy, "the other kids who backslid, are either in prison or in serious trouble with drugs or homosexuality or prostitution or like Dicken, in trouble with Maria and things like that." (I am, incidentally, totally satisfied that Dicken is in no such trouble. He is a happily married undergraduate at University.)

3.  EM remains a powerful voice in child care matters. It was she who removed this 2 year old boy from his murmuring parents. She said that if need be she would separate S from his mother in order to bring her to heel. It was an answer now

imprinted on my memory. An attitude of that kind held by a responsible member in some position of authority within the movement constitutes a risk to the well-being of my ward.

## SEPARATION OF CHILDREN FROM THEIR PARENTS AND THEIR WIDER FAMILY

Forsaking all has been a recurrent theme. One of the earliest letters is the "One Wife" letter telling The Family:

"God's in the business of breaking up little selfish private worldly families to make of their yielded broken pieces a larger unit - one Family. He's in the business of destroying the relationships of many wives in order to make them one wife - God's wife - the bride of Christ."

The letter is making another point that:

"Partiality towards your own wife or husband or children strikes at the very foundation of communal living - against the unity and supremacy of God's Family and its oneness and wholeness ... Are you really sure that the other children in the nursery have just as comfortable a bed and just as good food and just as good training as your own? - I don't like that expression! - they're all our children! ... If your spirit was perfect before God, everybody in the Revolution would be your brother and your sister just as much as your flesh and blood, and every child you would feel just as responsible for and loved just as much as God loves."

He returned to that theme in 1978 in the letter, "The Advantages of Having Children", where he said:-

"We ought to treat every child as our child ... They are the children of The Family and therefore the entire Family is responsible for them, not just those that happen to be their physical parents."

This philosophy has come under some attack during the course of this hearing for the understandable reason, which I endorse, that it is clearly better that children grow up in and with the stability and security of their own home, cared for by both parents wherever possible. I must, however, take a broader view and acknowledge that The Family live a communal life, for the order and good government of which it is necessary that there be equality of treatment. Insofar as these letters seek to achieve that, they cannot be fairly critisised. There is no public outcry against the practice among some of the kibbutzim where children are separated from parents and where their upbringing is largely delegated to others.

What causes me more anxiety is the huge pressure which has been placed upon parents and which can, therefore, as EM made clear, be placed upon NT to forsake all. An extreme example was contained in the letter "God's vomit" in September 1983. In this letter Berg raged against "backsliders, God's vomit." It was a letter referred to by SPM in his affidavit but the Official Solicitor's request for the production of it was rebuffed. It came to light very late in the day when MS produced it from her personal case of Family literature. For this purpose it is sufficient to describe her as a teenager who had grown unhappy with The Family but, knowing no other life, was apprehensive about leaving. Her distress in that dilemma was reinforced by the threatening tone of this Letter. It is directed at a young man who rejected Berg's offer of a World Service job in favour of going back to his wife and children. It was:

"A ridiculous decision ... to choose his family over the Lord and God's work when he knows all about forsaking all and forsaking wife and children and home and all these things for the Lord."

Of such a person, Berg wrote:

"God can't stomach you, he can't swallow you, he can't

'se you so he spits you out! So you've become nothing but God's vomit."

I find that to be very heavy pressure indeed.

There are other letters where Berg dealt with murmurers. For example, "God Hates Murmuring" written in November 1984, another letter produced by MS. Murmurers were some of the worst bad apples and bad apples had to be removed. Consequently, Berg made his antagonism towards them plain and said explicitly,

"If you don't like it here, for God's sake, get out and go some place else where you like it better."

It is obviously right for the maintenance of good communal spirit that any who forment insurrection should be expelled. My concern is for the children, especially those who have been born into The Family and who have no contact with their natural family outside it. I am troubled that there seems a woeful lack of appreciation just how terrifying it must be for the young teenager, perhaps in a foreign field, to "go some place else where you like it better" when he has nowhere else to go. This is the grandmother's concern for S. It is my concern accordingly. Without his maintaining good contact with his grandmother, his natural escape route is blocked.

It is not a surprise to me nor is it a surprise to the leadership that joining The Family is invariably greeted by the forsaken parents with nothing short of horror. Many an appalled parent would find it impossible to come to terms with such a decision; but others might subjugate their distaste in the interest of preserving family contact. Many of the witnesses told me convincingly of their having close loving contact with their family outside. Whilst it might be invidious to pick but one name from the many who gave evidence to me, I could point to CO, father of JL as example of the latter. To give another example closer to home, SB at one point entertained some hope of marrying NT. He was educated at Winchester and has a similarly conventional English background to NT. Unlike the Plaintiff, his mother seemed able, perhaps uneasily, to extend hospitality to SB and NT and S without tension rendering the visits uncomfortable. In fact, witness after witness produced bundles of photographs to convince me of the good relationship maintained with their system families. It all depends on the level of acceptance, resignation or hostility between the members and the outside families. The position was stated in this way in The Jumbo Story part 5 written in June 1988:

"Mama sent us some very good counsel on the danger of keeping up close communication with relatives that are not favourable:

"If our parents and relatives are favourable it's a different story, as it's an opportunity for us to not only lead them to the Lord, but feed them, etc. Other than that, we have so little in common with our flesh family, that it's really a waste of time to keep in close contact with them if they're totally unreceptive."

Another form of tension, perhaps more acute, arises when a person defects from The Family leaving close relatives in the group. Berg's relationship with his daughter Deborah and hers with him could scarcely be described as anything other than poisonous. The J family are deeply split between the anti-cult faction of mother and one daughter on one hand and father Simon Peter, a powerful figure still in World Services and daughter C2 on the other hand. When he separated from his wife VJ, C2 went with him and KJ stayed with mother. The girls had renewed some contact recently but KJ's participation in these proceedings brought that to an abrupt end. Father telephoned to berate her angrily about the evidence she had filed. "What I really wanted to hear from him," she told me sadly, "was, "Hi

daughter, how are you?"" Although I quote him slightly out of context, I cannot help but note the terrible irony between his rebuff of his daughter in that conversation and words he wrote in the Beauty and the Beast series where a child in the cartoon says:-

"Thank you Jesus for real fathers! .. Have you got a real father?"

KJ's answer to his question would be, "No!"

A surprising feature of the many months of evidence was the lack of deep emotion shown by almost everybody. One exception was AB. She broke down in cross-examination and became very distressed because her mother had failed to make contact with her. This was a family who had lived their life on the run because stepfather was wanted by the American authorities for breach of custody orders relating to his children.

Another feature of the evidence was the uncontradicted fact that many, many young children were separated from their parents, and were moved from one foreign field to another. That this was Family policy is made manifest by the letter, "A Teen Challenge" written by Apollos from his eyrie within World Services to his sons EG and JG both of whom gave evidence to me, for defendant and plaintiff respectively. He wrote:-

"As I am sure you know, we both love you very much and would love to be with you, to fight by your side on the fields of the world, winning souls, witnessing His word and preaching the Gospel to all whom we could, and also to be there with you to help bear your burdens, share lessons with you and do all that we could to help you do your best for Jesus! But as you also well know the Lord had a special job that he wanted us to do, something that required me to make a choice: to stick with and tend to you, my precious personal family, and therefore be able to minister to you, enjoy your fellowship, feed you what I could from the Word etc. etc. or be willing to commit you all to Him in order to spend most of my time down in the mines of the Word, digging up the gold and the precious metals and jewels which can be a blessing and a help and a strength not just to you all, but to the entire Family. ... Of course it has cost us something to give up you, our own dear children, and it has no doubt cost you something to give us up, but like David said, "I will not give unto the Lord that which hath cost me nothing!" and he also has promised you "a hundred-fold in this life, and in the world to come, life eternal"!!

EG's response was:-

"I don't feel in any way that you've forsaken me. But I have to admit that sometimes, although my mind can figure out completely why you're not here and I'm not there, I've course miss you and there are times when I feel how much better off I'd be living with you. Of course I miss you both very much and the devil even uses this sometimes to try to come in and get me discouraged. But I know the Lord has and is getting greater victories out of it all. ... As the evacuation of The Family in this country is well under way, it seems a lot of other teens will be forsaking their parents and not living in the same country as them any more, just how I have had to do with you. So that's nice to know that I'm not alone."

EG had just turned 14 at that time, JG was a year younger. They were shipped off to Macau where the conditions were as I have described and there they were left. I have seen both boys now going their separate ways. By your fruits shall ye know them. The fruit I saw was emotionally bruised. It would be utterly idle to pretend otherwise.

This was a time where the "forsake all" message was being heavily promulgated. "The Heavenly City School Training Seminar Notes TSN No.2" had Sara saying:-

"We are all parents these days and most of us have had to forsake our own kids to be in a school or position. It really costs us everything ... there is no more holding back. If the Lord is expecting you to care for someone else's kids and if you can love them as your own, you will really appreciate that when the same is required of you! Forsaking all is not exactly easy for our kids but the Lord is even requiring it now of many of our children, even toddlers and babies."

I must not forget that that was written at the time of the "School Vision" and that things have moved away from that since then.

These conclusions can be safely drawn:-

1. In the nature of their missionary endeavours, separations are more likely within The Family than outside it.

2. The heavy compulsion of the forsake all doctrine makes separations in fact even more likely to occur.

3. Long separations and/or frequent separations are a threat to childrens' security and stability and therefore harmful.

4. The Family's position at or near (some would say beyond) the extremity of conventional religious practice renders it more likely that family relationships between those within and without the movement will be fractured, often seriously so.

5. Children who do not have a satisfactory relationship with their wider "system" family may suffer.

6. These factors pose risks of harm to S.

## SUMMARY OF MY FINDINGS ON EMOTIONAL, SOCIAL AND BEHAVIOURAL IMPAIRMENT:

1. The use of isolation and silence restriction was frequently carried to excess and children were damaged by their experience of it.

2. The use of O.H.R's was capable of unfair exploitation to the disadvantage of those who felt compelled to give some disclosure lest they be punished for pride and self-righteousness.

3. Undue pressure was placed on children by the traumatic testimonies and the fear that any raising of doubt would lead to expulsion from The Family and banishment to the system caused apprehension.

4. The children were socially isolated.

5. Forsaking all was harmful.

6. Self was subjugated to service to The Family.

## PHYSICAL ILL-TREATMENT

This topic assumed more and more importance as the case progressed. Again I begin with some analysis of the literature.

## THE RELEVANT LITERATURE

"Home Discipline" was written in March 1972. The sub-title is, I note with approval was: "Law without enforcement is no law at all!" He explained why. "If you don't enforce it, your word means nothing." I shall rember that! In paragraph 12 I found an early example of Berg's attitude to corporal punishment:-

"Why do you think God says, "Spare not the rod for his crying"? (Pr. 19: 18.) They start yelling long before you sock them with rod, because they're afraid of the rod and don't want to be spanked! A lot of these people will scream louder before they are sentenced than afterwards, trying to forestall punishment."

In August 1975 he wrote "Lashes of Love". There was a revealing cartoon showing a man embracing a very young boy. The man was holding a branch ("twig" as it has sometimes euphemistically been called). The "switch" is gnarled where the smaller side stems have been removed. I draw attention to that picture because, as I later set out, it is quite apparent to me that such implements have been frequently used and it is an illustration of the power of the literature to influence behaviour. I must recite several passages. Though its authenticity was questioned, I am satisfied it is part of Family literature:-

"We feel sorry for a child or babe or whoever it may be because they seem to hurt so bad and they yell so loud and you're tempted to stop the spanking a little prematurely before they've really learnt their lesson. But don't rescue them prematurely until you're sure the job is done. Now this may sound cruel to you but it's the truth. ... But with the small children who don't understand an awful lot of reasoning sometimes, you just have to apply the rod. ... They try to scream real loud at first to make you think you're practically murdering them, and the whole neighbourhood too sometimes. They'll get sympathy from the neighbours if they can, so that you won't spank them as hard as they probably know they need it! I use to tell Mom that the time to stop spanking is not when they're screaming, it's when they stop screaming and beg for mercy! I usually swat a fly swatter. It's a very nice handy weapon. ... I usually use the handle end, and it does sting, I'll tell you! Sometimes it leaves little red lines too, stripes, but by their stripes they are healed! ... I would start applying the fly swatter, and oh my, how they would scream at first, but then as I really laid it on when they really deserved it, then they stop that loud yelling and then they began to really beg for mercy, I mean sincerely."

"Baby and Toddler Discipline! - begins at 6 months!" was written in October 1983. In it he referred to smacking Techi's hand but he also described how he used corporal punishment when teaching at a high school. There followed this interesting passage:-

"I even had to use a paddle on him a few times. I had a nice great big paddle. I don't know whether you ever saw one of those old fashioned bread boards with a handle, but let me tell you, one whack with that thing and they felt it. ... We believed in applying the rod, and in my case it was a big bread board! Well, I figured it was a little bit heavy, but it was so broad it couldn't possibly hurt'm, but they could feel it and it sort of knocked'm off balance once in a while."

"Child Discipline" was written in March 1976. It was a talk given to Sara when David was 11/2 years old. This was his advice:-

"You need to use something to punish kids that doesn't injure them any, but really hurts. My children really feared that fly swatter, I'll tell you! Like the old family belt! ... my Mother always had a little switch handy, like off the tree, a little tree branch. And brother, did that sting ... If he keeps persisting then just swat him good and hard ... You've got to have a rod or a fly swatter or a little stick or belt, something they know really hurts. ... My Mother would sit down and cry with the whip in her hands, "This is going to hurt me more than it hurts you." ... I do think we ought to get up a list of standard rules of chastisement or punishments for children ... but if they persist, sock it to'm! But never with such harsh or severe force as to actually injure, only hurt. Do it in love as the Lord does and if you really love them and they know it and love you, they'll eventually keep your commandments! And everybody will be happier in the end!" This was republished in 1984.

"Child care Discipline Jewels" seems to have been taken from a collection of previous writings. It addressed the problem that there were different standards of discipline adopted by different families within the home."

"The answer has to be real strict discipline from the very beginning for everyone - adults and children alike! It's important that all the parents and children know and agree upon

ll the rules the children are expected to obey so that anyone can discipline any of the children and not just the particular mother or father of the offending child! ... Things have to be run like an army because you just can always treat each child individually in a large home with a lot of children, and the more people you have, the more regimented and organised things have to be. ... So our parents who won't discipline their children are just going to have to learn to, and start now! And when they're not with their own child, they shouldn't be hurt or sensitive about his getting a spanking or correction from others! They're just going to have to let the people who help take care of him go ahead and do it because we can't put up with foolishness and rowdiness and defiance in our children! Thank God for the parents and helpers who we have who do discipline and know how to apply the rod and the word. I don't know why anybody would mind their child being disciplined. You know that every smack they get is helping them to be a better child in the future and it's really worth it all. Some people go to the extremes of course and it's all unjustified or harsh, that's something different, but that shouldn't have to happen in our Family! Children really need to get disciplined when they are young, and especially toddlers! ... You have to use discipline no matter what age they are. ... And that is also one of the worst things you can do - to give punishment that is too severe, too harsh, more than the crime or disobedience really justifies. ... The best way is the love way! The best way is the gentle way and not the breaking way and the force way or the legal way of the old law! The best law is love ... if the gentling and persuading, the love and the reasoning and the leading, the teaching doesn't work and they're still stubbornly wilfully disobedient, then you've got to apply the rod (Maria: Lord help us all to find the right balance in these important matters of disciplining our children)."

Finally "Dad on Kidz Correction" dated October 1985. Where he wrote:-

"Whoever's going to be teaching teenagers is going to have to learn that corporal punishment, except as a last resort, is not the answer to our kind of teenagers ... There are other ways you can correct them, I don't even like to use the word "punish" them. That's what chastening means, it does not only mean punishment, it means child training. The thing that really hurts them the worst is first of all just to displease, they don't really like to displease, and the next worst, to be shamed before others! To have their misdeeds brought out in the open before you is bad enough, but if they go further, to deal with them in front of others is even worse ... The rod of chastisement is not wrong but it is the spirit in which it is wielded that counts ... Children need discipline, but it must always be tempered with love and mercy. ... Those who can't be controlled through love have to be controlled through fear. Love never fails! If it's real love, it won't fail even if it's applying the rod in love. I think you should try everything else you possibly can before applying corporal punishment. But if all else fails, you just have to whack away! What else can you do? You have to use force. God does! ... He'll whack away until you repent!"

The message to be gained from the literature is that corporal punishment is encouraged but only as a last resort, it is to hurt but not to injure and it must always be administered "in love".

## EVIDENCE OF CORPORAL PUNISHMENT

I am in no doubt at all that its use was widespread. This ranged from quite savage beatings with paddles especially in the Victor camps and in Macau where I am satisfied that children were bruised and injured. The penalty for too many demerits in the Jumbo camps was to be "swatted" with a switch, which, certainly in the Philippines, was a bamboo cane. Berg's favourite implement, the fly swatter, was in regular use and children were regularly beaten with it. Again I am satisfied that there were many occasions when the beatings were more severe than was necessary. Given the emphasis on beating until it hurt and beating until they repent, it is not a surprise to me that many who administered these punishments lost sight of the admonitions not to injure. I am also satisfied that there were many occasions when the object of public beatings was as much to put fear into the onlookers as it was to humiliate and break the will of the recipient. It was not infrequently a brutal form of control.

## THE RECENT APPLICATION OF THESE PRACTICES WITHIN THE UNITED KINGDOM
## THE OXFORD/DIDCOT HOME

I know little about this home. The information came mainly from CA. She is quite a surly girl. For a long time she seemed to wish to remain aloof from these proceedings and was unwilling to offer any help. Finally she did give evidence. I am totally satisfied that there was no undue prompting by the Plaintiff to cause this. There was a ring of truth about her evidence which has made it impossible for me to discard it or to ignore it. She was at this home when a young teenager aged 13 or thereabouts. She was put in charge of the toddlers whose mothers were away on family business. About half of the mothers seemed to have been absent. CA reported seeing very young children suffer corporal punishment. She spoke of a child of only 18 months who had been bruised by her mother "Oxford" S. She is married to WA, the father of S, and,I note a little apprehensively, she appears prone to apply the rod quite unstintingly.

## THE TEWKESBURY HOME

CA gave evidence that during her time at this home there was a mother who beat her children with a spoon on one side of which was a happy face and a sad face on the other. This evidence troubles me. The pictorial message which it conveys is that after the unhappy beating the victim must accept a happy face because he must accept that it was done in love. It illustrates the power of the Law of Love to induce a self delusion that otherwise unacceptable conduct can be cloaked with acceptability by asserting - even believing - that it is done in love. I have little doubt that that is how NT herself felt when she was party to the beating of a 7 year old girl with a switch some time in about 1991 whilst at the home in Coggershall.

There is, therefore, evidence of young children being unduly punished in recent times in England. It was worse for the teenagers.

## THE WANTAGE SCHOOL.

The Family decided to run a school at Wantage. Those in charge were JD and ED who came from the Philippines and undoubtedly imported ideas from the Jumbo. PF and SF and RM and MM had come from the Oxford Home. Mary Malaysia, also from the Philippines, joined later. The school ran from about March 1989 until the lease expired at the end of the year. I remind myself that the School Vision was published in August 1988 and the Victor Programmes had started early in 1989. I find that the following were features of the school at Wantage:-
1.      SECRECY: The address of the school was Selah so that many
parents were not aware where their children were and could not visit them. A degree of censorship was imposed through

correspondence being read.

SILENCE RESTRICTION: This device was extensively used. A number of the children suffered this indignity. It was an indignity because the children had a sign or badge which they had to display upon which was written words to the effect, "Don't talk to me, I am on silence restriction." The restriction was not absolute. The children were able to answer the adults but their talking to their peers was discouraged. I do not find that it was rigorously enforced and I have no doubt that it did not prevent all conversation. It was still an excessive punishment. GK and SW were on silence on and off for three months or so. AM, NS, SC and EV also suffered.

3.    ISOLATION: The last named quartet were also put on a special programme which involved their being separated from others in order that they might in isolation read the Mo Letters and write their Open Heart Reports. SD acknowledged that it was a form of Victor Programme the like of which he had experienced in the Jumbo.

4.    OPEN HEART REPORTS: These were extensively used in an oppressive way not merely genuinely to ascertain what, if anything, troubled the children from time to time but as a means of control. VP was eloquent in her condemnation. She explained that she was made to feel guilty if she did not confess; she complained that her right to privacy of her own thoughts was invaded and she said that it was only when she was in bed that she could think what she wished.

5.    BUBBLE-BURSTING SESSIONS: Because pride and worldliness were such serious thoughts, the steps taken to eradicate them were extreme. There was an occasion when EP and SC were publicly mocked, disparaged and humiliated, the former because of his interest in map-making and the latter for his interests in wildlife and his desire to go down the Amazon.

There was a worse event. The children had been required to report on each other in their Open Heart Reports. They had to identify those of their peers who had the greatest spiritual problems. Since the list of demerits clearly identified those who were constantly in trouble, those were the ones identified by the others as the foolish ones. On a certain day the school was told there was to be no breakfast, but they were to fast, to read the Mo letters and write their reactions. The leaders looked solemn and an air of tension grew. The school then assembled. AM, NS, SC and EV were seated apart. The leaders denounced them as being full of the devil. The leaders read the Open Heart Reports of the other children (which were meant to be confidential) revealing, therefore, how the other children had identified these four. There was much shouting at them to break their spirit and much praying and much attempting to exorcise the devil out of them. The shepherds called on the other children and asked why the four should not be punished. Emotions ran so high that most were in tears. The quartet were eventually led away. Their hair was cut. Much time was spent at the hearing to try to establish whether their hair was shaved or merely shortened. I find the latter. It did not much matter, because the purpose of the haircut was not to improve their looks but to humiliate them, to mark them out as examples and to punish them. The boys were taken off and beaten. All children present were demeaned by this wholly unnecessary excessive bullying tirade. Its emotional intensity was unacceptable.

6.    CORPORAL PUNISHMENT. I am in no doubt at all that this was excessively applied. AM was bruised from above the knees to his lower spine following the haircutting incident. His mother MM denied that her son was bruised. I am in no doubt that he was. NS and SC were also beaten. They were beaten with a paddle. SD was asked by his father to make it. It is the same sort of implement that is used throughout The Family. The paddle had become a feature of English Family life as well. Another boy regularly beaten was GK. He was 14. His crime was bed-wetting. There was a total failure within The Family to appreciate that this boy was a seriously emotionally disturbed child who had undergone some appalling experiences in his childhood. He had witnessed and was clearly still suffering from his brother's drowning. SF did not appear to know this. No attempt was made to treat him for emotional damage evidenced by his enuresis. Instead he was punished for it. Without doubt he was ill treated by The Family.

7.    CALLISTHENICS: This involved running and some form of "squat walking" in laps around two trees about a football pitch apart. For some this was a difficult, painful task. It was the punishment imposed for achieving a lower level of demerit marks. The demerit system and the increasing levels of punishment was again an importation from the Jumbo.

8.    EMOTIONAL PRESSURE: The pressure to conform was great. There was, for example, an occasion when they had to read of the difficulties that Davidito was having. They all had to pray for Father David in his struggles to cope with Davidito's failure. It became so intense that most of them were in tears.

## BURNT FARM

When Wantage closed down, the school moved to Burnt Farm in Hertfordshire. The same team were in charge. The P children did not rejoin the school and I do not have as much evidence about its activities. I have no reason to believe that life did not continue much as it had done at Wantage. The most important incident relates to a boy SM. He was a most unhappy teenager 14 years old. He was thought by many to have the failing of being "self righteous" and to have "spiritual problems." He was made particularly unhappy in March 1990 by his mother being sent away to Eastern Europe on missionary work. His father was in Russia. He was not the only child who was separated from his parents. Many of the parents were working in Eastern Europe. In September 1990 SM was in trouble of some kind. His privileges were withdrawn and he was not allowed to watch television. He ran away and was apprehended by the police at Ramsgate trying to catch the ferry to see his mother in Switzerland or wheresoever she was. He could give no address for her. He was reluctant to reveal much about his personal circumstances. The following day his mother arrived. SM did not seem surprised or express any emotion upon seeing her despite her absence for more than 7 months. She would not reveal her address. She was equivocal about her involvement in "missionary work". The minutes of the Social Services Department have been produced to me and they recorded that:

"SM ... presents physically as being tired, pale, drawn, slightly anaemic in appearance and psychologically as emotionally flat, .... acting inappropriately when reuniting with mother or examining reasons for leaving Burnt Farm, presents as bland, blank, programmed, (guarded, inhibited responses to questions, reluctant to communicate, reluctant to disagree with mother.)

Enquiries were made at Burnt Farm. RM allowed the Social Services Department into a room which was described in the minutes as:-

"Cold and comfortless. The furniture was very shabby

and the room was dominated by a huge high-tech TV and video. RM denied any knowledge of an organisation called Heavens Magic or the Children of God but they did say they were missionaries. No evidence of crucifixes or other religious artifacts and no evidence of the presence of children other than some child size wellington boots in the hallway. No toys, comics, bicycles etc."

The local authority made enquiries which led them to the anti-cult organisations and VJ was introduced to SM. SM denied recognizing any Mo letters etc. but he made obviously knowledgable references to the material to prove the point he sought to make that the cult was being persecuted by the Social Services Department. SM was allowed to leave on 29th September 1990.

Several features of this episode cause me real concern:-

1. This boy was made unhappy for reasons among others that he missed his parents. No sufficient awareness of this fact, still less contrition was shown by those in charge.

2. He lied about his knowledge and involvement with The Children of God/The Family. He was clearly troubled about "persecution."

3. More importantly RM lied to the authorities.

4. This boy ran away at about 5.30 am. He was known to be missing. The Family's own efforts to find him were unsuccessful. Alarmingly, they did not report him missing to the police.

I am driven to conclude that this incident shows the practice of "Deceivers yet True" in action. The Family clearly had their "flee-bags" packed and they disappeared. It does not instil confidence and it requires me to scrutinise carefully the evidence of real, genuine and lasting change.

## TEWKESBURY

The period I am now concerned with is the end of 1991. The adults in charge seem to have been MM, Caleb, to some extent RM, Paul and Mary Malaysia. KA and AM were the teen shepherds.

I am quite satisfied that a Victor Programme was run from this home. Mary Malaysia was in charge but she was acting under the control of the National Child Care Shepherdess Heidi, SPM's wife. MM knew what was happening although she was more concerned with the ordinary running of the household. MM was an unreliable witness. In her Affidavit she dealt with discipline in the teen schools, as being:-

"Administered by the teachers and where parents were present (as they occasionally were) by the parents. Corporal punishment occasionally was used but very rarely and always with the basic premise of The Family that punishment must never be administered in anger: its purpose is for the person punished to understand what they had done wrong and why it was wrong."

That was a far cry from what was happening at Tewkesbury. There the children were regularly beaten and at times beaten by AM, himself a teenager. KA, a Family witness, told me that branches were cut from trees and used until they broke. That caused them to look for another implement. They found a riding crop. AM sought Mary Malaysia's permission to use it. Mary Malaysia sought Heidi's permission according to KA and it was granted. AM then beat S4, the son of a home shepherd, for too many demerits. He broke the skin on his backside. The boy bled from it and was bruised by it. It was a vicious attack. It was authorised from the very top of The Family in this country. It was known that it took place. The stoutest efforts have been made by The Family to cover it up. This particular incident cried out for full explanation. The obvious person to explain what had happened and what had gone wrong was Heidi. No reason was given to me why she should not have been called. I draw adverse conclusions from the failure to call her.

## RUGBY

There was also a home for a number of children at Rugby where RB and VB and MA and LA were in charge. They gave evidence to me and I can accept that in many respects this was a happy home. It was a pity, perhaps, that they did not allow the visiting Australians to film their home but rather chose to maximise the physical attractiveness of Tewkesbury by engaging in the pretence to which I referred much earlier. I can, however, readily understand that teenagers would have responded warmly to this adult team. Although strident in their defence of The Family they nonetheless made a good impression on me in many respects. VB's mediterranean temperament led her to some emotional exchanges with me but that same energy was well harnessed in her interactions with the young people with whom she had to deal. I cannot recall a bad word said against her and she seems to have been a most respected figure. Dare I say it in this case, but it would seem that she "loved" the children and they may well have loved her. Her husband RB, though possessed of British phlegm which made him more reserved than his wife, was nonetheless an enthusiastic member of the team. He got on well with the teenagers, and I have little doubt that they had exciting times with him. There was a lot to do in their ministry and the children had a lot of fun doing it. MA and LA were also impressive witnesses. MA had all the savoir faire that one would expect of The Family's public relations officer. He deployed his charm quite effortlessly and although there is a tough side to his character, I would imagine he earned not only the respect but also the affection of the children he was looking after. His wife LA seemed prepared to go much further than any other witness in her willingness to see The Family move much further towards acceptance. Enlightened though this couple appeared to be, their son KA had a vicious streak in him and in the exercise of his duties as teen shepherd, he wielded the stick with more enthusiasm than judgment, and his storm trooper-mentality alarmed me.

I am satisfied that generally and comparatively speaking life at Rugby was happy for the children living there. It was not all entirely acceptable. KA admits that he was on silence restriction in about February 1991 for some six weeks. He must have found the punishment effective because he made large silence restriction signs to hang about the neck of M1 and MS. He put M1 on silence after he had, as teen shepherd, tried to deal with M1's "spiritual problems" which he sought to cure by intensive shepherding, the Word, and counselling. It was a contemporary and rival, N1 who complained via LA to VB about MS whose punishment was then to be placed on silence restriction. I have no doubt that in the early stages MS would have tried to ignore the restriction as much as she thought she could get away with it. Not to report in the Open Heart Reports anything which "needed work on" showed self righteousness which became punishable. There were also some paddlings which cause concern. J4 paddled JA without even consulting the boy's father before doing it. It was a bad beating which caused some bleeding and bruising. Life at Rugby was, therefore, not all sweetness and light.

Then Mary Malaysia descended on the instruction of Heidi to run another Victor Programme. This was brutally conducted. The demerit system led to regular and frequent

~addlings. The paddle was made by J4 and kept in his room. ~A, S5, S6 and J2 were beaten and according to CA, J2 and S6 were bruised. KA in turn beat M1 and KA gave evidence that he reported the matter to VB and RB and that M1's parents agreed that the boy needed the hiding. He got it. LA seemed unwilling to admit this. I am in no doubt that CA was paddled three times and in her case the implement was a cane and what she described as "an elastic switch". EM conceded that she had been beaten.

I have been sorely troubled by the punishments meted out to MS. She is a pert young lady with a certain steely determination. I have no doubt that she caused The Family great concern. She had her sexual relationship with the 19 year old C1 and was defiant in her allegation that C1 was having an affair with her mother. Then she had a sexual relationship with a fellow teen DM. In The Family's eyes, she was a troublemaker with enormous spiritual problems of lying, self-righteousness, worldliness and every other sin in the calendar. In other circles this might have amounted to no more than a high degree of adolescent rebellion. Mary Malaysia punished her among for other things her sexual promiscuity knowing full well from information confided by the girl herself how cruelly abused she had been throughout her childhood. It was appallingly insensitive retribution. On one occasion Mary Malaysia paddled her as VB corroborated. On another occasion VB, who has I suspect even now, real affection for this characterful girl, beat her with a "bendy twig" and administered the stipulated punishment of "ten swats". MS would not yield and VB felt compelled to beat her again though I am sure a part of her was ~revolted by the ferocity of the attack which frustration at MS's stubbornness provoked. They both ended up in tears. VB asserts that it was done with a loving heart and that the punishment was accepted to have been administered in love. I dare say it was viewed in that way by both VB and MS. In my judgment, however, love cannot excuse twenty strokes which cause bruising. On another occasion VB could not bring herself to administer the punishment and delegated that task to N1 who was a rival of MS's for DM's affections. Because MS wished to continue her sexual relationship with DM, he was chosen to cut the branch from the tree which was used to beat her. She gave a graphic account of one of these occasions. She refused to agree to be beaten by Mary. Mary sent VB to call for RB, her husband. Mary threatened that RB would have to hold her down. To his credit he refused to have any part in anything of that kind. Instead he began to counsel her to accept the punishment which was due to her for her rebellious attitude. The threat was uttered that if she did not accept that punishment it would be a mark of such serious rebellion against the group that they would be compelled to expel her and send her to her grandparents with whom she had lost all contact. MS had grown up on the Traumatic Testimonies and had a fear of the system whose frightening ways had been emphasised in the literature. "God's Vomit" was a letter found in her little suitcase of Family literature and I was in no doubt at all that she entertained some deeply ingrained fear that God killed backsliders. One can but imagine how this young lady must have been struck with terrifying foreboding some months ago when she learnt that her friend and fellow backslider, who left The Family as she did, had recently been murdered. At Rugby the fear of the unknown system was greater than the pain of a beating, so MS submitted to Mary. She beat her so hard with the stick cut by DM that MS's buttocks were cut and her knickers covered with blood.

This was an utterly disgraceful incident. The injustice to a victim of sex abuse being harshly punished for lesser sexual misconduct, the humiliation of having her partner in that escapade having to cut the stick that was used to wound her, the duress used to extract consent to the beating and the self-deluding justification that all was done in love, all that excites my total condemnation.

That was not the end of it. MS was put into isolation. Every morning she was sent to a caravan in the grounds of the home where she was left alone apart from visits by some of the adults, especially VB. She was expected to read the Word. In fact she spent a good deal of the time filing her fingernails and brushing her hair which must have served only to confirm the impression of her inordinate vanity and sinfulness. She took exercise by walking the fields by herself or by digging in the garden. This was originally set as a form of physical punishment but MS preferred it to the caravan and so she did it. Her meals were brought to her, but not always. She was allowed to return to the house in time only to bathe or wash before lights out. She was by now in such disgrace and was so conscious of the fact that N1 would get her into serious trouble that now she did not dare to break the silence restriction which had been imposed upon her. This regime lasted for about 7 weeks. It was intolerable.

Others were put in isolation. CA was sent to her room for 3 months "intensive care" and M2 was likewise punished for 3 weeks. Silence restriction imposed on those in intensive care was much more rigorously enforced than the silence restriction under which MS had been placed for months on end or the silence restrictions imposed on CA, J2, J3 and M1.

## OTHER VICTOR PROGRAMMES

I have little evidence from The Family upon which I can rely and their failure to deal with these matters leads me to conclude that Mary Malaysia was running Victor Programmes probably in Newcastle, and in Scotland. JL told me that the National Shepherds were receiving calls from different homes about children whom Mary had put on silence restriction and she said, contrary to his assertion that he was without knowledge, that SPM dealt with at least one of these calls. EM's report did not allay my concern that Victor Programmes had been run in other locations. The information is sketchy. CA spoke of corporal punishment being administered in the Oxford home and she spoke of Oxford S paddling A2 with a broom handle which broke so that she then continued with an elastic switch. Oxford S paddled M3 for listening to inappropriate music. In London CA had been beaten for pulling a face on her passport photograph and when sent to Rugby beaten again. In the NAS home at Essex, which I assume is Coggeshall at the end of 1990/91 NT herself was present when a 7 year old child was beaten with a switch cut from a tree. I am driven to conclude that corporal punishment was endemic within the homes in the United Kingdom and that it was excessively and at times brutally applied. Silence restriction was also widely adopted for excessive length of time. Recourse to isolation was exceptional but its implementation was severe and damaging.

## RESPONSIBILITY FOR THESE EXCESSES.

Mary Malaysia has been held out to be the scapegoat. She certainly deserves to be roundly condemned and the practices she brought from the Philippines are indeed indefensible. An apology from her has been produced. It was a curious document in that it was not an original and seemed almost to be part of a series. Though dated September 1992 it is apparently a document written in September 1993. It was addressed to the JETTS and Teens and Mary apologised "as one

who laid heavy burdens on you and made life unpleasant for you) during the times you were with me". She acknowledged "a big problem with partiality shown to some of the teenagers". She apologised:

"For implementing the five demerits policy for little mistakes you would make and enforcing such a strict silence restriction rule on you all which was not the standard for Victor Programmes. ... I am very sorry for laying on you burdens that were not the Lord's and I would like to ask you to please forgive me for hurting you in this way. ... I pray that you will continue to go on for the Lord in spite of things that you have found confusing and hurt by."

Mary was not called to give evidence before me. I know not why not. Her conduct was totally inexcusable.

The attempt to shift the whole blame onto Mary is disingenuous. JD and ED introduced practices from the Philippines into Wantage which I have already described. Corporal punishment was administered at times other than during the course of Victor Programmes. The Victor Programmes were excessively abusive but the responsibility for that lies with the National Shepherds. Heidi is responsible. The Family is responsible. The Family knew perfectly well that things had gone wrong and they sent EM on a fact finding mission. I found her to be a totally unsatisfactory witness. She was not frank with me. She attempted to deceive me. She gave evidence to me on three occasions and I still did not get near the truth from her. If, which I do not accept, she believes even a part of what she presented to me in her report, which is a report which I understood to be remitted to World Services, then I am even more concerned for the children who remain in The Family. She must know that what she there reports is a travesty of the truth. How can she believe the following?

"From the accounts of the teens that we talked to, there was little over discipline. From all accounts one boy seemed to have been very difficult and the fact that he was in the programme at a young age was because of the insistence of his exasperated mother who just didn't know what to do with him. In one sense it was commendable for them to consider taking him on given his history, but on the other hand they clearly did not have sufficient experience to cope with him."

I ask rhetorically whether the beatings indiscriminately handed out to innumerable children, many of whom were bruised, can possibly be described as constituting "little over discipline". The sympathy she seems to require to be extended to an exasperated mother and the commendable carers at Tewkesbury seems to pay scant regard to a 10 year old boy who was horse cropped by another teenager till he his buttocks were cut and bruised. This wholly lamentable failure to face the truth and to acknowledge the full extent of their deficiencies gives rise to unallayed concern. If, which I doubt, the report presented to me was in fact the report being made to World Services, then how can one expect World Services to correct excessses when fed such anodyne information as EM presented to them? If, as I suspect, there are other internal documents which come closer to setting out the truth, the whole truth and nothing but the unpalatable truth, then why have I not been made privy to those disclosures? This case, being no different from all the others in this Division, is ultimately about trust. This young mother expects me to continue to trust her as she knows - and as The Family know - I have trusted her hitherto despite The Family's infamous history. Trust does not travel down a one way street. Trust must be earned. Trust must be mutual. I shall express my conclusions about this later.

It is, therefore, important to make certain preliminary

findings in this regard. I deal with EM's evidence in more detail. She swore an Affidavit in these proceedings in February 1994. She referred to the Victor Programmes which she and her husband had been running. She made reference to corporal punishment with a paddle "that is a ladle used for cooking rice", "between 4-6 stokes over a covered bottom". She asserted, "I do not believe it was administered harshly or cruelly." She referred to the Discipleship Training Revolution as having introduced "uniform minimum standards for all children." She acknowledged that Victor Programmes had been copied throughout the World, but, and significantly, she did not refer to the programmes conducted in this country even though she must have known that it was an issue in the case. She explained that silence restriction was intended to be that half hour period of silence in the morning after getting up, the one hour rest period during the day, and half an hour in the evening, it never being intended as a method of punishment. She acknowledged, "I have heard instances where some teenagers were placed on silence restriction for up to 4 weeks." She did not go further and admit that they were instances which had occurred in this country when again she must have known that was an issue in the case. Her Affidavit was wholly silent about the difficulties that the teenagers had been encountering in this country and which she had been sent to investigate. Is this not a perfect example of "Deceivers Yet True"? Indeed, when cross examined, EM asserted that it was permissible to lie to the system where the life and well being of the children was at stake, for example as it was in Argentina. She might have added "and in the United Kingdom!" In my note of her evidence in chief she explained that she had come to Europe because of the concern of World Services about the number of teenagers that were leaving the movement. She said that she had never seen so many teens leaving and so she thought The Family must be doing something wrong and she therefore visited all the homes in Europe. She also admitted that she had visited four homes in this country and that she had held a meeting for the teens to attend; that seventy did so in Nottingham; that it was acknowledged that there were problems and that they had an open forum session but that there were still problems in this country. She explained that the reason for the difficulties were that the children were subject to "diverse worldliness" in that they dabbled with heavy rock music, drink and violence and so the solution perceived to be necessary was "to bring back the standards we would expect in Family homes." She acknowledged the Victor Programme in Wales (Tewkesbury) and that Heidi, David, JL and SPM thought it better to set up training in individual homes. She was firmly cross examined on behalf of the Official Solicitor. It was interesting to read again comments I wrote in the margin of my notebook about the manner in which she gave evidence. Among the several things I noted were, for example, "nice lady but blind to the consequence of her acts"; "nervous, clenching and unclenching her fists and very tense"; "she is being defensive and is lying", "evading the truth" (when she sought to deny the authenticity of the picture in the Child Discipline letter where the adult holds a stick as I have already described). Thereafter my notes become variations on the theme of "evasive", "very evasive", "lies!", "not frank", "clear evidence of cover up". She was, therefore, an exasperating witness because she is an essentially sincere lady who simply cannot believe that her genuine actions taken with the best will in the world for the benefit of the teens with whom she has been so involved have nonetheless had wholly harmful consequences. Of the UK Victor Programme she said this:-

"The person asked to carry out the programme here didn't know enough to practice it effectively, so the leadership

terminated it. People made mistakes and so it was thought better not to have another."

On the issue of separating parents from children she said this:-

"NT must therefore understand that if ever she were persistently to murmur against the leadership, then I, after anxious prayer and as a last resort, would feel constrained temporarily to remove S from her to gain the victory."

Further cross examined about the Victor Programmes here she admitted that possibly she was wrong because she knew of a "new model programme" being run by Mary Malaysia at Rugby. She spoke of Tony, Zack Attack, and said of him:-

"He did get a beautiful victory. If you could see him you would see the miracle of the way the Lord worked in his life. It took extreme measures but if you read the tale of murmurers in the Sinai Desert who were destroyed, the Lord had mercy on Tony. You could see the victory in his expression."

On hearing that I made the comment, "Frightening evidence," because her complacency had robbed her of insight into why his spirit had been broken.

She gave evidence for 3 to 4 days and at the end of which she identified mistakes she found had been made as follows: That Mary Malaysia had little experience with teenagers and had not any realisation of the sobering responsibilities she carried. Her feeeling was that she was "partial" in her association with the teens. The treatment might have been harsh in some case, in that possibly MS had been beaten, that F1 (16) no longer had animosity from a few unfair paddlings and that CA who had left The Family, was partial but had not herself been paddled. Some of the teens F1, CA and M2 had said that silence restriction had been unfair and extreme. She knew much more than she was willing to disclose. Even now I doubt whether I heard the whole truth from her.

I now turn to SPM.

He has a long history with the family. He was a bishop in Australia before the RNR. He is the National Area Shepherd for the United Kingdom. He has filed voluminous evidence in the case I am in no doubt at all that he has had authority from World Services to devote himself to the defence of this action, that he has had free access to World Services and has taken instructions from them. He has been The Family's spokesman. In that capacity he has responded to the grandmother's case and the Official Solicitor's interrogatories. It is necessary to remind myself of some of the matters arising therefrom.

In September 1992 the Plaintiff pleaded her case in this way:-

"Children and adults are expected to be unquestioningly obedient. Children are particularly harshly disciplined by means including:-

    (a)      withholding of food.

    (b)      corporal punishment which includes beating and enforced exercises.

    (c)      enforced silence

    (d)      humiliation in front of their peers

    (e)      bullying by adults and by peers incited by adults

    (f)      children are punished inter alia for expressing an interest in anything which is outside the very narrow scope of their educational curriculum."

She had also asserted that:

"It is common for children at the age of puberty to be sent to teen schools or teen camps or Victor camps the address of which is rarely known to their parents."

The answer was that:

"There are such schools and camps but none in Great Britain, and where there are, attendance is voluntary and usually short term!"

There is no acknowledgement of the schools at Wantage and Burnt Farm or of the programmes being run at Tewkesbury and Rugby, the last of which ended about three of four months before that answer was given.

The answer continued in this way:-

"It is denied that children and adults are expected to be unquestioningly obedient. Leaders within The Family expect those under them to carry out their reasonable instructions, but such instructions are the product of a process of counselling and discussion between those involved. It is denied the children are harshly disciplined. Further and in particular it is denied that the allegations at paragraph 14(a)-(f) represent Family policy or general practice. It is admitted in relation to paragraph 14(b) that reasonable corporal punishment may be administered. It is admitted in relation to paragraph 4(c) that on a few occasions it some homes silence cards had been used to discipline children. It is adverred that violence or physical abuse towards children is incompatible with continued membership of the family."

In his Affidavit sworn in September 1993 to answer the interrogatories he stated inter alia that: "The Family no longer operates teen camps, teen schools or Victor camps." In answer to a question about corporal punishment he stated:-

"The Family policy is that corporal punishment is permissible as the last form of discipline to be used with children and would normally involve a smack with the hand for younger children and possibly smack with a fly swatter for older children, but usually with the hand. Very young children would not be smacked. It is not something that is particularly encouraged. We feel that if children are treated appropriately then corporal punishment should not be necessary. Most children of toddler age would be spoken to and may be as a last resort be given a slap on the leg or hand. We would tend to smack the offending member, for example like their hand if they touch or take something they have been asked not to do after several warnings. With children of 10, 11, 12 we would tend not to encourage corporal punishment, but would consider the removal of privileges as a more appropriate way of dealing with discipline problems. Punishments are usually carried out by parents, but, if in a classroom situation, by whoever is taking the class, usually one of the parents."

In answer to a further set of interrogatories he responded by Affidavit sworn in January 1994 that he had no knowledge of food ever being withheld from a minor:-

"While corporal punishment is an infrequently used instrument for child training within The Family, where legal, it is absolutely against Family policy and practice to use it excessively or inappropriately. It is considered a last resort in child training, and all other avenues are tried first before employing corporal punishment. Even when corporal punishment is deemed necessary by a parent or care giver, it is never excessive, and it is always tempered with love and understanding and is given with the goal of being to teach and instruct, rather than to punish."

Of silence restriction he said:

"To my knowledge this was never a widespread practice and does not now occur in any family community of which I am aware. In any case, even those isolated instances where silence cards were used, were never contrary to the welfare of a minor."

In his evidence in chief he admitted knowledge of a Victor Programme at Tewkesbury and of a "New Model programme", not a Victor Programme, run by Mary Malaysia at Rugby. He had very little knowledge of these matters because he

was concentrating on preparing this case. He expressed concern and upset on learning, as he had as the case unfolded, that some things had gone wrong. He said he was doing research on it, that he was reporting to World Services and that he hoped that it would never happen again.

Cross-examined by the grandmother he explained that Heidi and JL had been in charge of child care and "because it was war time for us there had been shortcomings in our shepherding." I have no doubt that is how The Family have regarded these proceedings, as a war-like battle against The Family. He labours under a deep and bitter sense of persecution. The evidence given by CA seemed to take him by surprise and he did not appear to know of any abusive physical ill-treatment of MS by Mary. Cross examined by the Official Solicitor he stated that he first heard of these matters when researching CA' Affidavit served after the evidence had started. He knew of Mary's apology but understood it to be for her partiality. He said also that he had received a report that whilst at Tewkesbury, Mary had spanked a boy and bruised him. He said he had heard that from the child's mother who must have known about it from the time it had happened. He had not asked JL for any reports. He had not sought help from JL or anyone else before answering the interrogatories. He said he had spoken to the children from Wantage but not to those from Tewkesbury and to only some from Rugby. He said he had received a written report from the children after MS had filed her Affidavit but he said he had received no report from EM. He had only been aware of Mary's partiality as the only problem for the teens. He could give me no satisfactory explanation at all for his failure to have dealt with these matters in his answers to the interrogatories.

I am driven to conclude that he was not fully frank with me. I cannot accept that he was so immersed in the preparation of this case that he was blind and deaf to what was going on about him. (I have to confess that my sympathies for him have increased as the burden of my completing this judgment has weighed like a larger and larger millstone around my neck!) It defies belief that he could live in the NAS home where his wife resided when she was in charge of childcare and, even if seperated from her, not be aware of the teenagers' discontent so rife that World Services had sent EM to investigate in the Autumn of 1993, before his final Affidavits were sworn. My confidence in The Family is not enhanced even if I approach the case on the basis that SPM was largely left in a state of blissful ignorance. That would serve only to demonstrate the abject breakdown in the chain of communication which is supposed to be there to provide the checks and balances against abuse. Whichever way I look at it, children in The Family have been left unprotected.

EM was recalled on day 60. She then admitted more of the meeting held in Nottingham over the weekend of 20th October 1993. About 70 teens attended. Complaints began to emerge about Tewkesbury. No complaints were made about Rugby. This worries me. If the children were truly free to speak openly and confidently at a special forum called to investigate their worries and complaints, why was information about Rugby withheld? The answer must be that the children were under some inhibition. What did emerge was that four or five boys aged between 11 and 13 spoke of being beaten with a "switch" at Tewkesbury. AM and KA made public apologies. EM did not feel that AM was being frank but she did believe KA who said he had not himself administered any swatting. He had, in fact, wielded the stick at Rugby. AM had beaten Oxford S's son with the horse crop and KA confirmed that he had told Heidi of that matter. EM said Heidi no longer held a position of power. She

referred to reports which had been sent to Europe of the events in Tewkesbury and seemed to suggest that these had been sent towards the end of 1990 to the beginning of April 1991. I certainly have not seen them. In her written report EM informed me "both Ricky and I wrote a report about our Nottingham meeting which was submitted to the European Shepherds." I have not seen that document either. When cross- examined, EM was prepared to admit that there was inappropriate corporal punishment administered to MS and to 10 year old S4 with the horse crop, but she was not prepared to concede that MS had been bruised or that S4 had been cut. That evidence was not complete when the Court rose on Friday afternoon. On Monday EM did not attend and I had to wait 10 days for her to reappear. She then produced her report. It was not what I wanted. I did not need her to prepare a written report for me. I wanted to read what she had reported to World Services. Her conclusions were myopic. Her analysis of the mistakes that appeared to have been made were identified as follows:-

"1. The UK NAS had insufficient information available to them about Mary's experience in working with teenagers, in particular that her experience appears to have been limited to working at the Jumbo in the Philippines.

2. That Mary had little or no experience in running Victor Programmes as they had been developed in Japan, and relied upon limited literature available and her outdated experience in the Philippines.

3. She had personal difficulties in that she showed partiality to her favourites, was overly strict and not sufficiently Spirit-led. Her manner of involvement in the programmes was inadequately thought through. There was a failure to work properly with the local teamwork and there were failures in her being adequately shepherded by the NAS teamwork.

4. The subsequent conflict between her and the local shepherds was probably inevitable.

5. That conflict was adequately resolved by the local teamwork referring the issue to the NAS teamwork and her being instructed to work within the local teamwork. When she did work more satisfactorily within the local teamwork her influence was modified.

6. She was withdrawn from further work with JETTS and Teens.

7. When she redirected her ministry to outreach and then subsequently worked with YAs, the YAs had no difficulty in voting her off the teamwork in light of their dissatisfaction at her shepherding.

8. The team working procedure appears to have functioned well to limit her influence. Although her involvement in the Victor Programme was unfortunate, the shepherding system managed to correct the problem. She should not be a scapegoat however for a more general problem about how to engage and involve family adolescents with ordinary Family life and that issue presents a positive challenge to The Family which is what we are engaged in and which we feel we are making progress with."

It did not present a difficult task for Counsel to cross examine EM into acknowledging that many others apart from Mary practised and/or permitted undue and excessive corporal punishment, silence restriction and isolation. I have no doubt that they did.

It is clear from a letter which appears to have been sent to all DO homes in the British Isles from the European Shepherds that either they have an imperfect knowledge of what went on or that they are trying to pretend to themselves and to the teenagers they are addressing that things were not as bad as

everybody knows they were. It is a letter of apology but the first page seems to lay all the blame on Mary Malaysia. they write:

"Mary was working closely with the NASs and we were receiving reports from them as to how you teens were doing, however these reports were not very detailed and we weren't aware of how different disciplinary measures were handled, nor that the spirit in which Mary and some of the older teens were shepherding you wasn't right. In the spring of 1992, one of the members of our teamwork (Dawn Gilligan who was not called to give evidence) "made a quick visitation around some of the homes in England with SPM."
This suggests that SPM must have had more knowledge than he declared. The concerns revealed, which were almost inevitably concerns linked to Mary Malaysia, were "later shared with the NASs especially Heidi."

"Some of you did speak up about something that had taken place with your teens that you weren't in agreement with, and we believe that NASs did take action in these cases - at least we hope they did, and if not, again we offer our apologies."
The letter then revealed how knowledge of the dissatisfaction had grown to the point that at the end of 1993 Mary wrote her apology.

"Ricky and EM arrived in England towards the end of last year, and one of the things they were initially hit with was the discontent and bitterness towards the past Victor Programme which Mary helped to shepherd. ... So the combination of these two - reports from Ricky and EM and info from the Court case - has helped us to see that Mary did use and advocate an excessive use of disciplinary measures such as silence restriction, the demerit chart system and excesive corporal punishment in some cases and for this we're truly sorry. We're sorry for the unnecessary hurt that was caused physically - although that heals fairly quickly - but more so for any emotional and spiritual battles that resulted as those are the scars which take the longest to heal. Again, we ask your forgiveness of our teamwork for not being closer in our communication and involvement ... Actually because of the active "grapevine" among our teens in The Family, and because we have good reason to believe that some of the teens who left have at best exaggerated parts of their testimonies, it has been difficult to discern what actually happened and what is hearsay and exaggeration. We know that excesses did occur, but rather than go into further detail on that side of it, some of which would probably wind up being quite a bit of speculation, what we would like to talk about is what has probably been the greater cause of bitterness and anger which some of you still feel and that is the spirit behind Mary's shepherding and training."
Once again blame was being heaped upon Mary. She seemed to have been punished by banishment from The Family home for 7 days. She was then placed on "Babes Status" for 6 months to:

"Provide an environment for her to hopefully learn more about truly being a servant to the flock, to help her grasp the lessons that she needs regarding her weaknesses of self righteousness, pride and man-pleasing which have sometimes motived her actions ..."
The letter then continued - and this is important -:

"The last point we would like to address is how we can safeguard our Family from these things ever happening again. One thing which we believe will help are some specific guidelines for discipline which will be coming out soon from WS. These make it clear where the boundaries lie in the use of different disciplinary measures and what is excessive. This in itself should make it impossible - or highly difficult - for anyone to take matters into their own hands or to have their own particular brand or style of discipline."
The letter concluded:-

"Our prayer is that we can all go on to the dawn of a brighter day, free from the clouds which have overhung those of you who were affected by all the above, and clearer in understanding of how to avoid it in the future. As Dad prayed, "Sometimes, Lord, we even learn by our defeats, very needed lesson. We learn also by our mistakes, very needed lessons, in order to teach others not to make the same mistakes, not enter into the same frays, to incur the same defeat, but to stay in the narrow path of Thy Will, very close, in tune with Thy spirit."
I must wait to see how much The Family are willing to learn from their mistakes.

## S'S DAY TO DAY CARE:

I turn to the arrangements made for S. He lives with his mother. The Ward's home is a property, with 31/2 acres of garden, leased to the MMs and MA in June 1993 for a term of 3 years. It has become home for NT and S. The conditions prevailing there are fully described in the social services reports which I will now refer.

## THE LOCAL AUTHORITY'S INVESTIGATIONS

At the hearing for directions in October 1993, it then appeared that the grandmother might not be able to continue to offer care to S. I directed Leicestershire County Council, as the appropriate Local Authority, to undertake an investigation of S's circumstances. I specifically requested that they investigate the following matters including education, medical care, investigations into child sex abuse in Leicestershire or elsewhere presently and in the past, police enquiries and most importantly I asked them to investigate:-

"How did the children present to the Social Workers? Are they happy children albeit in an unusual but still tolerable environment, or are they isolated and emotionally damaged victims of an oppressive religious fervour?"

I was fully aware when making that order that I was imposing a great burden upon the Local Authority's Social Services Department. It was wholly impracticable to furnish them with copies of the thousands of pages of evidence which had even then been presented to me. Time was comparatively short. Despite all those difficulties the Legal and Social Services departments responded magnificently to my request. I pay tribute to the care they took and I am most grateful to them for their report. I have already recited from the associated enquiries undertaken by the Education Authority who, of course, share these plaudits of praise. The Social Services Department reported to me as follows:-

Two experienced Social Workers made four visits to the Ward's home. The first two were unannounced and the team were there from 9 am to 4.30 pm and from 4.30 pm to 9.00 pm respectively. Two other pre-arranged visits one for a day and the other for two hours were made on other occasions. They set themselves these tasks:-

(i)      the general demeanour of the children including their behaviour and spontaneity across the whole age range. There were then twenty children at the home ranging in age from S then one of three children under a year old to KAS aged 16.

(ii)      to focus on any children who appeared withdrawn or whose behaviour caused them to stand out from the others.

(iii)      to look for any signs of sexualized behaviour and language in the children.

(iv)     interactions and relationships between children of different ages and between adults and children, including expectations of the children by the adults.

(v)     attitudes of the adults to the outside world and how that was reflected in the children.

(vi)     issues of discipline and how difficult behaviour was handled.

(vii)     sleeping arrangements for the children.

They found that the house was well suited for the purpose of communal living by the five family units who were living there. Considerable time and effort had been spent refurbishing the property and bringing the kitchen, bathroom and heating facilities up to required standard. It was comfortably furnished throughout, clean and well maintained. Every detail of daily living, e.g. cleaning, preparation of meals, laundry and so forth was planned and schedules allocated the tasks between adults and responsible children. The Social Workers were told that advice from Berg and Maria based on The Family's experiences world wide of communal living and raising children guided their modus vivendi.

The Social Workers observed the daily routines and activities of the children who were divided into groups being the toddler group, young children, middle children, the JETTS and the teenagers. These were the reported conclusions:-

"1.     We considered all the children we had met were happy, generally relaxed and confident.

2.     Each family unit is clearly close and distinct within the overall community of The Family. The children, including the babies, all know their own parents and siblings.

3.     The children are responsive and spontaneous. No child appeared withdrawn or difficult and there was no sign whatsoever of inappropriate sexual behaviour. The adults displayed positive and caring attitudes towards the children who obviously trusted them all.

4.     Between all the age groups the children interacted well.

5.     We were told both by adults and the children of contact with people outside the community e.g. an open day in the summer, assisting elderly people in the village and helping with someone's garden, and going to the village bonfire. There are outings to such places as swimming baths, parks and museums both in age groups and as family units. While this is sufficient for the younger children it seems the young people's lives are restricted to their own and other Family communities."

From their interviews it appeared that none of the adults believed there had been sexual abuse of children within The Family. They believed that there was no pressure put on individuals who had choice on issues of moving home, seeking medical attention and leaving The Family. Prayers for guidance would be said but it was generally thought to be pointless trying to make the disaffected stay against their will: communal living was not easy and all those involved had to be committed to make it work. The issue of discipline was not seen as a major one as the children grew up with love and positive attention and all responded to that. If any older children misbehaved sanctions such as withdrawing privileges were used but time spent listening and counselling was thought to be well spent. Teenagers were encouraged to make their own decisions but if they were angry or unhappy they too would receive counselling.

The children confirmed that they enjoyed living in The Family and although they could mix with people outside they tended to find enough within their own home or other Family homes to occupy their need. If they were experiencing problems, there was always an adult to whom to talk. There appeared to be no perception of people outside as evil. The Social Workers expressed the view that the children appeared not to be repeating what adults had told them and seemed to have thought things through for themselves. They accordingly concluded:-

"1.     During our visit we have observed and heard nothing of concern with regard to any of the children living here.

2.     We have seen all twenty children living here, spoken individually with several across the age range and talked more informally with most of the others.

3.     The teenagers particularly impressed us with their practical skills e.g. H3 cooking for thirty people and KAS teaching a group of three younger children. The boys also learn practical skills e.g. J is able to help with plumbing and car mechanics.

4.     The teenagers do not attain formal educational qualifications which could be seen as a disadvantage should they choose to leave The Family. According to MM, however, this is being considered and recently, e.g. H3 undertook a short course at a local college.

5.     The teenagers and older children genuinely do not see any need to mix with similar aged children who live locally and are not connected with The Family. Because of this their experiences of other ways of living are necessarily restricted and choices about their futures are therefore not fully formed.

6.     The Family according to MM is now making a conscious effort to become involved in the local community. On our last visit plans were well advanced to hold another open day for the villagers with a Christmas Concert. This may assist in the children meeting up with village children more.

7.     S along with the other younger children are happy and secure in this environment. Their emotional development needs are met in close, loving relationships with parents and siblings and also through security and trust in their other carers. Child care routines and practices ensure that all their physical development needs are met. There is plenty of age appropriate activity for their mental development and socially they have many opportunities for inter action with the other adults and children living in the home. From our observations all these interactions are positive with genuine regard and care evident.

8.     NT plans to remain in The Family with S and SB. Our observations and discussions with the older children at the Ward's home who have grown up in The Family suggest they are confident and happy.

Our only reservations are as outlined above about the restricted contact and understanding of the outside world which will limit his ability to make choices in later life about remaining in the family."

With particular regard to NT they reported that:-

"There is no doubt that NT is totally committed to S and also to The Family. S is currently thriving in this environment and all his needs fully met."

The purpose of my ordering that report was to give the Local Authority the opportunity to consider whether or not they wished to intervene in these proceedings in order to apply for a Care Order or a Supervision Order with respect to S or to provide services or assistance to S or his family or to take any other action with respect to the child. In other words this was an opportunity for the State, acting through the Local Authority, to intervene in a private family dispute and to seek public law remedies. The local authorities have public law duties to act to protect children in need. After a serious investigation by

xperienced social workers whose professionalism and
objectivity commands respect, the recommendations of the Local
Authority were:-

"Given all of the above the Local Authority does not
intend at this stage to bring any proceedings under Section 31 of
the Children Act 1989 for a Care Order or a Supervision Order in
respect of S or any of the other children. The overall demeanour,
health and welfare of the children seen are such that the Social
Services Department does not consider it necessary at this stage
to provide any voluntary services to The Family."

These conclusions have important consequences for me.
The first is a legal consequence: the Children Act effected
changes to the law which repealed the power of the Judge in
Wardship to make a Supervision Order directed at the Local
Authority if in the Court's discretion the exceptional
circumstances of the case justified it. Now it is necessary for the
Local Authority to apply and a Supervision Order cannot be
foisted upon them. That being the letter and the spirit of the law,
it would be quite inappropriate for me to impose conditions in
any order I make with a view to monitoring S's progress
hereafter. This is a truly exceptional case where the wider
discretion repealed by Parliament might well have proved
beneficial. But it is not to be.

The second important consequence is that I cannot
overlook the favourable aspects of this report. I have evidence to
similar effect from Dr Cameron and Dr Heller. Moreover I have
evidence of similar observations of children in Family homes in
America and in Australia. Though I am not bound by decisions
taken by other Courts in other jurisdictions, there is more
evidence of exoneration of The Family than of condemnation. I
have received evidence from witnesses both within and outside
The Family which leads me to suspect that The Family do have
"sample homes". It may be all homes are equal if only in an
Orwellian sense. Suspicion does not, however, justify a
conclusion that conditions and practices in the other homes are
necessarily bad though they may not be as good as the Ward's
home. My views of the expert evidence I have heard are set out
elsewhere and I was not always wholly convinced by all that was
written or said. I am, however, reminded of words attributed to
Abraham Lincoln that "You can fool all the people some of the
time, and some of the people all the time, but you cannot fool all
the people all of the time." The broad and generalised
observations and finding across the world therefore tend to
confirm the specific conclusions of the Leicestershire County
Council that by and large those living in Family homes, adults
and children, seem content enough with their lot. I must still
resolve whether that is good enough for S.

## OTHER INVESTIGATIONS

As I had requested of them, Leicestershire County
Council made enquiries of other local authorities where the
activities of The Family had come to the Social Services
Departments' attention. Newcastle had an occasion to
investigate one particular family but within the context of
disputed divorce proceedings where nothing could be firmly
established one way or the other as to the effect of The Family
on the children concerned. I have already referred to the
investigations conducted by Hertfordshire County Council with
reference to SM's running away from Burnt Farm. The London
Borough of Barnet carried out investigations in Hendon
following reports in the press, the Daily Mail and the Hendon
Times in November 1990. Those investigations were fruitless
because The Family apparently vacated the premises virtually
overnight. They visited another house in Cricklewood in

London but that was inconclusive. The police received reports
relating to Arkley and Pinner and eventually all three houses
were raided by the police in January 1991. The adults refused to
permit interviews with the children. Such enquiries as could be
conducted gave rise to no cause for concern.

## POLICE ENQUIRIES

After the conclusion of the hearing, there was some
publicity in the National Press relating to investigations
conducted by the Metropolitan Police into the affairs of the
Children of God and The Family. My attention was drawn to the
report in the Daily Mail. I have not read the police report and
although I am aware of their reported conclusions, I take no
account of them. I have sufficient evidence placed before me to
come to my own independent conclusions and the police report,
like the reports of proceedings in foreign jurisdictions, fades into
the background.

## THE EXPERT EVIDENCE

I am mightily relieved to have been spared the reams of
paper and days of evidence that it seemed at one time might be
inflicted upon me to resolve questions of brainwashing and mind
control. These terms seemed more likely to carry emotive
weight than scientific backing. The anti-cult movement may
believe it. I am most unlikely to have been helped by it at all.
The fact is that most of those within The Family remain there
because of their faith in what it offers. For most it is blind faith.
Some remain within The Family because, having almost become
institutionalised, they cannot find either the strength and courage
or the will to break away. For the young there are, as I have
already found, pressures brought to bear upon them through the
traumatic testimonies and more subtly, to fear the unknown and
to prefer the devil they know. There is no evidence whatsoever
to suggest that NT - or CT for that matter - were put under any
improper pressure to join the family. Far from it. They went into
it voluntarily and happily. The letters written by NT are eloquent
of that new found happiness through "finding" Jesus. She had
undergone a remarkable change but it is no more than one would
expect from the cataclysmic religious conversion which she and
many others have experienced. Being "reborn" is a phenomenon
which happens to some members of established churches. It does
not only affect those at the loony extremes of Christianity.

## PROFESSOR JAMES RICHARDSON

He is a Professor of Sociology and Judicial Studies at
the university of Nevada. He seems to have become interested
in the Children of God in the mid 1970's. He worked with Rex
Davis, the Dean of Lincoln Cathedral, who had himself become
interested in this group through their affiliation with the World
Council of Churches. They wrote a paper together in 1976.
They predicted that the Children of God would change just as all
social movement groups changed and for broadly two reasons.
Firstly a negative reaction to a new religious group was
predictable leading the group to adopt a defensive attitude to the
perceived attacks from the state, traditional religions and
especially the anti-cult movement. Secondly internally, as the
group developed and children were born into it, the group
necessarily became more "domesticated". This led to the group
being "deformed" from what they had set out to be and do. No
longer could they expect all members to spend their time and
energy evangelising in far-away lands. Some members had to
take care of their families and ways to support this diverse
membership had to be found. These authors did not, however,
predict that the major change would be the development of the

Flirty Fishing Ministry! Prof. Richardson finds this group interesting because of the blending of their acceptance of fundamentalist religious beliefs with "a strong experiential orientation" manifested by their "openness towards sexuality". He is of the opinion that The Family has evolved into a relatively stable pattern of managing sexuality in a manner much more in keeping with the values of ordinary society. He does not flinch from expressing the opinion that children were exposed to sexual experiences to a greater extent within The Family than outside it. He does not shrink from asserting his opinion that some child sexual abuse occurred within Berg's own household. He has spoken to Peter Amsterdam who accepted that open sexual activity in the presence of the children and adult teenage sex did take place and was "a mistake". He recognised that necessarily there is some "submerging of personality" in groups which are communal or collective simply because they do not foster the individualistic and competitive lifestyle to which society is accustomed. Nevertheless he believed that most of the participants were in their movements simply because they wanted to be there and further that they would leave when the experience was no longer rewarding for them. He struck me as a reputable scholar who had, not surprisingly, a scholar's enthusiasm for his subject and for his views, but not to the extent that he had lost his objectivity.

## DR SUSAN PALMER

She is a part-time lecturer in the Department of Religion, Concordia University, Montreal. There were times during her evidence when she was less than impressive almost as if she had fallen into the very trap she had acknowledged to exist, namely the danger posed for the academic that they might become irritated by the "wilful inaccuracies" of the anti-cult movement and so succumb to "the temptation to compensate by writing an overly positive report on The Family". Subject to that caveat, I found her evidence interesting and helpful. For example:-

"While the terms "system" and "systemites" suggest what the anti-cult movement call an "us - and - them mentality," I have observed Family members use them in a self-consciously satirical fashion, as a quaint relic from their past. While recent literature still conveys gothic portraits of "system" life as a warning to youth in The Family, one must remember that much of it is written by Mama Maria and her team, who have lived in hiding since the mid 70's, and are presumably out of touch with mainstream culture."

She formed her views from her spending a week in the San Diego School in September 1993, spending a week in the English homes in Newcastle, London and the Ward's home and a week with her own children in the Washington Y.A. home. She has visited other homes for a day. She has interviewed 45 members and three ex-members and her informants include Peter Amsterdam and Davidito. She has submitted various questionnaires.

The returns from 52 people in the United Kingdom on the reasons for their having become Turf Supporters showed that the causes for leaving The Family included a feeling that the leaders were applying too much pressure on them or the children. There seemed to her to be a discernible rise in the number of defections in the past few years. Nevertheless many seem to miss the practical assistance, the emotional support and the religious intensity of the commune. She quoted, by way of almost typical example, one 30 year old lady with children who expressed among the advantages of living outside a D.O. home, the ability to live according to her own faith but with the

freedom to make more of her own decisions. Her complaint was that even leisure times had to be scheduled, organised and co-ordinated in a way which in essence amounted to an unacceptable invasion of her freedom and her privacy. Despite that there was a percieved disadvantage for her children (who seem to be young teenagers) for there was less going on about them, less fun and excitement and so more boredom. These observations confirm views I have formed as I have listened to the evidence that there is both good and bad in The Family way of life.

She concluded from four case histories she took that:
"It does not seem very difficult for youth to leave The Family if they are so inclined. ...Defectors are neither shunned, threatened with Hell-fire nor debarred from returning".
I do not entirely agree with that observation. It was certainly true in the case of SC and SD but it was hardly true of the defectors called by the Plaintiff. Perhaps that is no surprise. One of the rare moments of passion in the case as I have already set out was the distress evinced by AB caused by the loss of contact to her mother and similar distress was evident from MS and others. The fact that some may come and go without fear or favour does suggest, and so I find, that it is not all as black as the Plaintiff's witnesses have painted.

I felt Dr. Palmer's evidence was weak when she came to deal with the Victor programme. She acknowledged that Tony - Zack Attack was made to conform by means of subjecting him to public humiliation. She compared the Victor programme with other groups and described it as an example of "mortification mechanism". Nevertheless, she became impatient when cross-examined about the excesses of the Victor programmes run in this country which she sought to shrug off as not being of any great interest to her. That may in part be due to her opinion that some individuals always suffer in a charismatic communal movement. She found it to be a "striking characteristic of The Family" that they were willing to experiment, admit they were wrong and try again. There would always be casualties in such a process of experimentation. I did not find this very reassuring for the children who are to be the subjects and perhaps victims of the next experiment!

When she came to discuss the group's sexual mores, she observed that:
"These early "sexual experiments" - luridly and outrageously preserved in pubs currently accessible only to anti-cultists and the Courts - are mere historical curiosities which have been whole heartedly expunged from contemporary homes and will never be reinstated."
She argued:
"That The Family has evolved far beyond David Berg's sexual fantasies and questionable pre-occupations and have successfully established a healthy society with a highly elaborated code of ethics which, if properly understood, would not stretch the tolerance of the public."
I venture to think that the public might reasonably expect to be furnished with a frank acknowledgement of the past deviant practices before being invited to show tolerance towards current behaviour patterns and beliefs.

She said that of the young adults she interviewed:
"They appear to regard their parents' time of sexual excess with a kind of amused indulgence. The second generation appear far more cautious in embarking on a sexual relationship."
She concluded her written report as follows:-
"In my view The Family provides a healthy, safe, fun and exiting environment in which to bring up children. I am convinced that there is far less child abuse (if any at all)

occurring in the D.O. homes than in the suburbs of our large city. Although it is true that Family JETTS and teens are directed into a vocational training programme that will render them better prepared to become leaders in the End Time than to sit for Havard or Oxford entrance examinations, it appears unfair to expect a communal, millenarian society struggling to instil spiritual ideals in its youth, to also train its children to excel in a pluralistic competitive society. There is a trend among the YA's and teens in California - apparently at the bidding of TSer parents - to undertake exams and receive their High School Certificate. I found The Family's second generation to be socially adept and emotionally open and they manifested highly successful efforts to cultivate old-fashioned Christian virtues like kindness, thrift, cleanliness, diligence and humility."

In her visits to The Family homes she sensed the air of excitement, satisfaction and fun as the children fulfilled their role of conducting their missionary work, as they perceived it to be, by going out onto the streets singing and dancing etc. Although, therefore, their educational system was narrow they were active and creative in song and dance which was their own tradition rooted in the conviction that the world was about to end.

It is difficult for me to ignore the observations she has made of the homes which she has visited though she readily acknowledged that she entered into her research "tending to find new religious movements delightful and amusing. They knew I would not be hostile or critical. As a Sociologist, I am value free." I am less than fully convinced of her objectivity and her ability to see the whole picture. I was not impressed with her response when cross-examined about the inappropriate use of corporal punishment and the other excesses of the Victor programmes, that, "This is all very dreary, there are more important things of interest about The Family." There may be well be interesting things about The Family's way of life but their methods of disciplining the youth cannot be shrugged off as something very dreary.

## DR GORDON MELTON

He is the Director of the Institute for the Study of American Religion which has a specialty in the study of new religious movements. He has written extensively on the subject and his expertise is unquestioned. He first became aware of the Children of God some time around 1970 and had his first direct contact with them in 1971. He monitored them through the 1970's until they closed their colonies and their headquarters and the majority of members left the country. After some years of being out of touch he was unexpectedly approached in the Autumn of 1992. He was provided with copies of the literature as he requested. He visited homes of The Family in 1993. One was in rural England which I assumed to be the Ward's present home. He also stayed at homes in Eastern Europe and Paris as well as in California. Frankly professing no special training in psychology or child care, Dr Melton nonetheless reported that he consistently found happy children who were comfortable in the presence of a stranger and who were openly affectionate with the grown-ups in their midst, especially their own parents. He observed nothing to indicate that any child abuse was occurring in any of the homes which he visited. He found the youth quite knowledgable of the world around them and remarkably free of criminal and drug related behaviour. Many were bilingual and multi-lingual and all were comfortable speaking to strangers and speaking before an audience. Many had developed specialised skills with modern technological equipment (especially the computer) and had an excellent musical background. Females lacked any marked interest in fashion and most males had little

interest in professional sport though some followed soccer.

His report dealt at length with the sexual freedoms granted by and practised in accordance with the Law of Love. When cross-examined he felt able to go further than he had in his written report and his evidence was clear and unequivocal namely that he was in no doubt at all that oral or manual masturbation and full sexual intercourse had occurred between child and adult within The Family and that the incidence of this having occurred was higher in The Family than outside it. He said that Peter Amsterdam had in a roundabout way acknowledged that fact. He described Amsterdam as an astute politician and apologist and a staunch defender of the family. He revealed that there had been much conversation among the leadership about the extent to which Berg himself had participated in child sexual abuse and there was some disquiet as to how he could hold himself out to be the Prophet when he was morally flawed.

Dr Melton stated that he had a reputation for being a defender of small religious groups and a defender of the freedom of religion. Nevertheless he was not afraid to voice his criticisms of The Family and he did not shrink from expressing his horror at the excessive punishments meted out to the children. He assisted the Official Solicitor by providing literature from his archives which had not been forthcoming from The Family. I found him to be independent and objective and his views on the future of this group, to which I will turn in due time, command respect.

## THE REVEREND DR. DAVID MILLIKAN

He is a Minister of the Uniting Church in Australia who for 20 years has been involved in working with new religious movements and monitoring their activities and evolution in Australia. When the "raids" took place in Australia and children were removed into care, he felt that the authorities had overreacted and, without any sympathy for The Family apart from that, and possibly even a degree of antipathy felt towards them, he became involved and began his investigations. He began his report in this way:-

"It is a complex undertaking to understanding a group such as the Children of God - Family of Love - The Family. There are a large number of sources one must contact before judgments can be made. There is the testimony of past members, the research of others, the literature and other materials produced by the group, and contact with the group itself and the experience of people within it."

At this stage of a judgment, which is already too long, I could say, "You're telling me!"

He had approached his task seeking openness with The Family. He made considerable progress but was denied direct access to Berg or Maria. He knew of the "Deceivers yet True" philosophy and he guarded against being deceived. The use of Victor camps had made him wary but he felt satisfied by their explanations until the events in this country gradually emerged. He was not told the full facts. That caused him concern but not enough completely to modify his views about The Family. He felt manipulated by them and angry. He told me, "I am still making my judgments about this group".

He has endeavoured to speak to a broad range of Family members from those newly-joined to many long-term members including several who were present at the beginning of the movement in the late 60's. He has many hours of recorded conversation and hand-written notes. He has been able to talk with several who are known as the key thinkers of the movement. He has visited homes in Australia, Japan, Thailand,

India, Russia and the United Kingdom. He has had extensive conversation with people who are ex-members of the family some of whom look back on their time in The Family with generally happy memories but others of whom are hostile.

I formed the view that he was by no means an apologist for them - on the contrary he struck me - if he will forgive me for describing him and if the World Services will understand my so describing him! - as a typical hard-headed Aussie who would have been treated as one of the lads on the hill at Sydney cricket ground. In other words, he was an impressive witness!
His conversation with Family members convinced him:

"That they believe they have freedom to make their own assessments of David Berg's writing. But they also live with the belief that gives them no expectation that David Berg could ever lead them astray."

He also expressed the opinion:-

"That there are some groups whose life is so aberrant and destructive that they move beyond the realms of what is acceptable in human society. Such a group I would call a cult. I do not believe The Family fits this description."

Because the group so strongly believe that they will witness the great events which will see the end of the world, their educational efforts are directed to equipping the children with the skills of management and decision making which will be appropriate to the task of ruling the world with Christ in the millennium. Dr Millikan expressed this opinion about their education:-

"I am not without some reservations concerning the education of the children above the primary school level. Up to that point what I have seen of the education of the children around the world is excellent. They are taught in a loving and open atmosphere and they appear to enjoy the experience. ...For the teens, the educational materials available are limited to a narrow band of publications emerging from the fundamentalist creationist frameworks, although it must be said that there is a concerted attempt within The Family to address this situation. ....What is primary in my mind is the emotional and spiritual health of the children. That I believe is not at risk."

He expressed this opinion:-

"I believe we must retain within society the right of groups such as this, when driven by powerful religious or philosophical beliefs to put themselves at a distance from the dominant values of our culture. The rights of children in this situation are complex and under certain conditions should be allowed to compromise the right of a group to stand against our culture. But it is not a sufficient argument to say that a group is aberrant and dangerous to its children when the only reasons advanced are that the group is isolated, or holds eccentric beliefs, or restricts access to the state educational system for its children, or advocates an openness in sexual expression. ...There were certain forms of behaviour prior to 1986 in relation to child sexuality which I believe are alarming...I am of the opinion that all sexual encounters between adults and children have ceased. The present literature is unequivocal in its rejection of this behaviour and the people within the group are clear about their own changes and that earlier lit. has been removed or destroyed. ...The Family as they present themselves now have a right to be respected within the diversity which makes up the contemporary pluralist nature of our society."

## THE PSYCHOLOGICAL AND PSYCHIATRIC EVIDENCE
## DR LAWRENCE LILLISTON

He is a clinical child psychologist with some 30 years experience as a clinician. He has, however, had a long standing interest in the psychology of religion and has made a speciality of his study of the development of children in religious families. He has seen about 200 to 225 children from five homes in the United States and three in England. He has however, only tested 34 out of about 8000! When questioned about his own gullibility in accepting at face value what he saw, he commented:-

"If The Family has a system for taking three to six year children and training them in such a way that they are able to maintain the deception over the time we were with them, then that is beyond belief".

He held the view that silence restriction did not seem excessively harmful nor was corporal punishment particularly damaging. The use of open heart report was fairly benign but in the wrong hands it could be abusive if activated by personal malevolence.

He met Tony - Zack Attack and described him as a "nice pleasant healthy guy with three kids who has his life together." He admitted, however, that he would have liked to have explored how his transformation happened and what effect the threat to remove his child had upon him. Without investigating those matters his observations of Tony seem to me to be superficial and to lack academic credibility. Likewise his conclusion about Davidito. This was an opportunity to explore exactly what had taken place in Berg's household. He merely touched upon these matters and Davidito made it obvious he was not prepared to talk about it. Nor did they talk about the reasons which impelled that young man to make attempts on his life said by The Family to have been caused by Satanic influences. Because I conclude that Dr Lilliston was not too concerned critically to examine The Family's past, I cannot be sure I get an accurate picture from him.

The testing he carried out on his very small sample produced these general results:-

Throughout the age range from pre-school through to late adolescence cognitive development was age appropriate or better, a level of development which would not typically be found in environments that were unduly restrictive, coercive, or punitive but were rather to be found in supportive and facilitative environment. The children were shown to be emotionally healthy and stable, characterised by high self-esteem, optimism, and feelings of self-efficacy. They felt empowered to control their behaviour and to influence the world around them. It was highly unlikely that those attributes could develop in an environment characterised by hostility, manipulation and excessive control. Rather the children had obviously received a great deal of affection and positive reinforcement. He found no evidence in any of the homes of sexual abuse or exploitation and the children's sexual adjustment was age appropriate and attitudes towards sex were healthy. The children showed impressive social development in that they got along quite well with each other and with people outside the homes. They liked people and were very much oriented towards establishing good and helpful social relations. He found no evidence of psychological abuse and it was clear that the children had not developed within an atmosphere that was repressive or destructive.

The fact that Dr Lilliston seems to have viewed The Family through his rose coloured spectacles, reduces the weight I can place upon his opinions, but I do not discount them entirely.

## DR MICHAEL HELLER

He is a Consultant Child Psychiatrist, an acknowledged expert in his field and a frequent witness in The Family Division.

He was called by NT. His written report recorded:-

"Materially the standards (at the Ward's home) were good and the rooms were well equipped. The "feel" of the place was warm and the various adults to whom I spoke were friendly and gave no sign of disturbance of any kind. My questions were answered in a straight forward fashion. The numerous children struck me as normal in all respects, polite to me and their seniors but lively and not the least subdued. ...I thought (S) to be a normal, bright toddler (then not yet 2 years old) who, it was clear, was closely attached to his mother; she handled him well.

## OPINION AND COMMENT

(1)     I neither saw nor heard anything concerning S which raises doubts as to his normality and I am sure that the Learned Judge can safely base his decision on an assumption that he is normal in all respects.

(2)     NT, too, gave me every reason to suppose she is psychologically normal. Perhaps, she is not an especially strong personality but I did not have the impression that she was unduly influenced either by anyone at the house or, "faith" excepted, by external forces of some kind.

(3)     You will have appreciated that I came away from (the Ward's home) without cause for significant concern. I would feel able to dismiss any suggestion that I was gulled by those I encountered there. If the issue before the Court was simply whether or not this particular "community" was an appropriate place in which a little boy should grow up, I would hesitate only a little before endorsing placement. Such doubts as I had would derive from a personal preference for a "broader" environment for a child - any child.

(4)     I see The Family as inbred. I think that those being trained for missionary work would be better equipped for that purpose by much more contact with the world outside the houses. ...So far as I can tell at present those (basic practices and standards) that characterise The Family are acceptable.

(5)     The point has, I understand, been made that Family members who were abused within it during their former years, ipso facto, present a threat to children in their general care. I see this as a very dubious generalisation; one needs to particularise."

When he gave evidence he expanded upon those views. He repeated that he would have no fear for S provided that the present and future arrangements for him would not bring him into close contact with damaged personalities who would have a significant influence on him. He was firmly of the view that no child should partake of any sexual activity with grown-ups nor should any child be exposed to adult sexual behaviour. He said that if corporal punishment of a more or less formalised kind was practised then he would be very concerned for there are always better ways of discipline. He said:-

"I hope those with executive power will take to heart that this ought not to have happened and must not happen again."

It became plain as he was cross-examined just how deeply he deplored the excesses of discipline used by The Family. He would have no truck with the suggestion that it being done in love was a sufficient excuse. He called that a medieval approach like middle-age inquisitors inflicting torture to force the victim to recant for the good of his soul. He considered it degrading that VB should use the Law of Love to justify her having done something which she knew in her heart was wrong. It raised for Dr Heller the extent to which people go to extremes in the name of faith.

Whilst acknowledging that a vast amount of material had become relevant, he felt angry that more information had not been vouchsafed to him when he was conducting his enquiries because he considered important matters had been put in issue in the case which he would have wished to have explored.

He was cross-examined about the effects of child sexual abuse. He made it plain that a general principle of psychiatry is that past abusers should where possible have treatment. If an abuser is without knowledge that his acts were abusive, then he is all the more dangerous. If an abuser thinks he can get away with it, he will do it. He was not convinced that the distinction drawn between love and lust was anything more than an exculpatory justification for something that was known to be wrong. A therapist treating a sexual abuser would look for a frank acknowledgement of the abuse that had been committed, an acknowledgment of the fact that it harmed the victim and a total renunciation of any suggestion that the child asked for it. Accordingly he denounced RF for exposing his penis - on his own admission - in order to give some verisimilitude to a lesson on the facts of life. Without those acknowledgments, risks would be too unacceptably high for contact between a child and the perpetrator of child sex abuse to take place unsupervised. He said this:-

"I would expect that adult members and leaders would come to a genuine and sincere acknowledgment that the earlier teachings were:-

(1)     In need of revision

(2)     Were in fact wrong.

Were I a member, I would want regular group meetings where these things were brought into the open. If people won't lookfacts in the face, if people are able to persuade themselves black was white, they must be seen as imperfect protectors of children. The leadership would need to undertake a lot of new writing to explain how the situation has changed."

He was cross-examined about GN 555, "Our beliefs concerning the Lord's Law of Love" written by Peter Amsterdam and Apollos. He condemned that letter for failing emphatically to assert that any sexualised contact with a child was not just inexpedient but plainly and unutterably wrong because it caused psychological and emotional harm to the child. He said,

"If these adults from mother upwards fail to recognise that this is a doctrine which cannot be accepted, then this would cause me great concern. If they accept this teaching, they will have no reason to suppose that they will have misconducted themselves. They should recognise this is a doctrine which is pernicious."

He felt that paragraphs 51 to 53 were a backhanded apology and he found it dismaying that charismatic figures were so arrogant as to be able to persuade others that they knew what was God's will. He said,

"Whatever motivated David Berg, those who are adherents need to look at the world in which they are now living and have regard to the views of the system. I would want them to be able to recognise within themselves that it was wrong and had bad affects and that he had responsibility for it. I would like them to acknowledge he was wrong. It is important from a child protective point of view to say he led us astray."

He was scathing in his criticism of paragraphs 60 and 61 of that letter which refused to lay the blame at the door of David Berg. That he said is the opposite of what had to happen.

"I would want who ever is responsible for S to reject the false doctrines. I would certainly want the leaders to come to a quite different view of these matters and say this is no longer a tenable reaction."

He was dismissive of the "Good Thots" selection of psychiatric advice which he condemned as wrong and very misleading and

ot based on principles which have any validity at all. He said it ought to be withdrawn with an explanation that research showed that any sexual contact between adult and child was harmful. His conclusion was:-

"If the leadership continued to broadcast mixed messages and those receiving them fail to recognise the risks, then it is difficult to be protective."

## DR. HAMISH CAMERON

He is another well known and respected Consultant Child Psychiatrist. He was called by the Official Solicitor. He expressed these conclusions in his first report dated 17th October 1993:

"1.    S is a delightful normal 20 month old little boy, a credit to his upbringing thus far.

2.    (Mother), a devout believer in The Family, has given S an excellent start in life. She recognises her tendency to ignore disagreeable matters, and says she will be vigilant in looking after S. However, at least partially, she accepts S as being a child of The Family.

3.    (Grandmother) is genuinely concerned about (a) child sexual abuse risks and (b) educational and social isolation and (c) likely to be untrained for independent living, all affecting S. She feels her daughter's blind faith will prevent her giving adequate protective care to her son.

At present it seems unlikely that S will be exposed to a degree of future significant harm, sufficient to justify removing him from The Family."

He made his second report on 13th May 1994. He said:-

"Recent direct observation of S with his mother...revealed an intelligent lively and happy little boy, who is developing satisfactorily. He shows no evidence of being harmed, nor does he appear to be at risk of significant harm currently. The present child care he receives from (mother), from SB, and from the other adult members of The Family at the Ward's home is of a high quality. As often happens when a child is brought up within a large extended Family, or in a community setting, S's emotional attachment is less intense to his mother then would be the case in a typical family and is spread apparently among the group who care for him. It does seem likely that S still regards (mother) as his primary psychological parent, but SB is probably a close second, with other members of the Ward's household also enjoying S's secure trust. ...S's upbringing thus far cannot be faulted and his present and immediate future best interests are likely to be protected by his continuing to be brought up in The Family in the short term future. ...Any serious circumstances putting S's wellbeing at risk could justify separation now.

NT's failure to protect S could take one of two forms:-

- either she would be physically separated from him, living in another house, perhaps in another country,

- or, although physically present, her trusting mind would not be acutely alert to threats to his welfare."

Dr Cameron then identified the groups of future risks. The first were acts of commission being sexual abuse and emotional and physical abuse. The second were acts of omission, i.e. neglect. These included the dereliction of duty to higher education, the neglect of social education, the neglect of medical provision and neglect of the child's attachment to mother. Dr Cameron concluded:-

"With such a recent history of misdeeds there must be a risk on commonsense grounds of S suffering, either from one or more of these recognised abuses, or from some new yet to be introduced experiment, at some time in the future as he grows up."

Nevertheless Dr Cameron seemed willing to adopt a "wait and see" approach. He said:-

"While (that) appears a reasonable way to proceed, over-optimism would be out of place. The Family senior members need to correct two major areas of child-rearing practice by written and verbal orders from the leadership

(1)    First of all all physical and emotional abuse and neglectful practices must cease with the leadership formerly banning and outlawing paddling, compulsory silence, isolation, dire emotional threats, abuse of the open heart report system and premature separation of children from their parents.

(2)    Education at GCSE level and A level as a preparation for University must be drastically improved. It is unlikely that this can be achieved in-house, and therefore The Family must reconsider its position about encouraging children and adolescents of a certain age to go to outside schools. Perhaps The Family may draw comfort from the Jesuits who are said to feel confident in children brought up in the faith until they are seven, and the experience of The Brethren who allow their children to attend ordinary schools."

Dr Cameron also emphasised S's right to have full and generous contact with all the extended natural family of the Ward. Of NT he said,

"She needs to show genuine appreciation that the worrying evidence before the Court demands that an outside authority should keep a watchful eye on S's wellbeing over the coming years."

Of the possibility of removing S to his maternal grandmother's home, Dr Cameron said:-

"The major disadvantage is that S is still a very little boy to take away from his primary parent and caring home. S is just at that delicate stage of development where he is growing an inner sense of security, and this would be jeopardised if he were to be removed now from his present home."

Of the "wait and see policy with oversight", Dr Cameron said:-

"Planned and purposeful delay has the merit of allowing S to continue to grow up in the environment where he has developed very well thus far. The Family may be improving its child-care practices and there is a possibility that further child centred goals will be achieved in the coming years."

So he concluded:-

"While not seeking to diminish the risks, this child psychiatric report favours the wait and see option. None of the adults in S's immediate environment wishes to see any harm come to him. All are conscious and acutely aware of the need to bring him up well. The past malpractices of The Family are closely associated with some of those who may currently look after S. It is concluded that although there is a risk of something adverse occurring to S it may be balanced by the benefit to him of continuing his early childhood experience uninterruptedly in the care of his own mother."

He wrote a very important letter dated 14th May 1994 in order that it be drawn to the mother's attention before she gave evidence. He said this:-

"There are three hurdles to be surmounted by this little boy's mother:-

(1)    Although her spiritual/emotional attachment is BOTH to The Family AND to S, does she place her son's interest first, and will she continue to do? If not, she is (like a private fostering arrangement) transferring her day to day parental responsibility for S to The Family, and it is The Family's parenting that will then have to be judged.

(2)    Does S's mother accept that some of The

Family's practices have corrupted and psychologically damaged a number of the children/ adolescents in its care." And because of this history the authorities are obliged to monitor S's welfare and are justified in doing so? If she cannot recognise and accept this, how can she protect S?

(3)     Does she accept that constricting the breadth and limiting the duration of education will seriously disadvantage any young person who chooses to leave The Family and go and live in the outside world? If she cannot see this, how can she be trusted to nurture S's educational potential?

Failure at any of these hurdles would raise reasonable doubts about S's continuing welfare in her   care."
When he gave evidence Dr Cameron addressed those three questions.  As to mother putting S first, he said that what concerned him was that whereas the intuitive feeling of most mothers would be to be with her child, NT had put her intuitive feelings aside and relied on the pressure from The Family to leave S at the Ward's home while she came to London for the purpose of this long hearing.  She had a trust in The Family which most mothers would not have.  This seemed to indicate to Dr Cameron that instinct had been overridden by some other belief system.

As to her acceptance of corruption, Dr Cameron found it significant that NT could say that the treatment of Davidito was wrong but she could not say that it was wrong to have happened in Berg's household.  If her loyalty to Berg was blind, then she was not able to use her own judgment as to whether something was reasonable or not.  If only a general "mistake" was acknowledged, but no blame attached to the leaders, then Dr Cameron remained worried.  He was very firmly of the view that it made no difference to the child if done in love because the child instinctively knows that an action is wrong and that brings the child into conflict between what the adult was encouraging him to do and what he subconsciously felt to be wrong.  It produced a psychological strain and groomed the child for promiscuous sexual activity which would not be in his best interest when he grew older.  The use of young children in the strip dancing videos crossed a taboo and was part of a process of adults' grooming children for sexual exploitation. As for the videos, it was self-deceit to think that they were not made for sexual gratification. The fact that "babes" were not exposed to "strong meat" was an implicit acknowledgment that the meat was too strong.  When finally exposed to it, there was almost a right of initiation that the newcomer must comply with the group's conduct in order truly to belong to the group.  His view of the RF exposing himself in the course of the sex education lesson, so called, was that it was an outrageous thing to do which was clearly wrong and damaging to the children concerned.  In Dr Cameron's opinion RF's sense that his father was present was his conscience working upon him knowing intuitively that what he was doing was wrong.

His evidence about MB was significant.  She was a conscientious child who became disillusioned and depressed because of her doubts.  She was in conflict between what she saw and disapproved of and what she was being taught to accept.  Her treatment was a form of physiological punishment.  If the cause of the breakdown was the feeling that MB did not have enough trust and faith and the treatment was to emphasise that she was a back-sliding sinner, then the treatment re-inforced the doubts  and made the condition worse.

Dr Cameron condemned the use of Open Heart Reports.  Adolescents must be allowed their own privacy and allowed their own doubts about the adult world they were entering.  It was an intrusion into the mind of a teenager and totally wrong.  The wilful might play the game and lie but the conscientious suffered.

What he knew of DR suggested that she was in need of professional help to come to terms with what had happened to her. Techi's crying every half hour was evidence of her being extremely emotionally overwrought and instead of proper support, she was punished.

He cited the failure of The Family to alert the police when SM ran away as an example of wrong priorities - the safety of the group had been judged to be more important than the safety of the child.

As for MS, Dr Cameron said that it was baffling how The Family could teach sexual freedom and then punish her for it,  even if she was then acting in breach of the rules. Her rebellion  manifested an underlying problem which her shepherds failed to examine and, when a substantial cause of her waywardness was declared to Mary Malaysia she ignored it probably because, like so many, she refused to believe there was a problem with child sex abuse in The Family. He disapproved strongly of her isolation.  He condemned the use of silence restriction as  outlandish and damaging through its humiliation and its destruction of self-esteem.  It mattered not that it was carried out with love.

Of EG, Dr Cameron expressed concern were he to be in charge because if he could not see anything wrong in his own early sexual initiation, he could hardly give moral guidance to the children who might be in his care.

The Tony Series  were alarming for the form of public group pressure that was being applied with the message that that was what happened if one did not conform.  The example of having to choose between The Family and his child was condemned as a misuse of faith and loyalty.

When cross-examined, Dr Cameron has spoke in terms similar to Dr Heller about the mixed messages given in GN555. He put it this way: the difficulty is that one gets a double message from the letter which says in effect, "You can't go around abusing children because it gets us into trouble but we still believe in the Law of Love" The message is, "Don't do it because it will get us into trouble but we know what we said previously was perfectly OK."  In other words it was a pragmatic amendment not a fundamental one.  He repeated that it was not enough to say it was a mistake; it was necessary to say it was fundamentally wrong.

He explained that the use of Open Heart Reports was not that they were wrong in themselves but that it was an abuse of the power and an abuse of the confessional.

It is important that I stress that the evidence of Dr Heller and Dr Cameron was given before NT had completed her evidence.  She must have been aware of what was expected of her.

## THE PLAINTIFF'S EVIDENCE

I was left in no doubt at all that the Plaintiff deeply loves her daughter and is saddened by the thought - which she does not  accept - that NT may not love her.  They view their relationship differently.  I suppose most mothers and daughters do.  There were undoubtedly times when things were fraught between them and she told me,  and I accept, that at times both mother and father found NT hard to handle.  Mother is more forgiving of daughter than vice versa.

NT cannot fully appreciate the reasons for and the consequences of her parents divorce but I was satisfied by the Plaintiff that it was a very difficult time indeed for her.

Knowledge of NT's joining The Family was a surprise

...ut NT's letters were loving and she seemed genuinely happier ...ian she had been. As knowledge of The Family grew, so did the Plaintiff's concern. I am quite satisfied the Plaintiff was genuine in arranging the luncheon party at which NT was introduced to VJ and KJ. The purpose was to open NT's eyes to past abuse. It was left to KJ to explain this. KJ was a teenage girl and could not possibly have posed a threat. NT's uncle was present. He was independant and there to see fair play. In no sense at all could this have been interpreted as an improper meeting. It inevitably had that effect. Because that effect was inevitable, it is pointless to lay blame for the deterioration of the relationship between mother and daughter. The fact is that The Family saw this as an attack upon themselves and they closed ranks. Against that background it is significant to note that when NT had her baby, she did telephone her mother. She did not telephone her father. Although father is now seen in a much more favourable light than mother, because he does not condemn The Family, the relationship is not as close as both would believe.

I also wholly acquit the Plaintiff of any attempt to "kidnap" CT. She was certainly anxious to make contact with him. She was certainly in touch by now with the anti-cult movement. She dearly wished both her children to leave The Family. But she was not a party to any improper means of achieving that object.

The Plaintiff has conducted herself throughout this long, draining hearing with a dignity that commands my admiration. I allowed her the opportunity to speak from the witness box to NT. It was an emotional yet tightly controlled appeal. It was a protestation of her love for NT and her confidence in NT's ability to care for her son. Her appeal was in effect only for NT to open her eyes. I fear a cold heart had chilled NT's sensibilities. NT sat stony-faced. It was a sad moment.

The case as it was originally pleaded included allegations that:-

-         members were encouraged to lie, maintain secrecy and regard the system with hatred and fear.
-         separation of spouse from spouse and parents from children was widely practised.
-         the result of FFing was a number of children who did not know their fathers;
-         neither did many children born of sharing.
-         children were more children of The Family than of the parent
-         children were harshly disciplined by withholding food, excessive corporal punishment, silence, humiliation, bullying by adults
-         children were deprived of a full and proper education or access to information from newspapers, radio and television
-         promiscuity was encouraged
-         child sexual abuse had occurred
-         Flirty Fishing and dancing have been encouraged
-         The Family were intolerant of those who suffered disability
-         The Family discouraged proper medical treatment
-         NT's capacity for making independent choices and judgments was nullified.

The grandmother's earnest wish is that NT leave The Family. She was at one time minded to suggest that it would be satisfactory if she lived outside a communal home and remained within the group as a TSer but she no longer advances that case. She is driven reluctantly to ask that she be given care and control of S. Her proposal is that he should make his home with her in Kenya. She has all the material comforts and the finance to make that possible. He will be cared for by a nanny. In time he will return to England to be educated. She would hope and expect that NT will maintain contact.

I am quite satisfied that in many respects the plan advanced by Grandmother is satisfactory. He will be physically well looked after. He will be loved by his Grandmother. He knows her sufficiently and he will settle in time in her home. I am now satisfied that the Plaintiff will not abandon her responsibilities but will honour them with the same steely determination that has characterised her pursuit of her claim. She will do so despite the fact that at the age of 58 it will not be easy to do so.

**NT'S EVIDENCE**

It is important to gauge to what extent, if at all, NT's case and perceptions have shifted. This is how she stated her position in her first affidavit sworn in June 1992:-

"I believe that my mother's application is ill-founded and based on fears and concerns that are not well based in reality and have been exaggerated, possibly by people with the deliberate and financial interest in causing people like myself in the Christian fellowship of which I am member problems. ....I ask to be free to make the decisions that every adult parent is free to make about how they choose to live their life and bring up their children, and I ask this Court to reject my mother's application which effectively would, for years to come, impose restrictions upon me that are neither just nor necessary and would severely restrict my basic human rights to freedom of religion, association and the right to bring up my own children."

In her answers to the Official Solicitor's Interrogatories, she denied substantially the allegations of inappropriate sexual behaviour and could not countenance the possibility that any over severe discipline had been exacted against the children.

On day 63 of the hearing she began her evidence. 54 witnesses had preceded her. She heard most of them. She started by telling me that she wished to remain in the Family and that nothing she had heard or read had caused her to change her views about Father David. The videos of the young children dancing were:

"A sad mistake but my mind is so full I cannot accept that it was done for sexual gratification. If they were sick and perverted and disgusting I would be extremely concerned. ...But I think they were naive and innocent sad mistakes."
As for MB's allegation that Berg had masturbated her and attempted to have sexual intercourse with her, she said that if that were the case she would be concerned. She could not say that the allegations were not true, she hoped they were not true. She would certainly be upset if Berg had been going around having sexual contact but she did not believe he was a pervert and that he would have harmed anybody.

"Everything I've read has taught me that he loves people. I do not believe he is a pervert."
She did not believe that sexual activity with children had in any way been encouraged by the leadership though she acknowledged that the publication of the Davidito story was a "serious misjudgment." As for the Victor Programmes and so forth, these were done at a "experimental stage" but, "we've learnt - it's now history."

She did not see that the children within the Family were in any way socially deprived: in fact, the Family was the best

place in the world to bring children up because there S would know Dad. He would learn that "David Berg was a good man with good fruit."

Dr Heller's evidence was interposed. NT listened to it. She returned to give evidence. She immediately reasserted her belief in the Law of Love and her belief that if any child had been abused it was not in accordance with the Law of Love. Berg was certainly not to blame for anything except perhaps the Davidito book. She could not accept that any abuse had occurred because of his teaching. She did not believe that Berg had seen the video on which the young boy and young woman speak of their sharing. If he had seen it she believed he would have stopped it. If that had been Sally's interpretation of the Law of Love, she had got it wrong. NT was wholly unable to explain why the 24 year old woman concerned, Sally, said in the video, "Hi Dad and Maria" before going on to chorus "Amen" to the boy J1 and Berg's grandson H1 having the chance to share with her.

Various passages from Davidito were put to her and she observed that if Berg had thought it was wrong and harmful he would have stopped it. "I love him and trust him".

Then Dr Cameron gave evidence and NT listened but probably did not hear. She still could not bring herself to condemn Berg.

"Very possibly his judgment has been wrong."
"I don't think his judgment was impaired, I say he has made a mistake. I don't think this led The Family astray and it is another matter whether some did go astray. If the people had correctly followed the Law of Love letter, this wouldn't have happened."
She asserted:-
"Mistakes in the past are past because we have learnt from them. They are not in my group today. It is not necessary to know the past because I know the people today, I know the motivation today, I know the rules agreed today."
NT was subjected to a persistent cross-examination and most of the offending literature was put to her. She continued to assert as I noted it:-
"Not Father David's fault if people acted wrongly under the Law of Love. He is responsible for the Law of Love not for the wrongful application of it. I do not accept that his writings have caused anyone damage - on the contrary he has effected miraculous changes to thousands of lives because he has given us through his writings a personal relationship with Jesus we would never otherwise have had."
She became exasperated at having to answer:
"Silly questions which have nothing to do with the Family today. What bearing has it to do with my case, the way I bring S up. Such a waste of time and pain in the neck however much we say it was a mistake and it won't happen again."
She had no worries about those who were in power.

NT was more forthcoming in acknowledging that serious harm had been caused to the teenagers subjected to excessive discipline. She saw no reason not to trust S to MM's care even though she had been in charge at the time of the horsewhipping incident. Despite those concerns she had not discussed these matters with RM and MM and had only talked generally to RB and VB and MA and LA. For NT no alarm bells rang suggesting there were risks for the future because she believed the lessons had been learnt from the mistakes that had been made.
"People know when they have made a mistake and they want to learn and to change, therefore S is not at risk."
NT freely admitted that when she was in charge of a seven year

old girl who had "quite a lot of problems," she was present when Heidi administered two swats with a switch cut from the garden. She also admitted that she had seen a fly swatter being used in the past. Either her recollection had not been as good or she was not as frank when she came to complete her answers to the interrogatories which denied any such activity! The truth is, I find, that she has changed her position a little and acknowledges that she is older and wiser today.

As for her attitude to her mother, she was ambivalent. She is certainly very angry and bitter. One should not be surprised at that reaction. She protested at times that she did not love her mother but I felt it was a hollow angry protest. The truth is both these parties know of their affection for each other and each would dearly like to be on good terms. The litigation is an inevitable but awful stumbling block. I am inclined to believe NT when she says:-
"I want to be able to have a relationship with my mother. The shepherds are not counselling me not to - they counsel me to set aside the bitterness."
I find that there was at least one occasion when prayers were said against the grandmother but more usually the prayer is that the Plaintiff's case be lost and that NT triumphs. She felt unwilling to stay in the guest house back home in Kenya but hoped with time that the relationship would improve and hostility subside so that she could visit her mother in Kenya. I very much hope that that will come to pass, whether S lives with his grandmother or remains with his mother. Both mother and daughter know perfectly well that, hugely difficult though it would prove to be, nonetheless somehow anger and suspicion must, perhaps gradually, be cast aside after this judgment so that S may know and love each of them without anxiety.

A most important fact emerged after NT had concluded her evidence. She had become pregnant. For all of us involved in this case, be it the parties in particular, or the Court Usher, my clerk and the ladies who type this judgment, the hearing has been a strain. It has been shown on the faces of mother and daughter and they have drawn deeply on the reservoirs of their inner strength. Of course they could not cope alone. Each would have needed some support from friends and loved ones. NT has had other pressures to cope with. When it emerged that SPM had been "sharing" with her at the same time as WA, I ordered that blood tests be taken to determine the paternity of S. That took long weeks. It could not have been easy for NT. She was living in London, under attack from the Official Solicitor for failing to heed Dr Cameron's advice to ensure that S lived with her. He was back at the Ward's home being cared for by The Family and particularly by SB whom NT then seemed to have every intention of marrying. That was not to be. The relationship broke down for reasons which have not been explored and as a result S lost the person he had grown to know as "daddy". He has no knowledge of and little contact with WA who is his real father. WA has now set up with "Oxford S" against whom CA made her accusations. In the circumstances I should be relieved that there is not much, if any, paternal contact.

Under that sort of strain I can whole heartedly sympathize with NT's desire for support, and for a friendly shoulder upon which to cry. She turned to RB. With his wife's, VB's consent, a "sharing" weekend was arranged and NT and RB went to a hotel "to get away from it all." They had sexual intercourse. NT became pregnant. Her son, S2, was born on 5th January 1995.

I take no high moral objection to this conduct. This is not a Court of Morals. It is a Family Court sadly well used, day in and day out, to dealing with children of mothers who move

~~om one relationship to another often with much less excuse
~~an NT can offer. The sad experience of the work in The
Family Division is that the children born in this way suffer
because they often do not know their father, have little real
meaningful contact with him, live with the confusion of different
father figures moving in and out of their lives and the lives of
their siblings. Nevertheless by her choosing to behave in this
way, NT does reduce her capability of meeting her children's
needs and increases the harm which her children will suffer and
are at risk of suffering, important criteria for me to bear in mind
when considering the check list factors set out in Section 1(3) of
the Children Act 1989.

## EVIDENCE OF CHANGE
The judicial function is to find the facts of past events
and assess the risks of what lies ahead in the uncertain future.
That task has obviously been made immeasurably more
complicated in a case like this where one is endeavouring to
place one little boy frozen at a moment of time in an organisation
which has developed and shifted as much as this one.
Before embarking upon the task of gazing into the
crystal ball of the future, I must, but briefly, remind myself of
recent trends, developments and changes. I take it as The Family
see it and present it to me in their "History of The Family" from
1978 to 1993 which World Services prepared for the purpose of
being exhibited to SPM's affidavit in answer to the Official
Solicitor's Interrogatories. The key features are these. In 1979
"anti-cult hysteria" drove The Family underground. The "mobile
ministry" began. In 1981 there was a concerted missionary
migration to Central and South America but especially to the Far
East. In the December 1982 letter, "Anywhere with Jesus" Berg
had to justify those frequent moves and he did so in these terms:-
"So these psychologists who say, "Oh no, no, no, you
mustn't change houses, you mustn't move your children too often
from one city or state to another, it's hard on them
psychologically to uproot them and tear them away from their
accustomed surroundings, it gives them a feeling of instability
and insecurity!" - that's the lies of the Devil, absolutely of the
Devil, because it's the best thing in the world for 'em! ...It's far
more important for us to be attached to each other and to the
Lord, then it doesn't matter where we are".
The children were necessarily becoming the focus of attention,
because at the end of 1983 children within the group for the first
time outnumbered the adults.
In 1984 The Family began to send mission teams into
China, the Soviet Union and other countries in the Eastern block.
This was the year Debra Davies published her revelations about
The Family and there was intense focus on them accordingly.
1985 saw the realisation that the children born into the
movement were becoming their first home-spawned teenagers
bringing with them all the difficulties that adolescence inevitably
involves. 1986 was the year of the Mexican Teen Training Camp
and allegedly the beginning of the awakening of the realisation
that sexual abuse was prevalent. Thus began the earnest
addressing of teenage problems. In 1988 the solution was seen
to be in "the School Vision" to be:
"The education of our children is getting to be a monumental
thing, a desperate need, really ... One of our biggest jobs, if not
the biggest job we have now, is to take care of our children."
It was also the beginning of a campaign to fight for the children.
This arose from an ABC television programme and a member's
success in the courts of the United States in securing an order for
the custody of his three children who had been "cruelly
abducted" from him by their ex-member mother. Berg wrote:-

"We're going to put them (our detractors) on notice that
they're going to have a fight!... We are going to put them on
notice with a declaration of war that if they come to try to steal
away our kids, we are going to fight and be violent if necessary,
and lay down our lives for our sheep!"
It was good fighting talk - and none the worse for that - but I
very much doubt whether the threat of violence was ever
intended and there is no scintilla of evidence to suggest that it
was, still less is, Family tactics. The leadership have shown
greater responsibility than is literally conveyed by that message.
I believe them to be even more responsible today than they were
then.
In 1989 the problems experienced with their children
led to the establishment of the Victor programme for teens. It
was the beginning of one of several experiments with their
youth. By the end of 1990 the experiment of the School Vision
was recognised (but not acknowledged to be) a failure. It was a
significant year in other respects. The "summit-90" attended by
the leaders set as its main goal the need to become "better
shepherds". To achieve that they probably effected a subtle coup
d'etat, which, whether intended or not, removed dictatorial
power from Berg and established the notion of teamwork from
top to bottom. It put power in the hands of the team and
removed power from individuals. It was the beginning of the
end of Berg's supremacy. Equally importantly, "teamwork"
decisions were taken by the team after long deliberation and
prayer and after a process of consultation with the lower
echelons by a process in which all were encouraged openly to
discuss "the shepherding weaknesses of all the leaders present."
As so often happens with Family schemes, this
acknowledgement of NWO's (those areas of personal weakness
which "needed work on") led to misinterpretation,
misapplication and potential of abuse as the NWO's joined the
OHR's as another means of enforcing control.
1990 saw what The Family regarded as the beginning of
"state-sponsored persecution" when 22 children were removed
by the authorities in Spain. A second summit was held that year
concentrating on the problems The Family were so obviously
having with their children and this paved the way for Maria to
institute the Discipleship Training Revolution in 1991. What is
significant about the DTR is that Maria was very much in charge
of it, acting not autocratically but after a real attempt at wide
consultation. She wrote:-
"It's obvious that "something's gotta give", and
something has got to change! If we want to avoid having all our
JETTs and teens becoming dissatisfied, confused and rebellious
"problem cases," I think we're going to have to re-evaluate our
entire structure and consider revamping and overhauling our
entire present method of handling them!"
So began another experiment. I have dwelt at length on
unsatisfactory consequences of the programme she instituted
which included having a Victor programme in every home. To
concentrate on that aspect would, however, be an unfair and
wholly biased reflection of all the changes she was seeking to
effect. She wished to set up a child-care teamworker in every
community to represent the needs of the children of that home in
order to help raise the level of child-care awareness in the home.
She decreed that child-care or parenting meetings should be held
weekly. Whilst I applaud the intention to have a forum in which
matters affecting the children could be discussed, my heart sinks
at the stifling pressure this puts upon everybody. My heart sinks
at all of this public baring of the soul this public beating of the
breast, but I do not doubt Maria's good intention.
She achieved much good by the DTR because she

insisted that there must be a "Family time" when parents spend at least an hour of each day with their children and a family day "to enjoy a day of fellowship and play, witnessing or outings - whatever they can do to spend quality time together." This is important. It is a recognition of the importance of Family life within communal life. It is a far cry from "One Wife" and earlier attempts to undermine the cohesion of the nuclear Family in order to strengthen the communal tie.

The communal need was not overlooked in the DTR. For the sake of uniformity leading to good order, there had to be "united home discipline standards" for children and adult alike I have already dwelt at length on the abuses which have occured when discipline which ought to be in the hands of the parents was surrendered unquestioningly to others.

Finally the DTR began to lay down mandatory guidelines for home schooling.

Another significant development in 1991 following the second summit was the decision that the teens and young people "should be given more opportunity to witness and share their faith with others and have more contact with their peers outside of the community." That was translated into action with the establishment by the teens of their own communities, coffee shops and outreach centres. It was also decided that The Family communities world wide should begin "opening up more to outside parties who were interested in The Family and our way of life."

By 1992 the striking feature of Family life was that two thirds of the members were now children. It was the year of "unprecedented persecution". This case had begun and in Sydney and Melbourne, Australia, 142 children were removed from their homes by the authorities. There was "media persecution" in Japan. It is important to note the reaction to that perceived persecution. One is that The Family are now facing their detractors submitting themselves to and acting within the law. NT came back to the jurisdiction no doubt because this Court's remedies are extensive and because I threatened to involve them, but no doubt also because she was encouraged by the leadership to do so. The other reaction has been confirmed by the conclusions of the "Summit '93" that:-

"It's easier to have faith and endure persecution when you realise the Lord has a plan in it for us, and is allowing it for our own good. He said a number of times not to fear, that it's all part of His plan and there is a purpose in it - to strengthen us, purge us, draw us close to Him, and force us out into the open so that (we) can be seen by the whole World!

This is a new day and the Lord has shown us that he now wants us to go on the offensive. This has resulted in a change in the type of media coverage we now receive. Since we are standing up and proclaiming the Truth in the face of persecution, we are getting a much fairer and better representation of our Message in the press. As the media people begin to meet and interview our Family members, visit the homes, and read our statements, many of them are seeing that we truly are innocent of the lies and accusations against us, and their articles and stories portray this. ... Now that our homes in many countries are presenting themselves openly as The Family, it has caused us to improve our sample and presentation to the public, and do more to really minister to people. The Family is being credited with and becoming known for our sincere and successful ministries of singing in orphanages, ministering to juvenile delinquents, assisting in relief efforts in disasters, feeding the homeless, and reaching and caring for the needy in countless ways."

As a result of decisions taken there, The Family

launched a world wide campaign to establish contact with religious scholars and sociologists and, at a local level, with Christians of other denominations. In the History from which I am taking this information, World Services wrote,

"though still in its infancy, initial reports on this new ministry are overwhelmingly positive".

The History for 1993 makes interesting but slightly disconcerting reading. It says this:-

"In January it came to Maria's attention that a number of our teens and young adults had some legitimate concerns about The Family, especially regarding the role they play. Maria wanted to hear more, and so instructed the regional leadership world wide to gather groups of teenagers from each area to hold open-forum discussions regarding their desires, their needs, their complaints, etc. She also requested that these teens write personally about the changes that they would like to see made throughout The Family (the problem situations most frequently cited by our teens where the adults' tendency to talk down to them, the adults' failure to give teens due recognition and authority for responsibilities they were already carrying. In short, they wanted to be treated like the responsible young adult Family Members they now are.) All of their suggestions were considered and taken into account. The result was a letter from Maria, "The Personal Encouragement Revolution" (the PER) which was published in June."

What disconcerts me is the suggestion that each area held this forum. I assume such a meeting was held in the British Isles. Minutes of that meeting must have been kept and relayed to Maria. Why have I not seen them? Once again The Family have not given me the full picture, warts and all. I have already referred to the inadequacies of the EM investigations. Here is another example where frankness was probably lacking. If it was, how can I have full confidence in the leadership? My attention was drawn to Peter Amsterdam's summary of Summit-93 where, in listing the benefits from persecution he wrote:-

"But now that we're involved in so many Court cases, we've been forced to make an exception to our important lit classification rules that forbid our giving DO lit to outsiders. We have given SOME of our legal counsel NEARLY full sets of MO letters, so they can properly prepare our defence." (My emphasis)

The implications of that statement are that some of the legal representatives do not get even nearly full sets of MO letters and all the representatives are denied some of the letters. Why, oh why? Because there is something to hide? Or because they lack the maturity to trust outsiders?

PER itself was seen as the next step for the young after School Vision and the DTR. Maria thanked those who responded "for opening up your hearts and honestly expressing your deepest feelings and desires and needs." I need refer to only one of the responses that she received:

"In the past, I know it wasn't true, but I sort of felt that "The Family can't ever be wrong." ( I don't remember ever being told that, but that's how I felt) so therefore I took all the blame for problems that I came across, thinking I just had too much pride...."

The emotional development of that child was surely impaired by having unfairly carried the burden of guilt and she wrote,

"It was just so liberating to talk openly about things that normally our group of teens and EAs just don't discuss."

She complaining in times past she was not free. Maria does seem to recognise that for she writes:-

"Now is the time we've got to loose them and let them go free ... as Dad said in his recent letter ... we need to think of

vhat we were doing when we were their age and loosen up a
little and let them burn free."
She reported of the teenagers:-

"You've expressed repeatedly that you want supervision,
you want training, you want the adults help, but you just wish
they wouldn't smother you, wouldn't be so protective, so
possessive, so authoritative."
There are most important lessons for The Family to learn from
that. I am not convinced they have learnt them. There, in a
sentence, is what is wrong with Family life. The children were
protesting that too much "love you, honey" is in fact
smothering, so is "drowning them in the Word" in the way
referred to in the Heavenly City Seminar Notes; that too little
acknowledgment of personal initiatives is too protective; that too
many OHRs demanding the revealing of every feeling and
emotion is too possessive; and that discipline unrelentingly and
harshly imposed is too authoritative. Maria lists the following
major areas where change was needed:-

(a)     The older teens and EAs request that they
should not be treated like children but as responsible young
adults.

(b)     The teens would like to "eliminate meaningless
rules, and to apply the legitimate ones less legalistically."

(c)     They would like "more prayerful spirit led
application of the Word without such legalistic interpretations
that don't allow for much freedom of the spirit. For example,
when a teen has a problem, we should not immediately assume
that their situation is exactly like Tony's was or exactly like
Techi's was or exactly like MB's was etc."

(d)     The teens wished more freedom in how they
witnessed others .

(e)     They would like more choice and authority in
their ministries.

(f)     They would like more choice in home matters.

(g)     They would like more freedom in their
relationships and more affection.

(h)     They would like more music.

(i)     They would like more fun and inspiration.

(j)     They would like to see fewer double standards
in the home.

Maria pointed out that changes often took time and she
asked for patience but she did promise that The Family were
trying to make their life better. "Grandpa says if you stop
changing, you die, so change is good."

"Important changes in a world-wide work which affect
every member of our homes and ministries and schedules and
our witnessing and everything, are going to take some time.
Besides all that's involved in prayerfully putting these new
changes into effect, remember it also takes time for people's old
habits to change into new ones, and for their past attitudes to
reflect new ways of thinking."
The decision I have to take depends upon how far and how fast
Maria is prepared to force change and whether past attitudes can
in fact adapt to her new ways of thinking.

Some progress has been made by "The Family
Discipline Guidelines" published in June 1994. The reasons
given for this include the need to address the concerns of Courts
of Law. This is clearly aimed at me, among others!

The word discipline varies in its meaning according to
its context. It varies from merely giving instructions and
showing verbal displeasure or sensure to the loss of privileges,
the imposition of additional duties and it includes practices
which have been the subject of examination earlier in this
judgment. The advice given in this letter is as follows:-

## CONVERSATION RESTRICTION
This should be used:
"Occasionally as a method of discipline to help check
children who have a problem with unruly speech.
"Conversation restriction should ideally only be for a
few minutes to half an hour or so (and certainly no more than 3
hours at any one time in any one day). Should repeated
conversation restriction be necessary the situation should be
taken to the child-care teamworker and counselled about together
with the childrens' parents or guardian acting on behalf of the
parents. ... Children should not have their mouth taped shut, or
suffer any other forms of physical restraint or facial covering
(such as a gauze mask) for the purpose of discipline which
prevents them from speaking, or from breathing freely or
naturally, or causes them undue public embarrassment."
To cover a child's face like that is an appalling practice which I
deprecate and I am only relieved that no evidence was given
suggesting it had ever occurred in this country.

## TIME OUT
This means: "placing a disruptive child in an alternative
setting away from other children where they can pray, read the
word and receive special attention and counselling." For two
year olds it should not exceed 5 minutes or so and a child or teen
should not be separated from any other members of the home for
more that 3 hours a day and preferably less unless they pose a
threat to other home members or significantly disrupt the home's
functioning. If the situation warrants it, a pre-teen or teen (aged
12 and up) may be separated from their peers for longer periods
(no more than 3 days at a time, as long as it is with the full
consent of the pre teen or teen, his or her parents or guardian
acting on behalf of the parents and the home teamwork.) In
order to make longer periods of time out most effective there
should be:
"positive input through word studies, personal
counselling and positive fellowship from an adult, such as one
on one reading at talk time".

## CORPORAL PUNISHMENT
This should be the exception and should only be
resorted to if other approaches have not succeeded in bringing
about the needed improvement. The following guidance is
given:-
"Babies and young toddlers - ages 0-18 months. Babies
under 6 months should not be given any form of physical
correction. For children 6 months to 18 months, circumstances
might arise where it could be age appropriate, proportionate and
reasonable to smack a child under the age of 18 months but it is
hoped it would perhaps be limited to a single light slap or tap to
reinforce a needed admonition. Children of 19 months up to 4
years should not be given more than 2 swats on the bottom at
any one time. Children aged 4 or 5 years should generally not be
given more than 3 swots on the bottom at any one time (with the
hand or a non-damaging, reasonable object, such as a light
flexible slipper). Children ages 6 and over should not be given
more than 6 swats at any one time (except in extremely serious
situations, and with the agreement of parents or guardians acting
on behalf of parents and shepherds). When going over these
guidelines, Mama said, "Some people think 6 swats is too much,
and some people think 6 swats is too little. You can't please
everybody ... You must pray with them, hear them out, explain
the problem and the reason for the correction, then show them
forgiveness, followed up with love and encouragement. We
strongly suggest that after aged 13 corporal punishment no

nger be given as other forms of correction are usually more ...ffective for this age group. ... At least one other adult, Y.A. or senior teen should be nearby to witness the administering of any significant corporal punishment which is beyond simple correctional swots. ... Any corporal punishment given a child should be administered with love and understanding. Be sure the child knows that you love them. Be affectionate, give hugs and help them know that their mistakes have been forgiven and that you have faith in them that they will try to do better in future." Non-acceptable forms of punishment included:-

**PUBLIC RIDICULE:**
"No child (or adult Family member) should be punished or disciplined or stigmatised by being made the object of public humiliation or ridicule."
The Family clearly had not thought of that when they published the Techi series and Tony series. It was not applied at Wantage. Most of the complainants I have heard felt their humiliation more painful than their physical punishment.

**FORCED RESTRAINT:**
"No child should be forcibly restrained or detained in any way, except in extreme cases in which they show obvious intent to harm or by their actions pose real and immediate danger to themselves and others."
These rules are good so far as they go and I must consider whether they go far enough. In what purports to be an attempt to set out some guidelines, other passages refer to the earlier letters on "Child care Discipline Jewels", "Kidz Correction" and "Dad's Guidelines for Discipline". I have already commented adversely on Berg's enthusiastic endorsement of corporal punishment expressed in those letters and there is little hint of recantation in 1994. It is a pity.
I have some evidence of some other changes that are taking place but - at least so far as I know - not yet the subject of specific letters from World Services. They were referred to by Peter Amsterdam in his letter to me.
The first related to The Family's educational philosophy. Apparently Maria convened a meeting of a number of WS and CRO educational representatives in January 1994 with a view to improving The Family's home schooling. They made a number of detailed recommendations which were said to be due for publication. Among them will be encouraging the taking of local national secondary education examinations, researching the possibility of taking outside training in subjects where help is needed, using people from outside the communities to help teach specialised skills and generally the making of greater use of local educational opportunities, excursions, outings and facilities. There seems to be no assistance offered to those who would wish to go on to further education because:
"It would be very difficult for a home to provide the necessary resources to facilitate such courses of education." The only solution seems to be that the child concerned, and probably his family, should leave the community and become TSers.
The second aspect to which he refers is the "Ministry of Reconciliation". I have already referred to the decision to open the doors to non-members. Amsterdam told me:
"As leader of The Family, I would like to affirm that we are committed to a long term policy of fostering as much openness as possible, both within our communities and in our relations outside."
In addition The Family saw as significant the TRF supporter

programme. Initially there was some tension between those who remained full time members and the TSers but, as The Family began to acknowledge the support the TSers gave them, especially in times of persecution, WS was now encouraging The Family at all levels to have more contact with TSers. Amsterdam wrote:
"We are presently in the process of drawing up new policy guidelines for contact with TSers."
Another aspect of their "evolving policies" concerns the teenagers who were leaving The Family. He wrote:-
"Some local leadership, most specifically in England, seem to handle the departing of some of their teens quite wisely, setting them up in apartments, giving them funds, helping them find jobs, etc. We very much agree with this approach and have encouraged other areas to adopt the same policy. We love these young people. If they decide that the missionary life in The Family is not their calling nor vocation, then we intend to help them make the transition into mainstream society with as few difficulties as possible. ... If any of our young people choose to leave The Family, we intend to respect their wishes." For those families where a teenager moves out of a Family home, "we are presently working on policy to make it easier for these parents and teens to have regular contact."
He also wrote that:
"This ministry of reconciliation, along with the general overall openness that has developed within The Family over the last 21/2 years is also touching the relationship between Family members and their relatives. With our new openness, Family members are more inclined to contact and visit relatives invite them to visit the homes".
That resumé of the literature satisfies me that The Family has undergone a series of quite fundamental changes in recent times, these changes affecting key areas of leadership and the style of leadership, a firm reining in of sexual freedom, greater freedom and responsibility for the teens, some kerbs on excessive discipline, some possibility of outside education, and a general opening of the doors to the outside world. I turn to consider to what extent the theory has been put into practice.

**EVIDENCE OF CHANGE EXPERIENCED BY MEMBERS AND FORMER MEMBERS**
The most noticeable example of change is BS. She has moved from arch enemy to passionate apologist. There is such inconsistency in her account of things that have happened in the past - and in her case many years in the past - that I would not rely on much she told me. She is, however, an example of change working to bring sworn enemies together. Even if ulterior motives are at work, she is a symbol of reconciliation and such symbols are often important.
On a more mundane level, I heard from many who seek no publicity or personal limelight and whose evidence is all the more convincing for that. Here are some examples:
JG.
He was the Plaintiff's witness, one of the teenagers who left in March 1993. He told me that in the last few years, and since there had been so much publicity about The Family, things had changed. "Yes, definitely," was the emphasis he put upon it. He said, by way of example, that they were taught not to call outsiders "systemites" but "strangers". They took field trips to give them more contact with these strangers. When he dealt with sexual matters, he said that:
"To continue to exist the group had to cut these things out. I'd say these things had gone for good but with the same person in charge I wouldn't think it possible for me to return to

'em. Because of external pressures on them they will probably remain as straight as they are. I think they've changed because people are older and Berg knows you can't get away with it. People do believe in good and right and things like that and they would probably be shocked if they ever came out again. An important change was that they gave us (the teens) some breathing space."

SD:

He is another who left in 1993 aged about 19 or thereabouts. He was called by the Defendants. He struck me as a thoroughly likeable young man with his feet fairly firmly planted on the ground. He told me he left because,

"I was just fed up with people telling me what to do. There is nothing wrong with them but they used to tell us what music was good or bad and I was not allowed to do things I wanted to do like have a tattoo to smoke and drink and even take drugs if I wanted to. The Family's idea of the End Time was not mine. Nothing surprises me about The Family because it is an extreme place to live, and extreme things happened there. But I don't think there is anything wrong with being in The Family."

Questioned about GN481 and how to make complaints, he said that:

"If the shepherds said you were murmuring, you could ask the next shepherd according to a Mo letter I recall. My gripe is that it is hard for the shepherds to think they're wrong. Now the teens tell me they are more prepared to reconsider."

In answer to questions I asked him, he told me about a seminar in Hungary in 1992. I now realise but did not then appreciate that this must have been one of the meetings organised by Maria which led to PER. He told me that a lot of the teenagers were leaving because they were so dissatisfied by the restrictions placed upon them and the lack of freedom. He said that since then he understood it had gradually got better and that if he had had a different shepherd, he would probably still be there. He told me that the biggest changes were that the teenagers were allowed to listen to music of their choice and that they could question adults and if there was no satisfactory response they could write direct to the European Shepherd whose address is on the board of every home. He said you could write the letter and post it without it being read. He added, however, that if the shepherds knew you were having a hard time, you were told you had to make your letter inspiring. Other changes he mentioned were that the demerit system was abolished, so was silence and callisthenics. He said if a boy liked a girl he could speak to her though there was to be no sexual activity under 16. If both were over 16 they had to ask the shepherd but they could talk without permission. He said that they could now go to the cinema and he sometimes took FC and his girlfriend out with him and his wife. They would take them to the pub and play pool.

"The rules have been relaxed and are not now so tight. The rules began to be relaxed after the seminar. It used to be that teenagers could only go out with an adult. The reason for the relaxation is because life had become too uninspiring for the teen and it was realised that if they were prevented from having a beer or going to the movies they would leave anyway."

Though he spoke of these changes, he disclaimed knowing anything at all about PER.

MB:

She could hardly be supportive of The Family but she did tell me that Maria and the leadership were trying "very hard to be back in society and respected. They are trying everything they can to look better." It is true that she had some doubt about their sincerity and certainly some doubt whether they would ever be able to admit that Berg had ever done wrong.

MS:

She was of the view that the changes brought about in relation to The Family's attitude to child sex were profound but were only brought about because of pressure on The Family from outside. She felt that Berg himself remained of the same mind and that he would change his mind about the teachings for the sake of the outward appearance of the group. This young lady suffered as much as anyone and more than most and it is, therefore, interesting to note that when she finally decided to leave The Family from the home in Scotland, she did so only or mainly because she was bored.

CA:

She explained that in England about a quarter of the teenagers were happy, but many had left and that there was no real debate among them because they were scared they would get into trouble. She was another who spoke of having mixed feelings about The Family. She said, "I know there were things which were totally wrong but there were also happy times."

SPM:

As the most senior person to give evidence on behalf of The Family he was, not surprisingly, often very much on the defensive. At times he knew he was defending the indefensible. I did not, therefore, gain any impression that he personally would be in the vanguard of those rooting for change and the likes of RB and VB, MA and LA and MM, but not necessarily RM, were much more ready to accept and indeed instigate change. MM told me:

"We are now looking at ourselves through the eyes of the others outside. The unknown can make us very fearful to opening the door and saying come on in."

The most SPM would concede was that the group had developed and matured over the years from a younger wilder group with less wisdom to a maturing organisation with a stable and good leadership structure. He told me,

"Society changes, and so do we; the laws in society change, and so do ours. We are not perfect we are always trying to correct things that have gone wrong and are sorry when they have."

**PETER AMSTERDAM:**

In the letter he wrote to me, he acknowledged:-

"We appreciate that a great deal of good has come from (all the investigations and litigation The Family has been involved in over the last 4 years.) They have resulted in many positive changes within The Family and have set us on an unchangeable course of more openness with non-members and society at large. ... We have embarked on a course of reconciliation with those we have offended and hurt, as well with those who are seeking to do us harm. Although this is a new initiative, it is taking hold throughout The Family and is bringing positive results. Parents have been put in contact with their children and grandchildren; ex-members with Family friends, ex-spouses and children; TRF supporter parents with their older Family teens and TRF supporters with D.O. members. ... Realising that not all of our young people will choose to be missionaries nor remain in The Family, we are attempting to make it easier for those who wish to leave to do so. ... Our history has been fraught with controversy; we have many times not foreseen some of the repercussions of our actions, and we realise that we have made mistakes. Yet, as an ever growing, maturing movement, when we recognise changes are needed, we make them. As times have changed, so have we ... We do not and will not revert to the practices that have been found unsatisfactory and abandoned. ... We realise that there are some

hildren who were not as well cared for or as well educated as others, some who have had adverse experiences and are now complaining bitterly about it. Although we believe that much of what they say is untrue or highly exaggerated, we do acknowledge that there is an element of truth to many of their accusations. We are genuinely sorry for any negative experience that current or former Family members may have undergone, and we are determined to make sure that everything possible is done to prevent any such things occurring in the future."

## THE OPINION OF THE EXPERTS ON THE LIKELYHOOD OF CHANGE

1.     DOCTOR PALMER

She argued:-

"That The Family has evolved far beyond David Berg's sexual fantasies and questionable preoccupations and have successfully established a healthy society with a highly elaborated code of ethics which, if properly understood, would not stretch the tolerance of the public."

In her evidence she told me:-

"This is an experimental society. I don't think it is just pretended reform, but a predictable pattern seen in other new religious movements where sexual deviancy changes as they have children and seek to find a place in society. There is a definite pattern to be more conventional."

Cross-examined she said that it had put aside its deviant sexual practices and:-

"It is at a critical point in its history, changing shape and becoming more accommodating to society."

2.     DOCTOR MELTON

He reported as follows:-

"As has been noted by both social and religious scholars for the past 2 generations, religious and communal groups past through a period of rapid change during their first generation. In the early phases, the group is distinguished by (1) its existence as a convert's-only organisation, (2) a new religious vision which called the group into existence, and (3) an emphasis upon the unique and different aspects of the group (as opposed to those many elements it shares with predecessor organisations). Groups then passed through a period of rapid change as the new religious vision is explored, its implications understood, and its adequacy tested, i.e. as theological reflection occurs. Most new religions die during this phase as their initial vision proves too limited or shallow. If a group is successful and survives, it generally faces a series of organisational problems created by an immature leadership which must be trained on the job. It is not unusual for people in their early 20's to assume national and international leadership responsibilities. If the group survives, however, the group reaches a point of maturity as the initial teachings of the founder are more completely stated, the implications perceived, and the problems inherent within it (or the way in which it was first stated) are handled. As the whole of the teachings are, so to speak, put on paper (i.e. a theology is developed), the larger portion of the teachings, usually identical with that of the predecessor group(s), begins to claim equal attention in the mind of followers along with the unique different and aspects.

Second, as the group matures, so does its leadership. Youthful enthusiasms that dictated policies are replaced by mature thoughtful deliberations on organizational matters. The third major force in stabilising the group arises as children are born and claim significant attention of the group. Children have to be trained in the group's teaching and along with a theology, a programme of religious education must be developed. Also, as a group, children are never as zealous for the faith as the first convert. The second generation is always more conservative than the first. ... As the second generation arrives and is assimilated into the group's life, the process of rapid change will slow to a crawl and a more or less stable theology will be articulated, a mature leadership will evolve and a stable behaviour pattern will be adopted by the group. Like all groups it will continue to change, but at a rate similar to that of the environment."

He concluded that:-

"The Family seems to have worked through its first generation of problems and arrived at a mature organisational state. ... The tendency of children has generally been to move organisations in a more conservative direction and into a lessening of tension with the surrounding environment. We shall watch with interest to see if they follow past trends."

In his evidence he expressed the view that on Berg's death the leadership would pass to a bureaucracy but that it would be a smooth transition because the structures are already in place. He said, and I confess I find this worrying, that there are some assumption that Berg will continue to guide them from the spirit world. He has in the past sought to give authority to his statements by asserting they come to him from his spirit mentors. It is too depressing to contemplate that Berg will rule from the grave. There are, however, sufficient signs in the recent changes to suggest to me that Maria and Amsterdam possess enough personal integrity and intelligence and wield enough power for their both to be able and to want to stamp their own mark of authority on the movement. Doctor Melton felt that the leadership had reached stability and maturity and so he, a heavy critic of The Family in the 1980's, was generally pleased to see their participation in inter-faith meetings and in their engaging with others. He said, and, having formed a favourable impression of him and a regard for his expertise, I must accept his evidence that:-

"I have come to trust some of them from empirical observation. I think the changes are very real. They show an intense desire to come back into society judged at least by their standing and fighting in Court and by their producing whatever documents I have asked for to complete my library of their literature."

3.     DOCTOR MILLIKAN

I remind myself that he has "taken on various cults unequivocally pernicious" in the past. He told me that:

"A cult will break down when it modifies its view that there are only two people in the world, the insiders and the outsiders. The Family have moved away from this position. The controversy in Australia and elsewhere has led them to adopt different views about "flatlanders" and "systemites"."

He found it significant that whereas changes in the past were initiated through Berg's fiat, now major changes, for example, PER, have taken time to formulate as views are invited and respected before policy is changed. Although he was cautious enough to state that he was still making his judgments about this group, his opinion was that the changes were irreversible because The Family were opening up to the world through their contact with the established churches, through opening their homes to the public, and to making themselves available to experts like himself. Whereas other groups have tried to keep hold of their principles, they have allowed change and his opinion is that if secrecy and isolation break down, then that also breaks down any errant behaviour.

4.     PROFESSOR RICHARDSON

He concluded as follows:-

"All groups, including the COG/FOL, go through a

natural history" or organisational evolution. They start out .tore radical, in part because the originators are typically younger, healthier and unfettered with families and responsibilities. Then the groups evolve, sometimes in fits and starts towards a more normal existence. They are forced to do this because of external pressures and because of internal demands put on the group by increasingly diverse types of members, including particularly the presence of large numbers of small children in groups which do not practice systematic birth control. THE COG/FOL NOW SEEM MORE "NORMAL" THAN THEY ONCE DID, AND IF THAT WORD EVER GETS OUT THROUGH THE MEDIA, THEY MAY WELL FADE INTO OBSCURITY, SIMPLY BECAUSE THEY ARE NOT DOING AS MANY STRANGE THINGS ANY MORE, AND FEW PEOPLE WILL BE VERY INTERESTED".
I have added the emphasis so that the media may reflect upon this opinion!

"Such relative obscurity will be a mixed blessing, of course, and at present some may think it could never happen. However, the history of many social movement organisations, some of which were quite radical indeed, suggest that the COG/FOL will follow a similar path. ... It is my considered view .. that The Family is not a group "gone bad" - indeed, by nearly all standards that could be imagined, The Family has "gone good," what with the changes it has undergone concerning sexuality and the rearing of children. The Family certainly has a colourful past, but it seems to this scholar that its future looks more normal."
When he gave evidence he said that if he were betting he would vager that The Family would look more like the Seventh Day Adventist than the Amish, a particularly isolated group.
MY FINDINGS
The review of the literature, the evidence of those who remain in and those who have left the group and the unchallenged common opinion of a group of experts who differed in their expertise and in the manner in which they gave evidence, all lead me to conclude that fundamental changes have taken place which:

(a)     have eradicated the sexual excesses of the past.

(b)     have begun, but not completed, a ban on inappropriate forms of discipline.

(c)     offer wider avenues of education.

(d)     have moved The Family significantly from a closed, secret society to one which is more ready to engage with the outside world.

(e)     may make them more trusting of the system and perhaps even more amenable to changes required by the system.

I am satisfied that the changes made are likely, on the balance of probabilities, to be irreversible so that The Family having moved forward, will not now move backwards. How much further forward they may be required to move and whether or not they will do so are matters which I shall deal with soon.

**THE OFFICIAL SOLICITOR'S CASE**
The recommendation made to me by the Official Solicitor in his written report dated 11th January 1994 was that he concurred with and adopted Doctor Cameron's assessment and recommendations and therefore:-

"SUBJECT TO THE HEARING OF ORAL EVIDENCE, the Official Solicitor submits that S should remain living with the mother, the wardship continue, and the matter be reviewed after one year. With regard to contact with the grandmother, both Doctor Cameron and the Official Solicitor

support this continuing and the Official Solicitor will make his submissions on the extent and nature of the contact through Counsel at the conclusion of the hearing." (I have added the emphasis)
Doctor Cameron's report was dated 17th October 1993 and I have already cited from it.
It is a pity that The Family appear to have misunderstood the Official Solicitor's role. He, through his representatives in his office, through Counsel whom he instructs, have a duty to act in the best interests of the child they represent. They must approach that task at all times with an open mind but also with an inquisitive one. His duty is to probe and to explore the evidence. The Family know perfectly well, if they are true to themselves, that there are vast areas of their past which scream out for thorough but dispassionate investigation and they could hardly expect otherwise. It is, therefore, a pity that Mr Barton was instructed to make his closing submissions on the basis that: "It became apparent from the outset of the oral evidence that the Official Solicitor took a more hostile attitude than that reflected in the report." He would have failed in his duty had he not, through Counsel, thoroughly investigated the areas of concern raised in this case.

Doctor Cameron reported again on 13th May. He had, by then, been informed of the nature of the evidence which had been led and he expressed the opinion that it was best for S to adopt a "wait and see policy" provided certain safeguards could be written into the Order for S's protection. He envisaged, for example, supervisory visits by the Official Solicitor's appointee with periodic progress reports, the appointment of a peripatetic christian nursery school teacher and substantial contact including staying contact. That wait and see policy was however dependent on certain preconditions being satisfied partly by The Family and partly by the mother. The following day he wrote the very important letter setting out the three hurdles for NT to surmount as I have already described.

When he gave evidence he explained that her failure at any hurdle would cause him concern as to putting S first. He felt that the changes effected were small steps in the right direction and he had weak confidence in The Family's ability to go as far he required of them. At the conclusion of his evidence, his message seemed clear enough to me: he wished for some movement on NT's part to be able to give effect to what he felt was best for S, namely that the Court adopt the wait and see policy. As I have already indicated, NT's evidence fell far short of satisfying his conditions.

There was then an unfortunate development. Doctor Cameron attended a consultation with Counsel in preparation of the Official Solicitor's final submissions. Having reviewed the case, Doctor Cameron reported that in his opinion the least detrimental alternative appeared to be "strongly to leave well enough alone." The Official Solicitor took another view. He was minded to submit that S should be removed from his mother's care and placed with grandmother. He recognised, however, that it was his duty to give full and frank disclosure of all material facts and matters and that would include the opinion of his expert which did not support his conclusion. When all of these matters were drawn to Doctor Cameron's attention he gave further thought to the best course to be adopted for S and having thought again, he changed his mind. He concluded that S would almost inevitably suffer educational neglect, that there was a real danger that S would be emotionally pressurised; there was a real danger that S could become the victim of sexual abuse and there was a probability of his being physically punished. He concluded:

"Regrettably the attitude of (mother) and The Family is typified by secrecy and aloofness rather than by willingness to cooperate voluntarily."

Now rather than wait and see:

"a strong recommendation is made that S's welfare would be best promoted by his being transferred to live in the care and control of his maternal grandmother."

He was recalled. He was embarrassed by his volte face. I cannot be harshly critical of his changing his mind. This is a difficult case and I make no secret of the fact that I have had some difficulty in finally deciding what is best for this young boy. Although Doctor Cameron's opinions are always most useful, the important point of his evidence is that this child would ordinarily be better off with his mother to whom he has made his attachments and that I should not remove him unless there are good and compelling reasons to do so. It is at the end of the day for me to assess whether or not those compelling reasons exist. Before deciding whether they do or not, I must remind myself of the law.

THE LAW

At the beginning of this judgment I reminded myself that S's welfare was my paramount consideration. So it is, and so it will remain. My decision is dictated by what I consider to be in his best interests having regard to the facts I have found to have been established, having regard to the risks to which I judge he may be exposed in the future and having regard to all the circumstances of the case including the counter-balancing of fundamental human rights claimed by the mother and claimed on behalf of the child. I shall need, therefore, to address some of these matters in more detail.

1. THE MOTHER'S "RIGHT" TO BRING UP HER SON.

She claims, as do those who support her, to have "the right" to bring up S free from interference from her mother, S's grandmother, and free, moreover, from interference imposed by the Court. It is an understandable enough reaction. Any interference with the power which a parent possesses to bring up his or her child strikes at the atavistic instinct to nurture and protect one's young. Whether the parent has such a "right", strictly speaking, is open to some jurisprudential debate into which it would not be profitable for me to enter. A fundamental purpose of the Children Act was to deflect concentration from parental rights to parental responsibilities and to emphasise that we do not own or possess our children: parenthood's only purpose is to bring them up to the best of our ability. I need no persuading that the mother's primary submission that she, as mother, is better able by nurture and by nature to care for S than his grandmother, is a powerful one. It is a submission which carries with it the backing of a number of significant recent cases which began in the House of Lords in RE: K.D. [1988] 1 A.C. 806 and has culminated in RE: "W" (A MINOR) (RESIDENCE ORDER) [1993] 2 FLR 625. There Balcombe L.J. said:-

"There have been a number of cases recently on (the proper approach of the Court) to which I think I ought to refer. The first is RE: "KD" (cited above.) That was a case where a young married mother of a Ward of Court had been stopped access on the basis that the child was to be adopted by the foster-parents and she appealed against this. One of the matters which the Court had to consider was the fundamental human rights of the mother as laid down by the European Convention of Human Rights. There are two passages from the speeches to which I refer. First, from the speech of Lord Templeman where he says, in the context of whether there was any inconsistency between the English rule about the welfare of the child being the first and paramount consideration and the European Convention:

"The best person to bring up a child is the natural parent. It matters not whether the parent is wise or foolish, rich or poor, educated or illiterate, provided the child's moral and physical health are not endangered. Public authorities cannot improve on nature. Public authorities exercise a supervisory role and interfere to rescue a child when the parental tie is broken by abuse or separation. In terms of the English Rule the Court decides whether and to what extent the welfare of the child requires that the child shall be protected against harm caused by the parent, including harm which would be caused by the resumption of parental care after separation has broken the parental tie. In terms of the Convention Rule the Court decides whether and to what extent the child's health or morals require protection from the parent and whether and to what extent The Family life of the parent and child has been supplanted by some other relationship which has become the essential life for the child."

I have to say that when that passage is quoted, it is usually the first few lines that are quoted and not the second part of the passage, and I think it is important to bear in mind the second part as well.

From the same case, the speech of Lord Oliver of Aylmerton where he says,:

"If the child's welfare dictates that there should be no access, then it is equally fruitless to ask whether that is because there is no right to access or because the right is overborne by considerations of the child's welfare. For my part, I think the President's analysis in HEREFORD AND WORCESTER COUNTY COUNCIL -V- JAH [1985] F.L.R. 530, places the emphasis perhaps too much upon the necessity of finding a positive benefit to the child from parental access. As a general proposition, a natural parent has a claim to access to his or her child to which the Court will pay regard and it would not I think be inappropriate to describe such a claim as a "right". Equally, a normal assumption is, as Latey J. observed in M V M (CHILD ACCESS) [1973] 2 ALL E.R. 81, that a child would benefit from continued contact with his natural parents. Both the "right" and the assumption will always be displaced if the interests of the child indicate otherwise."

Next in this line of cases is RE: "K" (A MINOR) (CUSTODY): [1990] 2 FLR 64, where the contest was between the uncle and aunt on the one hand, with whom the child had lived immediately after his mother had committed suicide, and the father on the other. Fox L.J. referred to the speeches of Lord Templeman and Lord Oliver in RE: K.D. and he, himself, set out the test in the following passage:

"The question was not where the child would get the better home. The question was: Was it demonstrated that the welfare of the child positively demanded the displacement of the parental right. The word "right" is not really accurate insofar as it might connote something in the nature of a property right which it is not but it will serve for present purposes. The "right" if there is one, is more that of the child."

I am not certain that Fox L.J. in his paraphrase of the speeches in RE: K.D. went rather further than he was entitled to do, and for my part I would prefer the approach in the same case OF Waite J. where he says this, after referring to RE: K.D.:

"The principle is that the Court in Wardship will not act in opposition to a natural parent unless judicially satisfied that the child's welfare requires that the parental rights should be suspended or superseded. The speeches in the House of Lords make it plain that the term "parental right" is not there used in any propriatary sense, but rather as describing the right of every child, as part of its general welfare, to have the ties of

...ature maintained wherever possible with the parents who gave
... life."

A little later in referring to the question that the Judge in that case ought to have asked:-

"The question he ought of course to have been asking was: are there any compelling factors which require me to override the prima facie right of this child to upbringing by its surviving natural parents."

Finally in the sequence one comes to the case of RE: H (A MINOR) (CUSTODY: INTERIM CARE AND CONTROL) (1991) 2 FLR 109 again in this Court. It is sufficient if I only refer to the Judgment of Lord Donaldson MR at p.112 where he says:

"... I am slightly apprehensive that RE: K (A MINOR) (CUSTODY) [1990] FLR 64 may be misconstrued as an authority. It was being used by (Counsel) as if it were authority for the proposition that fathers (or, as the case may be, mothers) have parental rights in the sense of proprietary rights. I think it is more important, if one is citing or relying on RE: K to look at the Judgment of Waite J. of which Fox L.J. would, no doubt, have been aware and with which he would undoubtedly have agreed, not only in the passage which Butler-Sloss L.J. has quoted, but also in the succeeding sentence which reads as follows ..." and he then quotes the passage which I have just mentioned. Lord Donaldson goes on: "So it is not a case of parental right opposed to the interests of the child, with an assumption that parental right prevails unless there are strong reasons in terms of the interests of the child. It is the same test which is being applied, the welfare of the child, and all that RE: K is saying, as I understand it, is that of course there is a strong supposition that, other things being equal, it is in the interests of the child that it shall remain with its natural parents."

For my part I agree whole heartedly with what Lord Donaldson says there, and I hope that it may be possible that this divergence of views, if such it really is, can finally be stilled. I would repeat what Lord Donaldson says. It is the welfare of the child which is the test, but of course there is a strong supposition that, other things being equal, it is in the interests of the child that it shall remain with its natural parents, but that has to give way to the particular needs in particular situations."

Waite L.J. delivered a concurring Judgment in which he said:-

"I agree. The authorities which had been cited by Balcombe L.J. illustrate the difficulty of finding, within the infinite variety of circumstances in which the welfare of a child may fall to be applied as the paramount consideration, some principle which does procure justice to the element in the child's welfare represented by the advantage of maintaining the ties of nature with its own parents. I agree that the principle is best and more succinctly expressed by Lord Donaldson in RE: H (A MINOR) (INTERIM CUSTODY) to the general effect that the welfare of the child is indeed the test, but there is a strong supposition, other things being equal, that it is in the best interests of the child to be brought up by his natural parents."

I direct myself accordingly.

## 2. THE COURT'S APPROACH TO RELIGIOUS CONTROVERSIES AND MORAL DILEMMAS:

Cases involving Jehovah's Witnesses, the Plymouth Brethren and the Scientologists have been before the Court and the factual circumstances in each case have inevitably varied significantly. I can, however, obtain some help from that line of authority.

In RE: "T" (MINORS) December 19th 1975, Scarman L.J., as he then was, said this:

"We live in a tolerant society. There is no reason at all why the mother should not espouse the beliefs and practices of Jehovah's Witnesses. There is nothing immoral or socially obnoxious in the belief and practices of the sect. There is a great risk because we are dealing with an unpopular sect, in overplaying the dangers to the welfare of these children inherent in the possibility that they may follow the mother and become Jehovah's Witnesses."

More recently the Court of Appeal had occasion to consider the Plymouth Brethren in RE: "R" (A MINOR) (RESIDENCE: RELIGION) [1993] 2 FLR 163. Purchas L.J. said this:-

"The Judge's approach to the fellowship, their beliefs and rules is set out at the beginning of his judgment in these terms: "The beliefs of this group of Christians are in some respects relevant to this case, but I stress that I have judged this case under the normal principles which apply in these Courts to every case." I have no hesitation in saying that that is an impeccable approach to this problem. It is no part of the Court's function to comment on the tenets doctrines or rules of any particular section of society provided that these rules are legally and social acceptable. ... However, ... the impact of the tenets, doctrines and rules of a society upon a child's future welfare must be one of the relevant circumstances to be taken into account by the Court when applying the provisions of Section 1 of the Childrens Act 1989. The provisions of that section do not alter in their impact from one case to another and they are to be applied to the tests set out in accordance with the generally accepted standards of society, bearing in mind that the paramount objective is promoting the child's welfare, not only in the immediate, but also in the medium and long-term future during his or her minority. This is well established. We will refer to the case of RE: T (MINORS) (CUSTODY: RELIGIOUS UPBRINGING) [1981] FLR 239 which among other matters held that:-

"It was not for the Court to pass any judgment on the beliefs of the parents where they are socially acceptable and consistent with a decent and respectable life; there was no reason why the mother should not espouse the beliefs and practices of Jehovah's Witnesses for there was nothing immoral or socially obnoxious about them."

Then another finding:-

"It was not necessarily wrong" (and I emphasis the word "necessarily") "or contrary to the welfare of children, that they should be brought up in a narrower sphere of life and subject to a stricter religious discipline than that enjoyed by most other people, nor that they be without parties at Christmas and on birthdays: in this case it was essential to appreciate that once the mother's teaching was accepted as reasonable, it had to be considered against the whole background of the case and not in itself so full of danger that it alone could justify making an Order which otherwise the Court would not make."

That authority merely supports the fact that it is against the normal standards of society that the provisions of the Act must be applied. A further reference to this approach is to be found in the judgments of this Court, in a different context admittedly to the present consideration, in the case of C V C (A MINOR) (CUSTODY: APPEAL) [1991] 1 FLR 223 in the judgment of Balcombe L.J. where emphasis is made in the context of a lesbian relationship that it is the generally accepted standards that are to be applied when judging the welfare of the child".

That decision of Balcombe L.J. in "C V C" is instructive. He said this at page 230:-

"It is apparent that views will frequently differ as to what the welfare of the child requires in a particular case. The

idge is thus faced with having to make a decision without the benefit of any guidelines, save such as may be prescribed by decided cases. One thing is however clear: in making a decision on welfare the Judge should not be influenced by subjective considerations. To take an example: the issue may be whether the child is to be brought up in the faith of Religion A or in that of Religion B. The Judge may be a member of Religion A, and a firm believer in it tenets: nevertheless, he must try to ensure that his personal beliefs do not affect his judicial function in deciding where the child's welfare lies.

Nevertheless although the Judge may not allow his subjective views to affect his decision on what the child's welfare requires, he cannot abdicate responsibility merely because the issue is a sensitive one on which different views are held. What standards then should he apply if he is not to apply his own objective views?

In my judgment, he should start on the basis that the moral standards which are generally accepted in the society in which the Judge lives are more likely than not to promote his or her welfare. As society is now less homogeneous than it was a hundred or even fifty years ago, those standards may differ between different communities, and the Judge may in appropriate cases be invited to receive evidence as to the standards accepted in a particular community, but in default of such evidence and where, as here, the child does not come from a particular ethnic minority, the Judge is entitled, and indeed bound, to apply his or her own experience in determining what are the accepted standards."

There are, of course, objections to the test propounded in that way. If the Judge has to rely on "his or her own experience" to divine "the accepted standards" of society, he or she is, in the final analysis, deciding the matter without the benefit of any evidence to assist in the task. One might well ask what possible evidence could be led to assist? Are the standards to be set by the readers of Daily Telegraph, or the Sun or, having regard to their special interests in the Children of God, the Daily Mail? Is an opinion poll to be conducted? How would one frame a question or even a series of questions which would encapsulate even the main arguments, never mind the nuances of this case? At the end of the day it is a decision for the Court to make. In making it, I will not be governed by subjective considerations of personal preference but I am bound by my judicial oath to "do right to all manner of people after the laws and usages of this realm without fear or favour affection or ill will". There is nothing new about this. Lord Mansfield in R v Wilkes 4 Burr. 2839 defined discretion as follows:-

"Discretion, when applied to a Court of Justice, means sound discretion guided by law. It must be governed by rule, not by humour; it must not be arbitrary, vague and fanciful, but legal and regular."

For that great English jurist, Sir edward Coke, to exercise discretion was:-

"To discerne by the right line of law, and not by the crooked cord of private opinion."

I shall endeavour to follow them.

3.      RELIGIOUS TOLERANCE AND THE LAW

We live in a tolerant society. For centuries it was the Church and not the State which controlled the exercise of religious worship and expression of opinion on religious matters. The State recognised and obeyed the law of the Church as it was enforced in the Ecclesiastical Courts. The link between Church and State remained a close one after the reformation. Although at the time of the Reformation Settlement, the establishment of the Church of England led to the proscription of other denominations, Parliament has in successive centuries passed Acts which have, from time to time removed the disabilities against observance of other religions. For example the Toleration Act of 1689 removed many of the disabilities against Protestant non- conformists. Discriminatory laws against Roman Catholics were swept away in the Roman Catholic Relief Acts of 1791 and the Roman Catholic Emancipation Act of 1829 allowing Roman Catholics to sit in Parliament and to be eligible for public office. Perhaps the last vestige of disability was swept aside with the Lord Chancellor (Tenure Office in the Discharge of Ecclesiastical Functions) Act 1974 which for the avoidance of doubt declared that the office of Lord Chancellor is tenable by an adherent of the Roman Catholic faith. In 1846 the Religious Disabilities Act relieved Jews of their constitutional disabilities.

Blasphemy is some barometer of the changing attitudes to religious observance. No longer is it a blasphemous libel simply to asperse the truth of Christianity. In REGINA -V- RAMSEY AND FOOTE (1883) 15 Cox CC 231, Lord Coleridge, LCJ directed the jury in his summing up thus:

"To asperse the truth of Christianity cannot per se be sufficient to sustain a criminal prosecution for blasphemy. And on the ground that in the sense understood by the judges in former times that Christianity is part of the "law of the land" to suppose so is in my judgment to forget that law grows. The principles of law remain, and it is the great advantage of the common law that its principles do remain; but then they have to be applied to the changing circumstances of the time. This may be called by some retrogression, but I should rather say it is progression - the progress of human opinion ... I now lay it down as law, that, if the decencies of controversy are observed, even the fundamentals of religion may be attacked without the right of being guilty of blasphemy."

In REGINA -V- LEMON (1979) AC 617 Lord Scarman observed:-

"In an increasingly plural society such as that of modern Britain it is necessary not only to respect the differing religious beliefs, feelings and practices of all but also to protect them from scurrility, vilification, ridicule and contempt."

We claim to be a civilised society whose distinguishing hallmark is our long-sufferance of our neighbour's practices, however obnoxious they may strike us to be.

4.      RELIGIOUS FREEDOM

The European Convention on Fundamental Human Rights and Freedoms;

The United Kingdom is a contracting party to the European Convention of Human Rights, Article 9 of which provides that:-

"1.      Everyone has the right to freedom of thought, conscience and religion; this right includes freedom to change his religion or beliefs and freedom, either alone or in community with others and in public or private, to manifest his religion or belief, in worship teaching practice and observance.

2.      Freedom to manifest one's religion or beliefs shall be subject only to such limitations as are prescribed by law and are necessary in a democratic society in the interests of public safety, for the protection of public order, health or morals, or for the protection of the rights and freedoms of others."

Among those other rights of freedoms are those in Article 8 which provides as follows:-

"1.      Everyone has the right to respect for his private and family life, his home and his correspondence.

2.      There shall be no interference by a public authority with the exercise of this right except such as is in accordance with the law and is necessary in a democratic society

the interests of national security, public safety or the economic well being of the country, or for the prevention of disorder or crime, or for the protection of health or morals, or for the protection of the rights and freedoms of others."
Article 14 of the Convention provides:-

"The enjoyment of the rights and freedom set forth in this Convention shall be secured without discrimination on any grounds such as sex, race, colour, language, RELIGION, political or other opinion, national or social origin, association with a national minority, property, birth or other status." (I have added the emphasis)
These articles were considered by the European Court of Human Rights in HOFFMANN -V- AUSTRIA [1994] 17 E.H.R.R. 293, a case concerning the Jehovah's Witnesses. The European Court, by a narrow majority of 5 to 4 held this:-

"In awarding parental rights - claimed by both parties - to the mother in preference to the father, the Innsbruck District Court and Regional Court had to deal with the question whether the applicant was fit to bear responsibility for the children's care and upbringing. In so doing they took account of the practical consequences of the religious convictions of the Jehovah's Witnesses, including their rejection of holidays such as Christmas and Easter which are customarily celebrated by the majority of the Austrian population, their opposition to the administration of blood transfusions, and in general their position as a social minority living by its own distinctive rules. The District Regional Courts took note of the applicant's statement to the effect that she was prepared to allow the children to celebrate holidays with their father, who had remained Roman Catholic, and to allow the administration of blood transfusions to the children if and when required by law; they also considered the psychological relationship existing between the children (who were very young at the time) and the applicant and her general suitability as a carer.

In assessing the interests of the children, the Supreme Court considered the possible effects on their social life of being associated with a particular religious minority and the hazards attaching to the applicant's total rejection of blood transfusions not only for herself but - in the absence of a Court Order- for her children as well; that is, possible negative effects of her membership of the religious community of Jehovah's Witnesses. It weighed them against the possibility that transferring the children to the care of their father might cause them psychological stress, which in its opinion had to be accepted in their own interests.

This Court does not deny that, depending on the circumstances of the case, the factors relied on by the Austrian Supreme Court in support of its decision may in themselves be capable of tipping the scales in favour of one parent rather than the other. However, the Supreme Court also introduced a new element, namely the Federal Act on the Religious Education of Children. This factor was clearly decisive of the Supreme Court.

The European Court therefore accepts that there has been a difference in treatment and that the difference was on the ground of religion; this conclusion is supported by the tone and phrasing of the Supreme Court's consideration regarding the practical consequences of the applicant's religion.

Such a difference in treatment is discriminatory in the absence of an "objective and reasonable justification" that is, if it is not justified by a "legitimate aim" and if there is no "reasonable relationship of proportionality between the means employed and the aim sought to be realised."

The aim pursued by the judgment of the Supreme Court was a legitimate one, namely the protection of the health and rights of the children; it must now be examined whether the second requirement was also satisfied.

In the present context reference may be made to Article 5 of Protocol number 7 ... although it was not prayed in aid in the present proceedings, it provides for the fundamental equality of spouses inter alia as regards parental rights and makes it clear that in cases of this nature the interests of the children are paramount.

Where the Austrian Supreme Court did not rely solely on the Federal Act on the Religious Education of Children it weighed the facts differently from the "Courts" below, whose reasoning was moreover supported by psychological expert opinion. Notwithstanding any possible arguments to the contrary, a distinction based centrally on a difference in religion alone is not acceptable.

The Court therefore cannot find that a reasonable relationship proportionality existed between the means employed and the aim pursued; there has accordingly been a violation of Article 8 taken in conjunction with Article 14."
I am an advocate for the principles expressed in the Convention and I see the force of the judgment of the European Court. The purpose of the Convention is to protect the rights of an individual against intrusion by the State: it is not a convention for the protection of children's rights. There is, of course, a balance to be struck between the parental rights of freedom of religion which is qualified by other rights one of which is the child's right to respect for his family life.

The United Nations Convention on the Rights of the Child:

The rights of the child are agreed in the United Nations Convention on the Rights of the Child adopted by the general assembly of the United Nations on 20th November 1989 and ratified by the United Kingdom on 16th December 1991. It is, however not adopted into the law of the United Kingdom. It may well be that like the European Fundamental Human Rights Convention, it can be prayed in aid to resolve any ambiguity in the construction of our law but no ambiguity arises in the construction of the Children Act 1989 which this later Convention could resolve. Its recent ratification must, however, make it a valuable mine from which I may draw nuggets of public policy. Its preamble calls for consideration of the truism that:

"The child should be fully prepared to live an individual life in society, and brought up in the spirit of the ideals proclaimed in the Charter of the United Nations, and in particular in the spirit of peace, dignity, tolerance, freedom, equality and solidarity."
Among its provisions are the following to which I have added the emphasis to order to stress to the Plaintiff and to NT, and through her ,The Family, the importance the General Assembly of the United Nations attaches to these fundamental rights which ought to be the birthright of every child in a civilized society. The Family should not be able to fault them and can have no justification for not assuring this Court that they will be applied by The Family without qualification.

"Article 3: 1. In all actions concerning children ... the best interest of the child should be of primary consideration.

Article 5: States Parties shall respect the responsibilities rights and duties of parents or, where applicable, the members of the extended family ... to provide ... appropriate direction and guidance.

Article 12: States Parties shall assure to the child who is capable of forming his or her own views the right to express those views freely in all matters affecting the child, the views of

he child being given due weight in accordance with the age and maturity of the child.

Article 13: The child shall have the right to freedom of expression; this right shall include the freedom to seek receive and impart information and ideas of all kind, regardless of frontiers, either orally, in writing or in print ...

Article 14: 1. States Parties shall respect the right of the child to freedom of thought conscience and religion.

2. States Parties shall respect the rights and duties of the parents ... to provide direction to the child in the exercise of his or her right in a manner consistent with the evolving capacities of the child.

3. Freedom to manifest one's religion or beliefs maybe subject only to such limitations as are prescribed by law and are necessary to protect public safety, order, health or morals, or the fundamental rights and freedoms of others.

Article 15: States Parties recognise the right of the child to freedom of association.

Article 16: 1. No Child will be subjected to arbitrary or unlawful interference with his or her privacy, family, home or correspondence, nor to unlawful attacks on his or her honour and reputation.

Article 18: 1. Parents ... have the primary responsibility for the upbringing and development of the child.

Article 19: States Parties shall take all appropriate ... measures to protect the child from all forms of physical or mental violence, injury or abuse, neglect or negligent treatment, maltreatment or exploitation, including sexual abuse, while in the care of parent(s) ... or any other person who has the care of the child.

Article 28: 1. States Parties recognise the right of the child to education, and with a view to achieving this right progressively and on the basis of equal opportunity, they shall in particular:

(c)     Make higher education accessible to all on the basis of capacity by every appropriate means.

Article 29: 1. States Parties agree that the education of the child shall be directed to:

(a)     The development of the child's personality, talents and mental and physical abilities to their fullest potential ...

(d)     The preparation of the child for responsible life in a free society in the spirit of understanding, peace, tolerance equality of sexes, and friendship among all peoples, ethnic, national and religious groups and persons of indigenous origin.

2. No part of the present article or Article 28 shall be construed so as to interfere with the liberty of individuals and bodies to establish and direct educational institutions, subject always to the observance of the principle set forth in paragraph 1 of the present article and to the requirement that the education given in such institutions shall conform to such minimum standards as may be laid down by the State.

Article 30: In those states in which ... religious .. minorities .. exist, a child belonging to such a minority ... shall not be denied the right, in community with other members of his or her group, to enjoy his or her own culture, to profess and practice his or her own religion, or to use his or her own language.

Article 34: States Parties undertake to protect children from all forms of sexual exploitation and sexual abuse ... in particular ... (a) the inducement or coercion of a child to engage in any unlawful sexual activity ... the exploitative use of children in pornographic performances and material.

Article 37: 1. States Parties shall ensure that (a) no child shall be subjected to torture or other cruel, inhuman or degrading treatment or punishment ... (b) no child shall be deprived of his or her liberty unlawfully or arbitrarily ...

On the evidence presented to me, and as set out above, there has been a significant number of breaches of the provisions of this Convention applied to children in The Family. I am not satisfied that children are fully prepared by The Family to live an individual life in society nor are they brought up in the spirit of tolerance as set out in the preamble, I am not satisfied children enjoy the right to express their views freely in all matters affecting them. They do not enjoy the freedom to seek and receive ideas of all kinds. They do not have the right to freedom of thought or the freedom of association. Forsaking all is an interference with their Family. In many respects, therefore, The Family fall short of the standards set by this Convention.

5.     CORPORAL PUNISHMENT AND OTHER FORMS OF DISCIPLINE

Section 1 of the Children and Young Persons Act 1933 provides:-

"(1) If any person who has obtained the age of 16 years and has responsibility for any child or young person under that age, wilfully assaults, ill-treats, ... or causes or procures him to be assaulted, ill-treated ... in a manner likely to cause him unnecessary suffering or injury to health ... that person should be guilty of an offence, and shall be liable - on conviction on indictment ... to imprisonment for any term not exceeding 10 years.

(7)     Nothing in this section shall be construed as affecting the right of any parent, teacher or other person having the lawful control or charge of a child or young person to administer punishment to him."

It is, therefore, a good defence that the alleged battery was merely the correcting of the child by its parents, provided that the correction be moderate in the manner, the instrument and the quantity of it.

It is not unlawful for a childminder who is registered with the local authority pursuant to Part X of the Children Act 1989, to smack a minded child with the consent of the natural parent: SUTTON L.B.C V DAVIS [1994] Fam. 241. Following that decision, the Department of Health reviewed the guidance it issued to the local authorities to include the following:

"5.     The Department recognises that there are differing views on use of smacking. Many parents when teaching their child right from wrong consider it an effective sanction. Punishment for the latter and praise for the former are part of a good family setting. It is for parents to decide whether to give a gentle smack as a quick and effective way of dealing with behaviour that has not responded to other powers of persuasion.

6.     Childminders, whose relationship with the child is more detached than that of a parent, should not NORMALLY smack a child as a means of dealing with its behaviour. The use of smacking should be rare and then only as a last resort with the consent of the parents. Childminders will have special skills for looking after young children and can be encouraged to develop other strategies for helping children to understand the difference between acceptable and unacceptable behaviour.

7.     When a childminder is prepared to use smacking as a sanction of last resort, this should be made clear to the parents at the outset. For the avoidance of doubt it is desirable for the parent's consent to be part of the written contract between the two parties about the childminding

rangements."

The position is quite different with private fostering arrangements. Under Section 66(1) of the Children Act 1989:

"A privately fostered child means a child who is under the age of 16 and who is cared for, and provided with accommodation by, someone other than a parent of his."

Section 66(2) provides that a child is not privately fostered if the person caring for and accommodating him does not intend to do so for any longer period than 28 days. It may well be that there are children within Family homes whose parents are away and who are, therefore, being privately fostered. Section 67 of the Act then imposes a duty on the local authority to satisfy themselves that the welfare of such children are being satisfactorily safeguarded. The Foster Placement (Children) Regulations 1991 require that the local authority do not place a child with a foster parent unless the foster parent enters into a written agreement with them covering the matters specified in Schedule II to the Regulations, paragraph 6 of which requires the foster parent to undertake "not to administer corporal punishment to any child placed with him."

It may be that some of The Family homes are "voluntary homes" within the meaning of Section 60 of the Children Act. Section 63 provides that no child shall be cared for and provided with accommodation in a Childrens home unless it is registered under Part VIII of the Act. A children's home means a home which provides or usually provides or is intended to provide care and accommodation wholly or mainly for more than 3 children at any one time but a child is not cared for and accommodated in a children's home when he is cared for nd accommodated by a parent of his. It may be, therefore, that Family homes are caught by the provisions of the Children's Homes Regulations 1991, Regulation 8 of those regulations provides that the following measures shall not be used in a children's home:

(a) any form of corporal punishment;

(b) any deprivation of food or drink

(c) any restrictions on visits to or by any child or any restriction on or delay in communication by telephone or post with his parent, his relatives or friends (which would include grandmother)."

The relationship of teacher and pupil formerly carried with it the right of reasonable chastisement. This right has, however, been severely curtailed by Section 47 of the Education (No.2) Act 1986 which provides that the giving of corporal punishment cannot be justified on the ground that it was done in pursuance of a right exercisable by the member of staff by virtue of his position as such. Corporal punishment has therefore been abolished in all except private fee-paying schools. Even there the enlightened policy of the Act is invariably adopted.

It will be seen from this review of these various provisions that there has been a steady and insistent curbing of the right of the parent and of those in loco parentis to reasonable chastisement of a child.

The European Convention protecting Fundamental Human Rights provides by Article 3 that:

"No one shall be subjected to torture or to inhuman or degrading treatment or punishment."

In the case of TYRER V UNITED KINGDOM [1979] 2 E.H.R.R.1, the European Court considered a sentence by a Juvenile Court on the Isle of Man to three strokes of the birch imposed for an assault occasioning actual bodily harm. The punishment was still available under Manx law but it had ceased to be a permissible sentence in England, Wales and Scotland in 1968. The Court held:

"The very nature of judicial corporal punishment is that it involves one human being inflicting physical violence on another human being. Furthermore, it is institutionalised violence, that is in the present case violence permitted by the law, ordered by the judicial authorities of the State and carried out by the police authority of the State. Thus, although the applicant did not suffer any severe or long lasting physical effects, his punishment - whereby he was treated as an object in the power of the authorities - constituted an assault on precisely that which is one of the main purposes of Article 3 to protect, namely a person's dignity and physical integrity. Neither can it be excluded that the punishment may have had adverse psychological effects."

The punishments meted out in Macau and the horsewhipping at Tewkesbury fall within that description if for the organs of State one understands the analogous teamworks within The Family.

In COSTELLO - ROBERTS V UNITED KINGDOM [1994] 2 FCR 65, a boy at a private school accumulated 5 demerit marks and, having already received 3 warnings from the Headmaster, he was given 3 spanks on his bottom through his shorts with a rubber soled gym shoe. The European Court considered that the punishment was not degrading in breach of Article 3 because the humiliation or debasement involved did not attain the particular level of severity and exceed the usual element of humiliation inherent in any such punishment. It would follow from that case that the fundamental human rights of the children in this Country had probably not been invaded except in the case of S4 and MS. This observation does not in any sense detract from the criticism I have already levelled at The Family for the excessive beatings they have administered to many other children in this Country. I am in no doubt at all that most of those beatings were unlawful.

6.          ON THE LAW GENERALLY

I have attempted by this excursus of the law to plant the signposts of public policy and to follow them, to identify the rights of the mother in order to balance them against the rights of the child and to look at this case through both ends of the telescope - at one end a private dispute between a grandmother and her daughter, but through the other end, a dispute which raises important matters affecting fundamental freedoms. I bear all of those matters in mind. The fact that there may be nearly 200 other children in the British Isles is not a material factor in this private dispute between a grandmother and her daughter over the grandchild but it is idle to pretend that others will not be affected by this judgment. That serves only to confirm that this is a serious matter which demands my earnest deliberation, and, I hope, justifies the length and detail of the enquiry. My duty is to give paramount consideration to S's welfare having regard to all the circumstances of this case and in particular to the check-list factors set out in Section 1(3) of the Children Act 1989. First, a summary.

**SUMMARY AND CONCLUSIONS**

1.          AN ASSESSMENT OF THE FAMILY

To the members of The Family, David Berg was an End-Time Prophet who was revered by his flock as a man of God. He was treated as an icon. Consequently, in the eyes of the members he could do no wrong. Since obedience was a clarion call and since murmuring was a cardinal crime, members faithful to him were unable to articulate criticism of him. There is little emanating from Maria or World Services strongly to suggest that they were prepared openly to disagree with him. Now he is dead. I have no evidence giving me any clear